# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| **In re:**<br><br>**The Cliffs Club & Hospitality Group, Inc.,** *et al.,*[1] *d/b/a* **The Cliffs Golf & Country Club,**<br><br><div align=center>**Debtors.**</div> | **CHAPTER 11**<br><br>**Case No. 12-01220**<br><br>**Jointly Administered** |

### FIRST AMENDED AND RESTATED DISCLOSURE STATEMENT TO ACCOMPANY FIRST AMENDED AND RESTATED JOINT CHAPTER 11 PLAN FILED BY THE DEBTORS AND THE PLAN SPONSOR

### JUNE 30, 2012

### (WITH SUCH AMENDMENTS STATED ON THE RECORD AT THE HEARING HELD ON JULY 2, 2012)

**MCKENNA LONG & ALDRIDGE LLP**
Gary W. Marsh
J. Michael Levengood
Bryan E. Bates
303 Peachtree Street, Suite 5300
Atlanta, Georgia 30308
Telephone: (404) 527-4000
Facsimile: (404) 527-4198

**LAW OFFICE OF DÄNA WILKINSON**
Däna Wilkinson
365-C East Blackstock Road
Spartanburg, SC 29301
Telephone: (864) 574-7944
Facsimile: (864) 574-7531
danawilkinson@danawilkinsonlaw.com

<div align=center>Counsel for the Debtors and Debtors in Possession</div>

THIS IS NOT A SOLICITATION OF ACCEPTANCE OF THE PLAN. ACCEPTANCES MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.

---

[1]     The Debtors, followed by the last four digits of their respective taxpayer identification numbers and Chapter 11 case numbers, are as follows: The Cliffs Club & Hospitality Group, Inc. (6338) (12-01220); CCHG Holdings, Inc. (1356) (12-01223); The Cliffs at Mountain Park Golf & Country Club, LLC (2842) (12-01225); The Cliffs at Keowee Vineyards Golf & Country Club, LLC (5319) (12-01226); The Cliffs at Walnut Cove Golf & Country Club, LLC (9879) (12-01227); The Cliffs at Keowee Falls Golf & Country Club, LLC (3230) (12-01229); The Cliffs at Keowee Springs Golf & Country Club, LLC (2898) (12-01230); The Cliffs at High Carolina Golf & Country Club, LLC (7576) (12-01231); The Cliffs at Glassy Golf & Country Club, LLC (6559) (12-01234); The Cliffs Valley Golf & Country Club, LLC (6486) (12-01236); and Cliffs Club & Hospitality Service Company, LLC (9665) (12-01237).

DISCLAIMER

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE FIRST AMENDED AND RESTATED JOINT CHAPTER 11 PLAN DATED JUNE 30, 2012, FILED BY THE CLIFFS CLUB & HOSPITALITY GROUP, INC.; CCHG HOLDINGS, INC.; THE CLIFFS AT GLASSY GOLF & COUNTRY CLUB, LLC; THE CLIFFS VALLEY GOLF & COUNTRY CLUB, LLC; THE CLIFFS AT MOUNTAIN PARK GOLF & COUNTRY CLUB, LLC; THE CLIFFS AT KEOWEE SPRINGS GOLF & COUNTRY CLUB, LLC; THE CLIFFS AT KEOWEE FALLS GOLF & COUNTRY CLUB, LLC; THE CLIFFS AT KEOWEE VINEYARDS GOLF & COUNTRY CLUB, LLC; THE CLIFFS AT WALNUT COVE GOLF & COUNTRY CLUB, LLC; THE CLIFFS AT HIGH CAROLINA GOLF & COUNTRY CLUB, LLC; AND CLIFFS CLUB & HOSPITALITY SERVICE COMPANY, LLC, DEBTORS AND DEBTORS IN POSSESSION (AS MAY BE AMENDED IN ACCORDANCE WITH THE TERMS THEREOF AND APPLICABLE LAW, THE "PLAN"). THE INFORMATION CONTAINED HEREIN MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE EXHIBITS ANNEXED TO THE PLAN AND ANY PLAN SUPPLEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED BY NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF ANY OF THE DEBTORS AND DEBTORS IN POSSESSION OR TRANSFERRING SECURITIES OR CLAIMS OF ANY OF THE DEBTORS AND DEBTORS IN POSSESSION IN THESE CASES SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN ANY OF THE DEBTORS AND DEBTORS IN POSSESSION IN THESE CHAPTER 11 CASES.

**IN THE EVENT THAT THE PLAN IS NOT CONFIRMED, THEN IT IS HIGHLY LIKELY THAT THE DEBTORS WOULD HAVE TO CLOSE THE CLUBS. THE DEBTORS WOULD LIKELY CONVERT THE CHAPTER 11 CASES TO CASES UNDER CHAPTER 7 OF THE BANKRUPTCY CODE (THE LIQUIDATION CHAPTER), AND A CHAPTER 7 TRUSTEE WOULD BE APPOINTED BY THE BANKRUPTCY COURT TO LIQUIDATE THE CLUBS AND ALL OF THEIR ASSETS.  AS SET FORTH IN THE LIQUIDATION ANALYSIS ATTACHED HERETO AS EXHIBIT D, THE DEBTORS BELIEVE THAT A LIQUIDATION OF THE CLUBS WOULD RESULT IN MUCH LESS FAVORABLE TREATMENT OF CLAIM HOLDERS THAN THE TREATMENT PROPOSED UNDER THE PLAN. SPECIFICALLY, EVEN ASSUMING THE HIGHEST ESTIMATED RECOVERY FROM THE SALE OF THE CLUBS' ASSETS IN A LIQUIDATION SCENARIO, THE DEBTORS BELIEVE THAT ONLY THE DIP LENDER WOULD RECEIVE ANY DISTRIBUTION AFTER PAYMENT OF ADMINISTRATIVE EXPENSES AND PRIORITY CLAIMS, MEANING THAT HOLDERS OF ALL OTHER CLAIMS (INCLUDING NOTE HOLDER CLAIMS AND MEMBER CLAIMS) WOULD RECEIVE $0.00.  UNDER THE DIP ORDER, THE DIP LENDER HAS ALREADY BEEN GRANTED RELIEF FROM STAY TO FORECLOSE ON THE CLUBS UPON AN EVENT OF DEFAULT, WHICH WOULD LIKELY OCCUR IF THE PLAN IS NOT CONFIRMED.  AGAIN, THIS WOULD MEAN THAT HOLDERS OF ALL OTHER CLAIMS (INCLUDING NOTE HOLDER CLAIMS AND MEMBER CLAIMS) WOULD RECEIVE $0.00.  ACCORDINGLY, THE DEBTORS BELIEVE THAT THE PROPOSED TREATMENT OF CLAIM HOLDERS UNDER THE PLAN IS MATERIALLY BETTER THAN THE TREATMENT CLAIM HOLDERS WOULD RECEIVE IF THE PLAN IS NOT CONFIRMED**.

[*Remainder of Page Intentionally Left Blank*]

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ................................................................................. 1

    A.    PURPOSE OF THIS DOCUMENT ........................................... 1

    B.    SUMMARY OF THE DISCLOSURE STATEMENT ............................. 2

    C.    VOTING AND CONFIRMATION PROCEDURES ............................ 10

    D.    CONFIRMATION HEARING ................................................. 13

    E.    RECOMMENDATION .......................................................... 14

II.   OVERVIEW OF THE PLAN ............................................................ 14

III.  OVERVIEW OF CHAPTER 11 ...................................................... 21

IV.   FORMATION, BUSINESS, DEBT STRUCTURE, AND OTHER PRE-
    PETITION OBLIGATIONS OF THE DEBTOR ................................ 21

    A.    FORMATION AND HISTORY OF THE DEBTORS ........................ 21

    B.    THE BUSINESS ................................................................... 23

           THE CLUB AT GLASSY ........................................... 24

           THE CLUB AT CLIFFS VALLEY ............................. 24

           THE CLUB AT KEOWEE VINEYARDS .................................. 25

           THE CLUB AT WALNUT COVE............................... 25

           THE CLUB AT KEOWEE FALLS ............................. 25

           THE CLUB AT KEOWEE SPRINGS ........................ 26

           THE CLUB AT MOUNTAIN PARK ......................... 26

           THE CLUB AT HIGH CAROLINA ........................... 26

           CORPORATE STRUCTURE ...................................... 27

    C.    DEBTORS' PRE-PETITION CAPITAL STRUCTURE ........................ 28

    D.    DEBTORS' MANAGEMENT TEAM...................................... 31

V.    EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER
    11 CASES ............................................................................................ 32

    A.    THE ECONOMIC DOWNTURN ........................................... 32

    B.    RESTRUCTURING INITIATIVES AND OUTLOOK FOR THE
        FUTURE ............................................................................... 33

VI.   THE CHAPTER 11 CASES ............................................................. 33

    A.    SIGNIFICANT "FIRST DAY" MOTIONS ............................. 33

    B.    OFFICIAL COMMITTEE OF UNSECURED CREDITORS ............... 35

ATLANTA:5397829.2

# TABLE OF CONTENTS
(continued)

**Page**

C.     EXECUTORY CONTRACTS AND LEASES ....................................... 35

D.     CLAIMS PROCESS ................................................................. 36

E.     BIDDING PROCEDURES, DEBTORS' MARKETING EFFORTS AND THE AUCTION OF PLAN SPONSOR RIGHTS ....... 36

F.     THE OFFICE LEASE, COMPUTER AND IT LEASE PURCHASE AND WELLNESS CENTER LEASE AGREEMENTS................................................................ 37

VII.    SUMMARY OF THE PLAN ............................................................. 38

A.     INTRODUCTION ................................................................. 38

B.     OVERALL STRUCTURE OF THE PLAN ........................................... 38

C.     SUBSTANTIVE CONSOLIDATION..................................... 42

D.     RECHARACTERIZATION OF DEBT TO EQUITY ............................ 43

E.     CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ........................................................... 45

F.     PROVISIONS REGARDING UNCLASSIFIED PRIORITY CLAIMS ................................................................. 56

VIII.   MEANS FOR IMPLEMENTATION OF THE PLAN AND EFFECTS OF CONFIRMATION........................................................... 56

A.     POST-CONSUMMATION CORPORATE STRUCTURE, MANAGEMENT AND OPERATION .................................... 56

B.     CONFIRMATION AND/OR CONSUMMATION ............................... 57

C.     RELEASES, INJUNCTIONS, EXCULPATION AND INDEMNIFICATION.................................................. 59

D.     PRESERVATION OF RIGHTS OF ACTION........................................ 63

E.     RETENTION OF JURISDICTION .......................................... 64

F.     AMENDMENT, ALTERATION AND REVOCATION OF PLAN ...... 67

G.     PLAN IMPLEMENTATION DOCUMENTS ....................................... 67

H.     MEMBERSHIP INFORMATION.......................................... 69

IX.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES........................................................... 71

A.     REJECTION OF CONTRACTS AND LEASES ................................... 71

B.     CURE OF DEFAULTS, REJECTION DAMAGES, AND AMENDMENT OF SCHEDULE........................................... 72

ATLANTA:5397829.2

**TABLE OF CONTENTS**
(continued)

Page

C.      SURVIVAL OF CERTAIN CORPORATE INDEMNITIES ................. 72

D.      CLUB MEMBERSHIP AGREEMENTS ................................................. 73

E.      EASEMENTS ......................................................................................... 73

X.      CERTAIN RISK FACTORS TO BE CONSIDERED ....................................... 73

A.      GENERAL CONSIDERATIONS ........................................................... 73

B.      CERTAIN BANKRUPTCY CONSIDERATIONS ................................ 74

C.      CLAIMS ESTIMATIONS ...................................................................... 74

D.      CONDITIONS PRECEDENT TO CONSUMMATION ........................ 75

E.      CERTAIN TAX CONSIDERATIONS .................................................... 75

F.      SUBSEQUENT DEFAULT .................................................................... 75

XI.     APPLICABILITY OF FEDERAL AND OTHER SECURITIES LAWS ........... 75

XII.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE
        PLAN ................................................................................................................. 75

A.      TAX CONSEQUENCES TO THE DEBTORS ...................................... 77

B.      TAX CONSEQUENCES TO U.S. HOLDERS OF CERTAIN
        CLAIMS .................................................................................................. 84

C.      TAX CONSEQUENCES FOR NOTE HOLDERS OF
        INDENTURE TRUSTEE SPE ................................................................ 89

D.      INFORMATION REPORTING AND BACKUP WITHHOLDING ..... 90

E.      PROFESSIONAL TAX ASSISTANCE.................................................. 91

F.      RESERVATION OF RIGHTS ................................................................ 91

G.      TAX TREATMENT OF THE LIQUIDATION TRUST AND
        BENEFICIAL INTEREST HOLDERS ................................................... 92

XIII.   FEASIBILITY OF THE PLAN AND BEST INTERESTS OF
        CREDITORS ..................................................................................................... 95

A.      FEASIBILITY OF THE PLAN ............................................................... 95

B.      ACCEPTANCE OF THE PLAN ............................................................ 95

C.      BEST INTERESTS TEST ...................................................................... 95

D.      LIQUIDATION ANALYSIS................................................................... 96

E.      APPLICATION OF THE "BEST INTERESTS" OF CREDITORS
        TEST TO THE LIQUIDATION ANALYSIS AND THE
        VALUATION ......................................................................................... 97

ATLANTA:5397829.2

# TABLE OF CONTENTS
(continued)

**Page**

F.    CONFIRMATION WITHOUT ACCEPTANCE OF ALL
IMPAIRED CLASSES: THE "CRAMDOWN" ALTERNATIVE......... 98

XIV.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF
THE PLAN ..................................................................................................... 98

A.   ALTERNATIVE PLAN(S) OF LIQUIDATION .................................... 99

B.   LIQUIDATION UNDER CHAPTER 7 .................................................. 99

XV.   THE SOLICITATION; VOTING PROCEDURES ........................................... 99

A.   PARTIES IN INTEREST ENTITLED TO VOTE ................................... 99

B.   CLASSES ENTITLED TO VOTE TO ACCEPT OR REJECT
THE PLAN ........................................................................................... 100

C.   SOLICITATION ORDER .................................................................... 100

D.   WAIVERS OF DEFECTS, IRREGULARITIES, ETC......................... 100

E.   WITHDRAWAL OF BALLOTS; REVOCATION ............................... 101

F.   VOTING RIGHTS OF DISPUTED CLAIMANTS .............................. 101

G.   FURTHER INFORMATION; ADDITIONAL COPIES ...................... 102

XVI.   RECOMMENDATION .................................................................................. 103

ATLANTA:5397829.2

# I.
# INTRODUCTION

## A.    PURPOSE OF THIS DOCUMENT

The Cliffs Club & Hospitality Group, Inc. and its affiliated debtors (the "Debtors") hereby submit this Disclosure Statement for the First Amended and Restated Joint Chapter 11 Plan filed by the Debtors and the Plan Sponsor dated June 30, 2012 (the "Disclosure Statement") pursuant to section 1125(b) of Title 11, United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), and Rule 3017 of the Federal Rules of Bankruptcy Procedure, in connection with the Joint Chapter 11 Plan dated June 30, 2012 (the "Plan").

The Debtors are:

The Cliffs Club & Hospitality Group, Inc.
CCHG Holdings, Inc.
The Cliffs at Glassy Golf & Country Club, LLC
The Cliffs Valley Golf & Country Club, LLC
The Cliffs at Mountain Park Golf & Country Club, LLC
The Cliffs at Keowee Springs Golf & Country Club, LLC
The Cliffs at Keowee Falls Golf & Country Club, LLC
The Cliffs at Keowee Vineyards Golf & Country Club, LLC
The Cliffs at Walnut Cove Golf & Country Club, LLC
The Cliffs at High Carolina Golf & Country Club, LLC
Cliffs Club & Hospitality Service Company, LLC

By order dated July ____, 2012 (the "Disclosure Statement Approval Order"), the United States Bankruptcy Court for the District of South Carolina, Spartanburg Division (the "Bankruptcy Court") has found that the Disclosure Statement provides adequate information to enable holders of Claims and Interests that are impaired under the Plan to make an informed judgment in exercising their right to vote for acceptance or rejection of the Plan.  A copy of the Plan is attached hereto as **Exhibit A**.  All capitalized terms used but not defined in the Disclosure Statement will have the respective meanings ascribed to such terms in the Plan, unless otherwise noted.

The Plan is premised on the modification of the Notes and security documents relating thereto followed by the transfer to the Plan Sponsor of all of the Debtors' Real Property Collateral and of substantially all of the Debtors' remaining assets, including the Personal Property Collateral, subject to the Permitted Liens and free and clear of all other liens, Claims and encumbrances, followed by the contribution of the assets by the Plan Sponsor to the Indenture Trustee SPE, subject to the Permitted Liens, in return for a 100% member interest in the Indenture Trustee SPE (the Indenture Trustee will hold a 0% non-economic membership interest in the Indenture Trustee SPE), which will then assume the payment obligations under the modified Notes, in satisfaction of the Note Holder Claims against the Debtors and the Plan Sponsor, with the Sale Consideration including the payment on the Effective Date of Allowed

ATLANTA:5397829.2

Administrative Claims, DIP Facility Claims, Priority Claims, the Allowed Claim of the Bridge Lender, Allowed Mechanic's Lien Claims, Allowed Other Senior Secured Party Claims, and Allowed Administrative Convenience Claims, a the first payment of three to establish a fund for distribution to Holders of Allowed General Unsecured Claims, a fund for distribution to Holders of Allowed Rejecting Club Member Claims and the Post Effective Date Administration Plan Sponsor Funding in the manner outlined in the Plan. To ensure the sale of the Assets at the highest and best price, the Debtors' obtained approval of Bidding Procedures and conducted an auction at which all qualified bidders were given the opportunity to bid for the right to be the Plan Sponsor for the Plan and to purchase the Assets in accordance with an Asset Purchase Agreement and the Plan.

The Debtors received offers from several potential Plan Sponsors before the Petition Date, and selected the Carlile Group to be the "stalking horse" bidder subject to a higher or better bid in these Chapter 11 Cases. The Debtors sought approval of Bidding Procedures in a first day motion that was granted on March 16, 2012 when the Bankruptcy Court entered an Order approving the Bidding Procedures. On April 6, 2012, the Debtors received an Amended Term Sheet from Cliffs Club Partners as successor to Carlile Group. On April 13, 2012, the Debtors received a bid from NatureFirst Real Estate Holdings, LLC ("NatureFirst"); however, on April 16, 2012, NatureFirst advised the Debtors that it was either not willing or not able to deliver the required $1 million deposit, and withdrew from the bidding process. On April 13, 2012, the Debtors also received a bid from The Seaport Group ("Seaport"), along with the required $1 million deposit. The Debtors concluded that Seaport was a Qualified Bidder within the meaning of the Bidding Procedures; however, on April 20, 2012, Seaport advised the Debtors that it no longer desired to participate in the bidding process, and requested the return of its $1 million deposit, which the Debtors have returned.

## B.    SUMMARY OF THE DISCLOSURE STATEMENT

On February 28, 2012 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court. On the date hereof, the Debtors filed their proposed Joint Chapter 11 Plan, which sets forth the manner in which Claims against and equity interests in the Debtors will be treated.

This Disclosure Statement is being submitted pursuant to section 1125 of the Bankruptcy Code for use by those entitled to vote on whether to accept or reject the Plan in connection with (a) the solicitation by the Debtors of acceptances of the Plan and (b) the hearing by the Bankruptcy Court to consider confirmation of the Plan. That hearing (the "Confirmation Hearing") presently is scheduled for August 6, 2012 at _____ __.m., prevailing Eastern Time.

The Plan sets forth the manner in which Claims against the Debtors, and equity interests in the Debtors, are proposed to be treated in connection with these Chapter 11 Cases. This Disclosure Statement describes certain aspects of the Plan, and also

ATLANTA:5397829.2

provides a general description of the Debtors' businesses as well as information regarding various other matters relevant to the purpose for which this Disclosure Statement has been prepared. This Disclosure Statement is intended to provide sufficient information to enable those who are entitled to vote on the acceptance or rejection of the Plan, as explained below, to make an informed decision in connection with that vote.

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operating and financial history, their reasons for seeking protection and liquidation under Chapter 11 and significant events that have occurred during the Chapter 11 Cases. This Disclosure Statement also describes certain terms and provisions of the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the Plan and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that Holders of Claims entitled to vote on the Plan must follow for their votes to be counted. Among other things, this Disclosure Statement describes:

- an overview of how the Plan treats creditors of the Debtors, and holders of equity interests in the Debtors (Article II);
- how Chapter 11 works (Article III);
- the Debtors' formation, business, debt structure, and other prepetition obligations (Article IV);
- the events leading up to the commencement of the Chapter 11 Cases (Article V);
- significant events in the Chapter 11 Cases (Article VI);
- summary of the Plan (Article VII);
- the means for implementation of the Plan and effects of confirmation (Article VIII);
- treatment of executory contracts and unexpired leases (Article IX);
- certain risk factors to be considered before voting (Article X);
- applicability of federal and other securities laws (Article XI);
- certain federal income tax consequences of the Plan (Article XII);
- feasibility of the Plan and best interests of creditors (Article XIII);
- alternatives to confirmation and consummation of the Plan (Article XIV);
- solicitation and voting procedures (Article XV); and
- recommendation (Article XVI).

This Disclosure Statement has been carefully prepared in order to, among other things, describe the material aspects of the Plan, but it is not intended to override the Plan or any aspect of it. Accordingly, in the event there are any inconsistencies or ambiguities between the Plan itself and the descriptions of the Plan contained in this Disclosure Statement, the terms of the Plan will govern. The Plan and this Disclosure Statement, along with the other exhibits attached to this Disclosure Statement, and the exhibits attached to the Plan or to the Plan Supplement, are the only materials that those who are entitled to vote on acceptance or rejection of the Plan should use in determining how to vote.

ATLANTA:5397829.2

After careful consideration of the Debtors' business and assets, and their prospects for reorganization, as well as the alternatives to reorganization, the Debtors have determined that utilizing the treatment established under the Plan will maximize the recoveries to creditors.  The Debtors further have determined it is not possible to afford any recovery at all to the holders of interests in the Debtors, whether under the sale proposed in the Plan or in any other liquidation alternative.

The following additional materials are or will be attached as exhibits to this Disclosure Statement:

as "**Exhibit A**", a copy of the Plan, including the exhibits thereto (excluding any exhibit included as an exhibit to the Plan Supplement);

as "**Exhibit B**", the Debtors' Pre-Petition Income Statements;

as "**Exhibit C**", a copy of the Debtors' Post-Petition Income Statements;

as "**Exhibit D**", a copy of the Debtors' Liquidation Analysis;

as "**Exhibit E**", a copy of the Plan Sponsor's Projections;

as "**Exhibit F**", a copy of a schematic of the transaction contemplated by the Plan;

as "**Exhibit G**", a copy of the order of the Bankruptcy Court (excluding the exhibits thereto), dated July __, 2012 (the "Disclosure Statement Order"), that, among other things, approves this Disclosure Statement, establishes procedures for the solicitation and tabulation of votes to accept or reject the Plan, and schedules the hearing on confirmation of the Plan;

as "**Exhibit H**", a copy of an executive summary of the New ClubCo Membership Plan;

a Notice to Voting Classes;

a Ballot to be executed by holders of Class 1, 3, 4, 5, 6 and 7 Claims to accept or reject the Plan; and

other documents approved by the Bankruptcy Court to be included in the solicitation materials with respect to the Plan.

In the case of any exhibits not yet attached hereto, such exhibits will be filed with the Bankruptcy Court sufficiently in advance of the hearing to consider approval of this Disclosure Statement.

In addition to the exhibits attached to this Disclosure Statement and the exhibits attached to the Plan, the Debtors anticipate there will be certain additional materials that are necessary or appropriate to the implementation and/or confirmation of the

ATLANTA:5397829.2

Plan. Those additional materials are summarized in this Disclosure Statement, to the extent now known or reasonably determinable; and copies of those materials (in final or substantially final form), or summaries thereof, will be contained in one or more Plan Supplements, which will be filed by the Debtors with the Clerk of the Bankruptcy Court no later than (A) five (5) calendar days prior to the Confirmation Hearing or (B) such later date as may be approved by the Bankruptcy Court on notice to parties in interest. Information on obtaining access to the Plan Supplement, on-line or in hard copy, is contained in Article XV(G) of this Disclosure Statement.

By order entered on or about July __, 2012, after notice and a hearing, the Bankruptcy Court has approved the Disclosure Statement as containing "adequate information" (as that term is defined in section 1125 of the Bankruptcy Code). Section 1125(a)(1) of the Bankruptcy Code defines "adequate information" as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and the history of the debtors and the condition of the debtors' books and records, including a discussion of the potential material federal tax consequences of the plan to the Debtors, any successor to the Debtors, and a hypothetical investor typical of the holders of claims or interests in the cases, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court will consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information...." 11 U.S.C. §1125(a)(1). **APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.** No solicitation of votes may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. In voting on the Plan, Holders of Claims entitled to vote should not rely on any information relating to the Debtors and their businesses, other than that contained in this Disclosure Statement, the Plan, any Plan Supplement and all exhibits and appendices hereto and thereto.

Pursuant to the provisions of the Bankruptcy Code, only classes of Claims or Interests that are (a) "impaired" by a plan and (b) entitled to receive a distribution under such plan are entitled to vote on such plan. In the Debtors' cases, only Claims in Classes 1, 3, 4, 5, 6 and 7 are both Impaired and entitled to receive a distribution under the Plan; accordingly, only the Holders of Claims in those Classes are entitled to vote to accept or reject the Plan. Claims in Class 2 are Unimpaired by the Plan; accordingly, the Holders of Class 2 Claims are conclusively presumed to have accepted the Plan. Holders of Interests in Class 8, which receive nothing under the Plan, are deemed to have rejected the Plan and the Holders of Interests in Class 8 are not entitled to vote.

FOR A DESCRIPTION OF THE PLAN AND VARIOUS RISKS AND OTHER FACTORS PERTAINING TO THE PLAN, PLEASE SEE ARTICLE VII OF THIS DISCLOSURE STATEMENT, ENTITLED "SUMMARY OF THE PLAN"

ATLANTA:5397829.2

AND ARTICLE X OF THIS DISCLOSURE STATEMENT, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED."

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATING TO THE PLAN, CERTAIN EVENTS THAT HAVE OCCURRED IN THE CHAPTER 11 CASES AND CERTAIN FINANCIAL INFORMATION.  ALTHOUGH THE DEBTORS BELIEVE THAT THE SUMMARIES OF THE PLAN AND RELATED DOCUMENTS SUMMARIES ARE FAIR AND ACCURATE AS OF THE DATE HEREOF, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS AND TO THE EXTENT THEY MAY CHANGE AS PERMITTED BY THE PLAN AND APPLICABLE LAW.  THE DEBTORS' MANAGEMENT HAS PROVIDED FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTORS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

NOTHING CONTAINED HEREIN WILL BE DEEMED TO CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY OR BE DEEMED CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS OR INTERESTS.  YOU SHOULD CONSULT YOUR PERSONAL COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES OR OTHER LEGAL CONSEQUENCES OF THE PLAN.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL, FUTURE RESULTS. EXCEPT AS OTHERWISE SPECIFICALLY AND EXPRESSLY STATED HEREIN, THIS DISCLOSURE STATEMENT DOES NOT REFLECT ANY EVENTS THAT MAY OCCUR SUBSEQUENT TO THE DATE HEREOF AND THAT MAY HAVE A MATERIAL IMPACT ON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS DO NOT ANTICIPATE THAT ANY AMENDMENTS OR SUPPLEMENTS TO THIS DISCLOSURE STATEMENT WILL BE DISTRIBUTED TO REFLECT SUCH OCCURRENCES. ACCORDINGLY, THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT UNDER ANY CIRCUMSTANCE IMPLY THAT THE INFORMATION HEREIN IS CORRECT OR COMPLETE AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF.

THE DEBTORS BELIEVE THAT THE PLAN WILL ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS

ATLANTA:5397829.2

IN THE BEST INTERESTS OF THE DEBTORS, THEIR CREDITORS AND THEIR ESTATES. THE DEBTORS URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT THE PLAN.

## ANSWERS TO CERTAIN QUESTIONS
## ABOUT THE PLAN AND DISCLOSURE STATEMENT

The information presented in the answers to the questions set forth below is qualified in its entirety by reference to the full text of this Disclosure Statement, including the Plan. All creditors entitled to vote on the Plan are encouraged to read and carefully consider this entire Disclosure Statement, including the Plan and all exhibits thereto or in the Plan Supplement, prior to submitting a Ballot to accept or reject the Plan.

### *What is this document and why am I receiving it?*

On February 28, 2012, each of the Debtors filed a voluntary petition for reorganization under chapter 11 of the Bankruptcy Code. The Debtors continue in possession of their properties and are managing their businesses as debtors-in-possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. In connection with the proposed sale of the Debtors' assets in accordance with chapter 11, the Debtors have prepared the Plan, which sets forth in detail the proposed treatment of the Claims of the Debtors' creditors and Interests of the Debtors' equity interest holders. This Disclosure Statement describes the terms of, and certain other material information relating to, the Plan.

This Disclosure Statement is being delivered to you because you either are or may be the holder of, or have otherwise asserted, either a Claim or Claims against the Debtors. This Disclosure Statement is intended to provide you with information sufficient to make an informed decision as to whether to vote to accept or reject the Plan.

### *Am I eligible to vote to accept or reject the Plan?*

You are entitled to vote to accept or reject the Plan only if you hold an Allowed Claim (or a Claim that has been temporarily allowed for voting purposes) in one or more of the following Classes:

- Class 1 – Indenture Trustee – Note Holder Claims
- Class 3 – Mechanic's Lien Claims
- Class 4 – Other Senior Secured Party Claims
- Class 5 – General Unsecured Claims
- Class 6 – Administrative Convenience Claims
- Class 7 – Club Member Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Facility Claims and Priority Tax Claims are not eligible to vote with respect to the Plan as a holder of such Claim. If you hold an

ATLANTA:5397829.2

Allowed Claim in Class 2 (Indenture Trustee – Bridge Loan Claim) your claim is Unimpaired and you are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. If you hold a Class 8 Interest, you will not receive or retain any Property under the Plan on account of such Interest and you are conclusively deemed to have rejected the Plan.

### Why should I vote to accept the Plan?

Simply put, from a creditor's perspective, the Debtors believe that the Plan provides the best means for achieving the maximum distribution on account of your prepetition claim. The Plan is the product of months of difficult negotiations, and is believed to have the support of the major constituencies who have had the financial resources to investigate and pursue alternative courses for achieving a distribution on account of the prepetition claims. It is believed that a failure to achieve prompt confirmation of the Plan will result in a piecemeal liquidation of the Assets, with less favorable distributions to the first priority secured creditors and with little or no prospects for distributions to junior priority secured creditors and unsecured creditors.

From a Club Members' perspective, confirmation of the Plan will maintain continuity of your use of the club amenities. The failure to achieve confirmation of the Plan could result in the closure of the Debtors' Clubs and your loss of access to those amenities.

### How do I vote to accept or reject the Plan?

If you are entitled to vote on the Plan because you are the holder of a Claim in Class 1, Class 3, Class 4, Class 5, Class 6, or Class 7 that is Allowed or has been temporarily allowed for voting purposes, as the case may be, you must complete, sign and return your Ballot or Ballots in accordance with the ballot instructions to be provided. If you are both the holder of a Class 1 Claim as a Note Holder and the holder of one or more Class 7 Claims as a Club Member, you will receive one (1) Ballot as a Class 1 Creditor and one or more Class 7 Ballots as a Class 7 Creditor. If you hold more than one Club Member Claim, then you may receive one Class 7 Ballot for each of your Club Member Claims. Because the Plan is a Joint Plan proposed by eleven (11) debtors that its premised on their substantive consolidation, your vote in Class 1, 3, 4, 5, 6 or 7 will be deemed to have been cast the same way (either to approve or to reject) the Plan in each of the Debtors' Cases.

### What if I'm entitled to vote to accept or reject the Plan and don't?

In general, within any particular class of Claims, only those holders of Claims who actually vote to accept or to reject the Plan will affect whether the Plan is accepted by the requisite holders of Claims in such Class. The holders representing at least two-thirds in dollar amount and a majority in number of the Claims in such Class that are allowed or have been temporarily allowed for voting purposes, as the case may be, and that are held by holders of such Claims who actually vote to accept or to reject the Plan must vote to accept the Plan.

ATLANTA:5397829.2

***What happens if the Plan is not accepted by each Class entitled to vote on the Plan?***

If the holders of each Class of Claims entitled to vote on the Plan (*i.e.*, Class 1, Class 3, Class 4, Class 5, Class 6, and Class 7) vote to reject the Plan, the Plan will not be confirmed or consummated in its present form. Conversely, as long as the requisite holders of Claims in one of the above enumerated classes vote to accept the Plan, the Debtors may seek Confirmation pursuant to the "cramdown" provisions of the Bankruptcy Code (which will require a determination by the Bankruptcy Court that that the Plan is "fair and equitable" and "does not discriminate unfairly" as to each impaired Class that does not accept the Plan or is deemed to have rejected it). The Debtors believe that the Plan satisfies the "cramdown" provisions of the Bankruptcy Code and, in any case, have reserved the right to modify the Plan to the extent that Confirmation thereunder requires modification.

***As a current or former Club Member, what will I receive on account of my Claim if the Plan is confirmed and becomes effective?***

If the Plan is approved, each Club Member's Claim against the Debtors arising under its Club Member Agreement will be treated pursuant to the terms of Class 7 of the Plan, in full satisfaction of such Claims. Club Members, including inactive Club Members who have resigned their membership and are waiting for return of their deposit, will have the opportunity to join the New Clubs and execute agreements on the terms and conditions of New ClubCo Membership Plan attached to the Plan or Plan Supplement as an Exhibit, an executive summary of which is attached hereto as **Exhibit H**.

In the event a Club Member, including inactive Club Members who have resigned their membership and are waiting for return of their deposit, elects not to join the New Clubs and execute agreements on the terms and conditions of New ClubCo Membership Plan attached to the Plan or Plan Supplement as an Exhibit, then such Club Member's Claim will be treated as provided by the terms of Class 5 in the case of Rejecting Non-Contingent Club Member Claims or the applicable terms of Class 7 of the Plan related to the treatment of Rejecting Contingent Club Member Claims.

***What will I receive if my Claim is Disputed?***

No distributions will be made on account of any Claim that is a Disputed Claim unless and until that Claim becomes an Allowed Claim in accordance with the procedures for resolving Disputed Claims set forth in the Plan.

***When will the Plan be confirmed?***

After the Bankruptcy Court has approved the form and adequacy of information in this Disclosure Statement, the Bankruptcy Court will schedule and conduct a hearing concerning Confirmation of the Plan. Typically, the Plan confirmation hearing is scheduled about a month after the Disclosure Statement hearing. The Plan confirmation hearing may be continued or adjourned, however, and even if it is held,

ATLANTA:5397829.2

there is no guaranty that the Bankruptcy Court will find that the requirements of the Bankruptcy Code with respect to Confirmation have been met. In addition, the conditions to Confirmation set forth in the Plan must be satisfied or waived in accordance with the Plan before the Plan can be confirmed. Thus, while the Debtors expect the Plan to be confirmed perhaps as early as August 6, 2012, there is no way to predict with any certainty when, if ever, Confirmation will actually occur.

### When will the Plan be effective?

Even if the Plan is confirmed in August 2012, there are a number of additional conditions that must be satisfied or waived before the Plan can become effective. The Effective Date will not occur until after the Plan has been confirmed and when the sale of the Debtors' assets as contemplated by the Plan will have occurred. No assurance can be given as to if or when the Effective Date will actually occur.

### What happens if the Plan isn't confirmed or doesn't become effective?

The Debtors expect that all of the conditions to Confirmation and effectiveness of the Plan will be satisfied (or waived in accordance with the Plan). There is no guaranty, however, that the Plan will become effective. Although the Debtors intend to take all acts reasonably necessary to satisfy the conditions to the Confirmation and effectiveness of the Plan that are within the Debtors' control, if, for any reason, the Plan is not confirmed or does not become effective, the Debtors may be forced to propose an alternative plan or plans of reorganization under Chapter 11 of the Bankruptcy Code. If no plan of reorganization or liquidation can be confirmed, the Debtors may have to convert to a liquidation case under chapter 7 of the Bankruptcy Code. Your treatment as the holder of a Claim under each of those alternatives will be much less favorable than the treatment proposed under the Plan because the Debtors will not be able to keep the Clubs open and the cost to reopen the Clubs will be problematic once the golf courses lie fallow and deteriorate.

## C.    VOTING AND CONFIRMATION PROCEDURES

To the extent this Disclosure Statement is being submitted to a holder of a Claim that is entitled to vote to accept or reject the Plan, this Disclosure Statement also is accompanied by a Ballot to be used by such holder in connection with that vote. As further described below, holders of certain categories of Claims against, and equity interests in, the Debtors automatically are deemed to have accepted the Plan or to have rejected it, depending on the particular category of Claims or equity interests. Holders of Claims and equity interests that are deemed to have accepted or rejected the Plan are not entitled to vote to accept or reject the Plan.

If you did not receive a Ballot in your Solicitation Package, and believe that you should have, please contact McKenna Long & Aldridge LLP, 303 Peachtree Street, Suite 5300, Atlanta, GA 30308 Attn: Bryan E. Bates; or by facsimile at (404) 527-4198, Attn: Bryan E. Bates; or by electronic mail, at bbates@mckennalong.com.

ATLANTA:5397829.2

a)      Holders of Claims Entitled to Vote

This Disclosure Statement, the form of Ballot and the related materials delivered together herewith (collectively, the "Solicitation Package"), are being furnished, for purposes of soliciting votes on the Plan, to holders of Claims in Classes 1, 3, 4, 5, 6 and 7.

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are impaired are entitled to vote to accept or reject a proposed chapter 11 plan. Classes of claims or equity interests in which the holders of claims or equity interests are unimpaired under a chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan. Classes of claims or equity interests in which the holders of claims or equity interests are impaired but are not entitled to receive or retain any property on account of such claims or equity interests are deemed to have rejected the plan and similarly are not entitled to vote to accept or reject the plan.

Classes 1 (Indenture Trustee – Note Holder Claims), 3 (Mechanic's Lien Claims), 4 (Other Senior Secured Party Claims), 5 (General Unsecured Claims), 6 (Administrative Convenience Claims), and 7 (Club Member Claims) under the Plan may be or are Impaired. To the extent Claims in Classes 1, 3, 4, 5, 6 and 7 are not the subject to an objection, the holders of such Claims or Interests are entitled to vote to accept or reject the Plan.  Class 8 (Equity Interests) will not receive or retain any interest pursuant to the Plan and, thus, pursuant to section 1126(g) of the Bankruptcy Code, such holders are deemed to reject the Plan and are not entitled to vote to accept or reject the Plan. Class 2 (Indenture Trustee – Bridge Loan Claim) under the Plan is unimpaired. Pursuant to section 1126(f) of the Bankruptcy Code, the Holder of the Class 2 Claim is conclusively deemed to have accepted the Plan and therefore may not vote to accept or reject the Plan.

ACCORDINGLY, A BALLOT TO ACCEPT OR REJECT THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASSES 1, 3, 4, 5, 6 and 7.

Generally, a creditor's Claim must be "allowed" for purposes of voting in order for such creditor to have the right to vote.  Generally, for voting purposes a Claim is deemed "allowed" absent an objection to the Claim if: (i) a proof of claim was timely filed, or (ii) if no proof of claim was filed, the claim is identified in the Debtors' Schedules as other than "contingent" (excepting contingent member initiation deposit claims, holders of such claims being entitled to vote such claims in their face amount), "unliquidated," or "disputed," and an amount of the Claim is specified in the Schedules, in which case the Claim will be deemed allowed for the specified amount. Pursuant to the Bar Date Order in these Chapter 11 Cases, Holders of Contingent Club Member Claims who accept the amount of their claims as set forth in the Debtors' Schedules, do not have to file a proof of claim.  In any case, when an objection to a Claim is filed, the creditor holding the Claim cannot vote unless the Bankruptcy Court, after notice and a hearing, either overrules the objection, or allows the Claim for

-11-

voting purposes.  Accordingly, if you do not receive a Ballot and believe that you are entitled to vote on the Plan, you must file a Bankruptcy Rule 3018 Motion with the Bankruptcy Court in accordance with the timing set forth in the Disclosure Statement Approval Order for the temporary allowance of your Claim for voting purposes. Otherwise, persons who do not receive a Ballot will not be entitled to vote to accept or reject the Plan.

The Debtors note that, with respect to Class 1 Indenture Trustee – Note Holder Claims, the individual Holders of such Claims will vote for purposes of whether Class 1 votes as a class to accept or reject the Plan.  The Debtors intend to file a first amendment to their Schedules (schedules of assets and liabilities) and attach thereto a Schedule D Rider that will detail the individual Note Holder Claims that comprise the Class 1 Secured Claim estimated at $73,532,000 in the aggregate.  For the avoidance of doubt: (i) this provision and the Debtors' submission of the Schedule D Rider is for Plan voting purposes only, and any Note Holder who disagrees with any amount set forth in the Schedule D Rider need not file a proof of claim to assert the amount of his or her Note Holder Claim, but rather should indicate the alleged amount of his or her Note Holder Claim on any Class 1 Ballot submitted to the Voting Agent (the Debtors may address in the tabulation report submitted to the Bankruptcy Court any disputes regarding the appropriate amount of any Note Holder Claim indicated on any such Class 1 Ballot); and (ii) Note Holders will be provided separate Class 7 Ballots with respect to their Club Member Claims.

THE DEBTORS AND THE LITIGATION TRUSTEE, AS THE CASE MAY BE, IN ALL EVENTS RESERVE THE RIGHT THROUGH THE CLAIM RECONCILIATION PROCESS TO OBJECT TO OR SEEK TO DISALLOW ANY CLAIM FOR DISTRIBUTION PURPOSES UNDER THE PLAN.

b)      Voting Instructions and Voting Deadline

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan. If you hold a Claim in more than one Class and you are entitled to vote Claims in more than one Class, you will receive separate Ballots that must be used for each separate Class of Claims. Please vote and return your Ballot(s). No votes other than ones using such Ballots will be counted, except to the extent the Bankruptcy Court orders otherwise.  The Bankruptcy Court has fixed _____  ___, 2012 as the date (the "Voting Record Date") for the determination of the holders of Claims who are entitled to (a) receive a copy of this Disclosure Statement and all of the related materials and (b) vote to accept or reject the Plan.  After carefully reviewing the Plan and this Disclosure Statement, including the annexed exhibits and any Plan Supplement, please indicate your acceptance or rejection of the Plan on the Ballot and COMPLETE, SIGN AND SUBMIT THE BALLOT SO THAT IT IS ACTUALLY RECEIVED BY BMC GROUP, INC., THE VOTING TABULATION AGENT, BY MAIL ADDRESSED TO BMC GROUP, INC., ATTN: CLIFFS BALLOT PROCESSING, P.O. BOX 3020, CHANHASSEN, MN 55317-3020, OR DELIVERY BY HAND, COURIER, OR OVERNIGHT

ATLANTA:5397829.2

SERVICE ADDRESSED TO BMC GROUP, INC., ATTN: CLIFFS BALLOT PROCESSING, 18675 LAKE DRIVE EAST, CHANHASSEN, MN 55317-3020 ON OR BEFORE _____ __, 2012 (THE "VOTING DEADLINE").

ANY BALLOT THAT IS NOT EXECUTED BY A DULY AUTHORIZED PERSON WILL NOT BE COUNTED. ANY BALLOT THAT IS EXECUTED BY THE HOLDER OF AN ALLOWED CLAIM BUT THAT DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.

DO NOT RETURN YOUR NOTES OR ANY OTHER INSTRUMENTS OR AGREEMENTS THAT YOU MAY HAVE WITH YOUR BALLOT(S).

c)      Who to Contact for More Information

If you have any questions about the procedure for voting your Claim or the packet of materials you received, or if you received a damaged Ballot or you lost your Ballot, or if you wish to obtain additional copies of the Plan, this Disclosure Statement, or the exhibits to those documents, at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d), please contact McKenna Long & Aldridge LLP, 303 Peachtree Street, Suite 5300, Atlanta, GA 30308 Attn: Bryan E. Bates; or by facsimile at (404) 527-4198, Attn: Bryan E. Bates; or by electronic mail, at bbates@mckennalong.com.

d)      Acceptance or Rejection of the Plan

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in that class that cast ballots for acceptance or rejection of the plan. Assuming that at least one impaired Class votes to accept the Plan, the Debtors will seek to confirm the Plan under Section 1129(b) of the Bankruptcy Code due to the deemed rejection of the Plan by the Class 8 Interests. Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan notwithstanding the non-acceptance by one or more impaired classes of Claims or Interests. Under Section 1129(b) of the Bankruptcy Code, a plan may be confirmed if (a) the plan has been accepted by at least one impaired class of claims and (b) the Bankruptcy Court determines that the plan does not discriminate unfairly and is "fair and equitable" with respect to the non-accepting classes. A more detailed discussion of these requirements is provided in Article XIII of this Disclosure Statement.

**D.      CONFIRMATION HEARING**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing. Section 1129(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

Pursuant to section 1128 of the Bankruptcy Code and Bankruptcy Rule 3017(c), the Bankruptcy Court has scheduled the Confirmation Hearing for August __, 2012 at __:00 __.m. prevailing Eastern Time before the Honorable John Waites, Chief Judge, United States Bankruptcy Court, J. Bratton Davis U.S. Bankruptcy Courthouse, 1100 Laurel Street, Columbia SC 29201. The Bankruptcy Court has directed that objections, if any, to Confirmation of the Plan be served and filed so that they are received on or before August __, 2012.  The Bankruptcy Court may adjourn the Confirmation Hearing from time to time without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

## E.    RECOMMENDATION

The Plan was developed over several months and is the product of extensive, arm's-length negotiations among, among others, the Debtors, the Plan Sponsor, the Indenture Trustee, and the Committee.  The Debtors believe that approval of the Plan presents the best chance for the Debtors' successful emergence from chapter 11.

THE DEBTORS BELIEVE THAT THE PLAN WILL ENABLE THEM TO ACCOMPLISH THE OBJECTIVES OF CHAPTER 11, AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS.   THE DEBTORS RECOMMEND THAT CREDITORS VOTE TO ACCEPT THE PLAN.

IF NO IMPAIRED CLASS OF CREDITORS VOTES TO ACCEPT THE PLAN, THESE CHAPTER 11 CASES MAY BE CONVERTED TO CASES UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.   IF THESE CHAPTER 11 CASES ARE CONVERTED TO A CHAPTER 7, DISTRIBUTIONS TO CREDITORS, IF ANY, WOULD BE DELAYED SIGNIFICANTLY, CREDITORS WOULD RECEIVE A SMALLER RECOVERY THAN THEY WILL RECEIVE UNDER THE PLAN, OR NO RECOVERY AT ALL, AND THE CLUB ASSETS WOULD LIKELY CLOSE.

## II.
## OVERVIEW OF THE PLAN

The Debtors and the Plan Sponsor propose to make the following distributions either from the Debtors' Estates, the Liquidation Trust, or by the Plan Sponsor on the Effective Date or as soon thereafter as is reasonably practicable to holders of secured and unsecured Claims illustrated below.  The Plan classifies all Claims against and Interests in the Debtors to eight (8) separate Classes.  The following table summarizes the classification and treatment afforded under the Plan as further described in Article VII of this Disclosure Statement.  At this time, the Debtors cannot predict whether any additional distributions will be made based on recoveries from Retained Actions pursued after the Effective Date by the Liquidation Trustee.  The following table briefly summarizes how the Plan classifies and treats Allowed Claims and equity interests, and also provides the estimated Distributions to be received by the holders of Allowed Claims and equity interests in accordance with the Plan:

-14-

SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND
EQUITY INTERESTS UNDER THE PLAN

| Class | Designation | Impaired | Entitled to Vote | Treatment of Allowed Claims | Estimated Recovery[2] |
|---|---|---|---|---|---|
| -- | Administrative Claims (estimated at $1,100,000) | No | No (unclass-ified claims, not entitled to vote) | Except as otherwise provided for in the Plan, on the later of (i) the Initial Distribution Date, if an Administrative Claim is Allowed as of the Effective Date, or (ii) as soon as practicable after the date such Administrative Claim becomes an Allowed Claim, if an Administrative Claim is not Allowed as of the Effective Date, each holder of an Allowed Administrative Claim will receive from the Debtors (before the Effective Date) or the Liquidation Trustee or Plan Sponsor thereafter, in full satisfaction, settlement and release of, and in exchange for, such Allowed Administrative Claim, (a) Cash equal to the unpaid portion of such Allowed Administrative Claim, or (b) such less favorable treatment to which the Debtors (with the consent of the Plan Sponsor) or Liquidation Trustee and the holder of such Allowed Administrative Claim will have agreed upon in writing; provided, however, that Allowed Ordinary Course Trade Claims will be paid in the ordinary course of business of New ClubCo and/or its sublessees in accordance with the terms and subject to the conditions of any agreements governing or relating thereto. | 100% |
| -- | DIP Facility Claims (estimated at $7,771,000) | No | No (unclass-ified claims, not entitled to vote) | The DIP Facility Claims will be repaid by the Plan Sponsor in full, in Cash, on the Effective Date in full and final satisfaction, settlement and release of such DIP Facility Claims. | 100% |
| -- | Professional Fee Claims (estimated at $1,300,000) | No | No (unclass-ified claims, not entitled to vote) | Except as otherwise provided for in the Plan, all requests for compensation or reimbursement of Professional Fee Claims for services rendered from the Petition Date through the Effective Date will be Filed and served on the Debtors, counsel to the Debtors, the United States Trustee, counsel for the Indenture Trustee, counsel to the Committee, counsel to the Plan Sponsor, the Liquidation Trustee, and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, prior to the end of the Administrative Claim Bar Date for Professional Fee Claims, which is sixty (60) days after the Effective Date, unless such date is otherwise modified by order of the Bankruptcy Court. Holders of Professional Fee Claims that are required to file and serve applications for final allowance of its Professional Fee Claims and that do not file and serve such applications by the required deadline will be forever barred from asserting such Claims against the Debtors, the Plan Sponsor or the Indenture Trustee, and such | 100% |

---

[2]    **NONE OF THESE FIGURES REFLECTS ESTIMATED RECOVERIES DISCOUNTED TO PRESENT VALUE.**

ATLANTA:5397829.2

| Class | Designation | Impaired | Entitled to Vote | Treatment of Allowed Claims | Estimated Recovery[2] |
|---|---|---|---|---|---|
| | | | | Professional Fee Claims will be deemed discharged as of the Effective Date.  Objections to any Professional Fee Claims must be filed and served on counsel for the Debtors, counsel for the Plan Sponsor, counsel for the Committee, counsel for the Indenture Trustee, and the Liquidation Trustee and the requesting party on or before twenty-one (21) days after the filing and service of such request. | |
| -- | Priority Tax Claims (estimated at $1,943,000) | No | No (unclass-ified claims, not entitled to vote) | Except as otherwise provided for in the Plan, on (i) the Initial Distribution Date, if a Priority Tax Claim is Allowed as of the Effective Date, or (ii) the first Distribution Date after the date such Priority Tax Claim becomes Allowed, each holder of an Allowed Priority Tax Claim will receive from the New ClubCo, in full satisfaction, settlement and release of, and in exchange for, such Allowed Priority Tax Claim, (A) Cash of New ClubCo equal to the amount of such Allowed Priority Tax Claim, (B) such less favorable treatment as to which such Debtors (with the consent of the Plan Sponsor), and the holder of such Allowed Priority Tax Claim will have agreed upon in writing; or (C) at the option of the Debtors, Cash of New ClubCo in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of not more than five (5) years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code. | 100% |
| Class 1 | Indenture Trustee – Note Holder Claims (estimated at $73,532,000) | Yes | Yes | The Indenture Trustee shall have an Allowed Claim in the amount of $64,050,000, which shall be treated as follows:<br><br>On the Effective Date, (i) the Allowed Secured Claims of the Note Holders represented by the Indenture Trustee will be satisfied through a combination of (x) a modification of the terms of the Notes to provide for repayment of $64,050,000, without interest, in twenty (20) annual payments beginning on the one year anniversary of the Effective Date in the amount of the greater of $1 million or 50% of New ClubCo Net Cash Flow and with a balloon payment of the remaining principal, if any, at maturity, all paid through the Indenture Trustee to the Note Holders subject to the terms of the Notes and Indenture, as may be modified and amended, and (y) the modification of the Prepetition Facility Documents, including without limitation, the Pledge and Security Agreement and the Collateral Trust Agreement to subordinate the Liens of the Indenture Trustee to the Exit Facility and the Mountain Park Facility, after which the Debtors will transfer the Real Property Collateral and substantially all other property of the Debtors to the Plan Sponsor, subject only to the Permitted Liens and otherwise free and clear of all liens, claims and encumbrances, and the Plan Sponsor will assume the payment obligations under the modified Notes until the Indenture Trustee SPE assumes the | < 87%[3] |

---

[3]     **NONE OF THESE FIGURES REFLECTS ESTIMATED RECOVERIES DISCOUNTED TO PRESENT VALUE.**

ATLANTA:5397829.2

| Class | Designation | Impaired | Entitled to Vote | Treatment of Allowed Claims | Estimated Recovery[2] |
|-------|-------------|----------|------------------|------------------------------|------------------------|
|       |             |          |                  | payment obligations under the modified Notes, as described below, followed by the Plan Sponsor's and/or Indenture Trustee SPE's execution of the Exit Facility and the Mountain Park Facility, and then the Plan Sponsor will contribute these assets to the Indenture Trustee SPE, subject to the Permitted Liens, in return for a 100% economic and managing membership interest in the Indenture Trustee SPE (the Indenture Trustee will hold a 0% non-economic membership interest in the Indenture Trustee SPE), and the Indenture Trustee SPE will assume the payment obligations under the modified Notes, all in satisfaction of the Note Holder Claims against the Debtors and the Guarantors of the Note Holder Claims (provided, however, that James B. Anthony will not receive a release without satisfaction of the following: (a) he becomes a D&O Releasee; and (b) he and any non-Debtor affiliates he directly or indirectly owns or controls: (i) waive and release any and all claims of any kind against the Debtors; (ii) transfer and convey to the Debtors or to the Plan Sponsor all real property, personal property and other assets used by the Debtors, or necessary to operate the businesses of the Debtors, or which is necessary to satisfy any condition precedent under the Plan or the Asset Purchase Agreement; (iii) fully cooperate with the transfer of the Acquired Assets, the Sale and the orderly transition of the Debtors' businesses to the Plan Sponsor; (iv) do not object to or oppose confirmation of the Plan; (v) vote to accept the Plan to the extent he or any of them hold a Claim entitled to vote, and (vi) otherwise cooperate fully with the consummation of the Plan) as well as against NewCo or New ClubCo arising under the Notes or the Notes as modified and amended.  Then, the Indenture Trustee SPE will enter into the Lease(s) with New ClubCo (or its subsidiary entities, at the sole option and in the sole discretion of New ClubCo) and New ClubCo, in turn, shall enter into subleases with its subsidiaries or affiliates.  From and after the Effective Date, the Debtors will have no liability to the Indenture Trustee or to the Note Holders.  Upon receipt of title to the Acquired Assets, the Indenture Trustee SPE will execute such documents as are required to evidence its assumption of the payment obligations under the modified Notes and underlying security interest(s) as modified pursuant to the Plan and to secure the obligations thereunder.  In the event the Indenture Trustee SPE defaults under the Note Restructuring Agreement subsequent to the Effective Date, the Indenture Trustee will have a number of remedies, including without limitation, the following:  (i) the right to foreclose on the assets subject to its liens; (ii) the right to require deeds in lieu of foreclosure; and (iii) the right to acquire the 100% economic member interest of the Plan Sponsor in the Indenture Trustee SPE. The enforceability of the aforementioned remedies upon a default or subsequent bankruptcy of the Indenture Trustee SPE is not absolute. The foregoing will be effectuated and governed by the terms of certain operative documents, which will include but will |       |

| Class | Designation | Impaired | Entitled to Vote | Treatment of Allowed Claims | Estimated Recovery[2] |
|-------|-------------|----------|------------------|------------------------------|------------------------|
|  |  |  |  | not be limited to: Note Restructuring Agreement by and between the Debtors and the Indenture Trustee; Assumption Agreement by and between Cliffs Club Partners and the Indenture Trustee; Assumption Agreement by and between Indenture Trustee SPE and the Indenture Trustee; Master Lease by and between Indenture Trustee SPE and Cliffs Club Partners; Mortgages/Deeds of Trust by and between Indenture Trustee SPE and the Indenture Trustee; Security Agreement by and between Indenture Trustee SPE and the Indenture Trustee; Collateral Assignment of IP/License Agreement by and between Indenture Trustee SPE and the Indenture Trustee; Deeds in Lieu/Escrow Agreement by and between Indenture Trustee SPE and the Indenture Trustee; Amendment to Indenture; Indenture Trustee SPE Operating Agreement; Establishment of IT Representative, LLC; and Subleases by and between Cliffs Club Partners and the golf operating subsidiaries.  Each of the Note Holders by voting its Class 1 Claim to accept the Plan is deemed to consent to the use of the Indenture Trustee's cash collateral by the Debtors to fund Distributions under the Plan, to the subordination of its Liens to those of the Exit Facility and the Mountain Park Facility and to all other provisions of the Plan that affect the Note Holders.  By accepting the Plan, the Note Holders and the Indenture Trustee will be deemed to waive the right: (i) to any dues credits or club credits; (ii) the right to any subordinate lien securing their Membership Deposit obligations; and (iii) the right to any deficiency claim against the Debtors and Guarantors of the Note Holder Claims (but not their Membership Deposit Obligations that are treated under Plan Class 7).  Notwithstanding anything else in the Plan, this Disclosure Statement or otherwise, the Notes shall not be deemed satisfied and thus extinguished, but rather restructured under the terms of the Plan and related documents, such that the payment obligation of the obligor under those Notes shall be to deliver payments totaling $64,050,000 to the Indenture Trustee. |  |
| Class 2 | Indenture Trustee – Bridge Loan Claim (estimated at $2,292,000) | No | No | The Bridge Lender as the Holder of the Allowed Class 2 Indenture Trustee - Bridge Loan Claim will receive in full satisfaction, settlement, release, and extinguishment of such Claim, and of any lien securing such Claim, Cash equal to the amount of such Allowed Bridge Loan Claim, including all interest accrued thereon as and to the extent provided by the Bridge Loan Documents, on or as soon as practicable after the Effective Date. | 100% |
| Class 3 | Mechanic's Lien Claims (estimated at $1.5 million) | Yes | Yes | Each Holder of an Allowed Class 3 Claim will receive, in full satisfaction, settlement, release, and extinguishment of such Claim, and of any lien securing such Claim, and as a condition precedent thereto, the following treatment: Payment in full of the principal amount, in Cash, without pre-petition or post-petition interest, costs or attorneys' fees, by New ClubCo directly to all holders of Claims that are Allowed and that are secured by Mechanic's Liens on the | 90% |

ATLANTA:5397829.2

| Class | Designation | Impaired | Entitled to Vote | Treatment of Allowed Claims | Estimated Recovery[2] |
|---|---|---|---|---|---|
| | | | | Effective Date. | |
| Class 4 | Other Senior Secured Party Claims (estimated at $75,000) | Yes | Yes | Each Holder of an Allowed Class 4 Other Senior Secured Party Claim will receive, at the election of the Debtors (with the consent of the Plan Sponsor), in full satisfaction, settlement, release, and extinguishment of such Claim: (a) Cash equal to the amount of such Allowed Other Senior Secured Party Claim on or as soon as practicable after the later of (i) the Effective Date, (ii) the date that such Other Senior Secured Party Claim becomes Allowed, and (iii) a date agreed to by the Debtors and the Holder of such Class 4 Other Senior Secured Party Claim; (b) Cure and Reinstatement of one or more equipment leases with such Other Senior Secured Party but not any guaranty that gives rise to such Allowed Other Senior Secured Party Claim; (c) the Equipment that is the subject of one or more leases with such Other Senior Secured Party securing such Other Senior Secured Party Claim without representation or warranty by or recourse against the Debtors; or (d) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors. | 100% |
| Class 5 | General Unsecured Claims (estimated at $3.9 million) | Yes | Yes | Each Holder of an Allowed Class 5 Claim will receive its Pro Rata Share of the General Unsecured Claims Fund less a reserve established by the Liquidation Trustee for expenses of administration of the Liquidating Trust, on or as soon as practicable after the later of (i) the first Distribution Date after the Claims Objection Deadline has occurred, if no objection to such Claim has been timely filed, or (ii) the first Distribution Date after the date on which any objection to such General Unsecured Claim is settled, withdrawn or overruled pursuant to a Final Order of the Bankruptcy Court. On each subsequent Distribution Date or as soon thereafter as is reasonably practicable, the Liquidation Trustee will continue to make Pro Rata Distributions of the General Unsecured Claims Fund to Holders of Allowed Class 5 Claims. | < 75% |
| Class 6 | Administrative Convenience Claims (estimated at $56,000) | Yes | Yes | On either (i) the Effective Date, (ii) the first Distribution Date after the Claims Objection Deadline has occurred, if no objection to such Claim has been timely filed, or (iii) the first Distribution Date after the date on which any objection to such Administrative Convenience Claim is settled, withdrawn or overruled pursuant to a Final Order of the Bankruptcy Court, each Holder of an Allowed Class 6 Administrative Convenience Claim will receive, in full satisfaction, settlement, release, and extinguishment of such Claim, Cash in an amount equal to the full amount of such Allowed Claim, without interest, costs or fees, from the Liquidation Trustee from the Administrative Convenience Claims Fund. | 99% |

ATLANTA:5397829.2

| Class | Designation | Impaired | Entitled to Vote | Treatment of Allowed Claims | Estimated Recovery[2] |
|-------|-------------|----------|------------------|-----------------------------|----------------------|
| Class 7 | Club Member Claims | Yes | Yes | Each Holder of an Allowed Class 7 Club Member Claim will receive in full satisfaction, settlement, release, and extinguishment of such Claim, the following treatment:<br><br>Option to Join the New Clubs:  A Club Member may elect in the ballot the New Club Membership Option and become one of the Accepting Club Members.  If so, then upon payment of the applicable Transfer Fee, and any Membership Reinstatement Fee, if applicable, and execution of an agreement to pay at least one year of dues under the New ClubCo Membership Plan, the Class 7 Claimant will receive a membership with New ClubCo under the New ClubCo Membership Plan as well as the right to satisfaction by New ClubCo of any Membership Deposit Obligations in accordance with the Vesting Schedule.  Accepting Club Members will also receive a release of claims by the Debtors.<br><br>Option not to Join the New Clubs:  A Club Member who does not (i) elect in the ballot the New Club Membership Option and (ii) become one of the Accepting Club Members, will thereby become one of the Rejecting Club Members and will receive its Pro Rata Share of the Rejecting Member Fund on or as soon as practicable after the later of (i) the first Distribution Date after the Claims Objection Deadline has occurred, if no objection to such Claim has been timely filed, or (ii) the first Distribution Date after the date on which any objection to such Rejecting Club Member Claim is settled, withdrawn or overruled pursuant to a Final Order of the Bankruptcy Court. On each subsequent Distribution Date or as soon thereafter as is reasonably practicable, the Liquidation Trustee will continue to make Pro Rata Distributions to Holders of Allowed Class 7 of the Rejecting Member Fund. | Members electing to join the New Clubs: 35-75%<br><br>Members electing not to join the New Clubs: 4-10% |
| Class 8 | Equity Interests | Yes | No | Holders of Class 8 Interests in all of the Debtors will not receive or retain any Property under the Plan on account of such Interests.  On the Effective Date, all Interests will be canceled. | 0% |

ATLANTA:5397829.2

## III.
## OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and equity interest holders. In addition to permitting rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying claims against and equity interests in the debtor. Confirmation of a Chapter 11 plan by the bankruptcy court makes the plan binding upon a debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor.

After a plan of reorganization has been filed, the holders of claims against or equity interests in a debtor are generally permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, however, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. The Debtors are submitting this Disclosure Statement to holders of Claims against the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code.

## IV.
## FORMATION, BUSINESS, DEBT STRUCTURE, AND OTHER PRE-PETITION OBLIGATIONS OF THE DEBTOR

### A.     FORMATION AND HISTORY OF THE DEBTORS

Each of the Debtors is owned, directly or indirectly, by Cliffs Communities, Inc. ("CCI"). CCI has other subsidiaries or affiliates that on the Petition Date were dedicated to the development and sale of residential real estate, unimproved company lots and finished homes at a number of Cliffs communities. CCI and these non-debtor affiliates are generally referred to as the Cliffs development companies or "DevCos" while the Debtors are referred to as the "ClubCos" (collectively, "The Cliffs"). The Debtors own and operate eight exclusive private membership clubs located in South Carolina and North Carolina focused on golf, tennis, wellness and social activities at eight Cliffs communities. The clubs (individually a "Club" collectively the "Clubs") are: (i) The Cliffs at Glassy Golf & Country Club ("The Club at Glassy"); (ii) The Cliffs Valley Golf & Country Club ("The Club at Cliffs Valley"); (iii) The Cliffs at

ATLANTA:5397829.2

Keowee Vineyards Golf & Country Club ("The Club at Keowee Vineyards"); (iv) The Cliffs at Walnut Cove Golf & Country Club ("The Club at Walnut Cove"); (v) The Cliffs at Keowee Falls Golf & Country Club ("The Club at Keowee Falls"); (vi) The Cliffs at Keowee Springs Golf & Country Club ("The Club at Keowee Springs"); (vii) The Cliffs at Mountain Park Golf & Country Club ("The Club at Mountain Park"); and (viii) The Cliffs at High Carolina Golf & Country Club ("The Club at High Carolina"). The Club at Walnut Cove and The Club at High Carolina are located in the State of North Carolina. The remaining six Clubs are each located in the State of South Carolina. Construction of the club amenities at six of the eight Cliffs communities is largely complete, while construction of the club amenities at two of the Cliffs communities is not. The golf course at The Club at Mountain Park has been 70% completed while construction of the club house and other amenities there has not. The amenities for The Club at High Carolina are still in the planning stage. The Debtors' headquarters are located in Travelers Rest, South Carolina.

The first Cliffs community opened in 1991 and The Cliffs grew to become an award-winning collection of eight premier, private master-planned residential communities, each ultimately to have its own world-class designed golf course, encompassing a total of 23,000 acres that would accommodate over 9,000 units at full build-out. The Cliffs offers a full range of premier-quality products and services for primary and secondary homeowners while preserving the communities in mountain and lakeside surroundings. The Cliffs markets primarily to affluent move-up, pre-retirement and retirement buyers looking for world-class golf and commensurate amenities. Internationally renowned professional golfers, designers and architects, including Jack Nicklaus, Tom Fazio, Ben Wright, Gary Player, Tiger Woods and Tom Jackson, have designed the golf courses at The Cliffs. The Cliffs has invested well over $500 million over the past 20 years to systematically develop and market The Cliffs communities.

Throughout all of The Cliffs communities, approximately 3,734 lots have been sold. Although not owned by the Debtors, there are currently 1,384 finished homes, with 63 under construction. The eight Clubs have approximately 1,937 members. There are approximately 766 former members on the resigned lists of the Clubs, with refundable contingent initiation deposits totaling approximately $37,000,000. The Cliffs Golf & Country Club, Inc. ("CGCC"), an affiliate of the Debtors that is owned by James B. Anthony, owned the first two Clubs that opened in The Cliffs communities, and CGCC managed those Clubs as well as the other Clubs as they opened until 2010, when CGCC conveyed its assets to two ClubCos, and Cliffs Club & Hospitality Service Company, LLC ("ServCo"), one of the ClubCos, began to manage the Clubs. Membership plans have been modified during the past twenty years as additional Clubs have been formed. These membership plans are referred to collectively as the "Membership Plan." After the first two Clubs opened, new entities were formed to own and operate each Club. Under CGCC's management and thereafter, the Debtors have done business as The Cliffs Golf & Country Club. CGCC, prior to April 30, 2010, acted as the manager of the Clubs and entered to contracts on their behalf. For example, when a new Member joins a Club, even when CGCC managed the Clubs, a new Member would contract with CGCC to join the

ATLANTA:5397829.2

Club, which the Member selected as the Member's home club. These transactions were always reflected separately for the Clubs. Consequently, the Debtors have operated with the understanding that the membership agreements to which CGCC originally was a party are now held by The Cliffs Club & Hospitality Group, Inc. and the home ClubCo for The Cliffs community where the Member resides. Pursuant to the Membership Plan for the Clubs, these refunds would be paid only from the initiation deposits of new members, as a result of the sale of additional lots, with $100,000 being paid out for each $500,000 received in new member initiation deposits at the Cliffs at Mountain Park, at High Carolina, at Walnut Cove, at Keowee Falls and at Keowee Springs, and with $100,000 being paid out for each $300,000 received in new member initiation deposits at the Cliffs at Glassy, Valley and at Keowee Vineyards. The contingent initiation deposits related to active members total approximately $181,000,000.

It is important to note that the Debtors' financial statements state this liability at the full amount of all initiation deposits received, plus the mark-to-market adjustment noted above, instead of at the discounted present value of refunds due 30 years from the initial deposit. Any refund payable before that time is contingent upon the receipt of sufficient cash flow to refund resigned Member deposits, or 30 days after the purchase of the membership in a resale transaction. Accordingly, the Debtors believe that the actual present value of this liability is less than 10% of the stated amount. Historically, as an industry benchmark, real estate developments offering 30 year refundable initiation deposits pay approximately 4% of the gross amount due from their own funds. The remainder is paid by new members, and is renewed every time a membership transfers with the 30 year period beginning anew. The Debtors reserve all rights regarding the valuation and estimation of these contingent unsecured claims.

Through its development, operations, marketing, sales efforts and provision of services and amenities through The Cliffs, CCI has developed The Cliffs® internationally known brand. The development of the brand allowed CCI to generate revenues from two primary sources: (1) the development and sale of residential real estate, including unimproved company lots and finished homes, and (2) the operation of country clubs, wellness facilities and other amenities for the members of the facilities (the "Members"). CCI has licensed to the Debtors a non-exclusive right to use its intellectual property.

Only one of the DevCos has filed bankruptcy petitions at this time. Those entities dedicated to the operation of country clubs, wellness facilities and other amenities for the Members, which are the Debtors that filed voluntary petitions for protection under chapter 11 of the Bankruptcy Code in these Chapter 11 Cases, in order to preserve the value of the operating entities within The Cliffs, are the subject of this Disclosure Statement.

## B.    THE BUSINESS

None of the Debtors owns any lots for sale. Upon purchase of a new residential lot at one of the communities from a DevCo entity, a buyer had the right, within thirty

days, to obtain a full golf membership, or anytime thereafter to obtain other types of memberships, and become a Member in exchange for payment of a membership initiation deposit, periodic dues and service fees.  The initiation deposits are refundable after 30 years, without interest.  At maturity, the refunds are due in full, and the membership then continues.  If the membership is acquired by a new buyer, through the Club, the 30 year period starts again.  The buyer of a resale lot also has the opportunity to acquire a Club Membership from sellers who hold golf memberships may obtain a full golf membership while buyers from sellers who did not hold golf memberships might obtain other types of Club Memberships.  The first refundable initiation deposits were accepted in 1991, and would be refundable in 2021. Such a club membership entitled the Member to use any of the recreational, dining and social facilities of any of The Cliffs communities.  With each community as close as a 15-minute drive and no more than a 90-minute drive from each other, the proximity provides significant value for purchasing property at The Cliffs that cannot be replicated by other comparable projects.  Furthermore, the relative proximity of the properties provides for operational economies of scale not available at "one-off" developments. A club membership is a non-exclusive, revocable license, which, as of the Petition Date, cost $100,000 for a refundable initiation deposit, or $50,000 for a non-refundable initiation deposit.  By acquiring a club membership, the Member does not acquire any ownership interest in any of the Clubs or its facilities.  A Member is prohibited from transferring the club membership to any person, including a buyer of the Member's property in a resale transaction.  Rather, a Member may resign the club membership, at which time the Debtors, pursuant to the Membership Plan, are obligated to refund the amount of the Club Membership as specified in the Membership Plan to the Member.

### The Club at Glassy

Established in 1991, The Club at Glassy is situated in a beautiful mountain setting on the Cherokee Foothills Scenic Highway in the northwest corner of South Carolina.  The Club at Glassy amenities include an 18-hole Tom Jackson golf course, natural areas, hiking trails, wellness center, chapel and 22,000 square-foot clubhouse all of which are located in a 3,500-acre Cliffs community bordered by 12,000 acres of Greenville watershed property and protected forests.  The Cliffs at Glassy community includes approximately 1,000 single-family residential lots.  Nearly 95% of the platted lots at the Cliffs at Glassy have been sold as of the Petition Date.  The number of full and part time associates employed at The Club at Glassy ranges, on a seasonal basis, between 68 and 88.  The Club at Glassy currently has 364 Members.

### The Club at Cliffs Valley

Established in 1994, The Club at Cliffs Valley is situated along the southernmost edge of the Blue Ridge Mountains, upon a picturesque terrain of rolling hills.  Known for its 18-hole, Parkland-style golf course designed by world-renowned golf architect, Ben Wright and its 15,000 square-foot wellness center and 28,000 square-foot clubhouse, The Club at Cliffs Valley enhances an exclusive golf course living experience.  As of the Petition Date, of the 900 total lots scheduled to be platted

ATLANTA:5397829.2

in the Cliffs Valley community, 860 have been platted and, of those, nearly 90% have been sold. The number of full and part time associates employed at The Club at Cliffs Valley ranges, on a seasonal basis, between 85 and 112. The Club at Cliffs Valley currently has 419 Members.

### The Club at Keowee Vineyards

The Club at Keowee Vineyards was established in 1997 in the oldest and most mature of the three Cliffs at Keowee communities that span the Lake Keowee shoreline. Similar to The Club at Keowee Springs, The Club at Keowee Vineyards includes an 18-hole Tom Fazio-designed golf course. Additional amenities include tennis courts, a clubhouse/restaurant, a Lake house, hiking trails and a private marina, a marina market and equestrian center. Since the founding of the Cliffs at Keowee Vineyards community, 634 platted home sites have been developed, with more sites projected for the remaining undeveloped land. Over 550 lots have been sold at the Cliffs at Keowee Vineyards as of the Petition Date. The number of full and part time associates employed at The Club at Keowee Vineyards ranges, on a seasonal basis, between 69 and 86. The Club at Keowee Vineyards currently has 315 Members.

### The Club at Walnut Cove

The Club at Walnut Cove, just minutes from downtown Asheville, NC, is home to a Jack Nicklaus Signature Course, a wellness center featuring an indoor lap pool, state-of-the-art fitness equipment, an outdoor pool, sauna and tennis courts surrounded by a private, residential golf community that spans nearly 1,300 acres of dense forests, interspersed with meadowlands and streams on the border of the Pisgah National Forest. Sales of single-family lots in the Cliffs at Walnut Cove began in the summer of 2002, with 82 home sites being presold at an aggregate sales price of $36,262,900 or $442,270 per lot on average. As of the Petition Date, 70.6% of the platted lots in the Cliffs at Walnut Cove have been sold. The number of full and part time associates employed at The Club at Walnut Cove ranges, on a seasonal basis, between 55 and 78. There are currently 275 Members in The Club at Walnut Cove.

### The Club at Keowee Falls

The Club at Keowee Falls is located in the Cliffs at Keowee Falls South, which sits on over 2,500 acres of land. Amenities of the Club at Keowee Falls include a Jack Nicklaus-designed 18-hole course, a clubhouse and restaurant that sit atop the mountain, and hiking trails. Members also have access to Keowee Towne, a small commercial village that includes a wellness center, a gourmet grocer now closed for the season, The Market at Keowee Town, and a hardware store. Of the 950 total lots scheduled to be platted in The Cliffs at Keowee Falls South community, 565 have been platted, and of those platted lots, nearly 75% have been sold as of the Petition Date. Title to the land planned for certain of the amenities and to the tennis courts at The Club at Keowee Falls is vested in one of the DevCo affiliates of the Debtors as of the Petition Date. The number of full and part time associates employed at The Club at

ATLANTA:5397829.2

Keowee Falls ranges, on a seasonal basis, between 57 and 82. There are currently 246 Members of The Club at Keowee Falls.

### The Club at Keowee Springs

The Club at Keowee Springs contains a Tom Fazio-designed 18-hole golf course, a beach club and a golf training center, currently leased by the PGA Tour Academy. Additional planned amenities for The Club at Keowee Springs include tennis courts, a clubhouse/restaurant, hiking trails and a private marina. The Cliffs at Keowee Springs community sits on over 1,500 acres of land and is platted for 473 home sites with more than 220 additional sites scheduled for development. Established in 2004, Keowee Springs has sold 244 home sites—more than 50% of its total platted lots—as of the Petition Date. The number of full and part time associates employed at The Club at Keowee Springs ranges, on a seasonal basis, between 23 and 45. There are currently 125 Members of The Club at Keowee Springs.

### The Club at Mountain Park

The Club at Mountain Park will contain a Gary Player-designed golf course, which is approximately 70% complete. Other planned Club amenities including a clubhouse, garden and nature center, swimming pools, tennis courts, wellness and fitness centers, a lake pavilion, a children's adventure center and hiking trails. The Club is located in The Cliffs at Mountain Park, which, in turn, is situated amidst over 5,000 acres of rolling terrain at the edge of the Blue Ridge Mountains in the Western Carolinas, between Asheville, North Carolina and Greenville, South Carolina. Mountain Park entered the initial phase of development in the latter part of 2006. As of the Petition Date, 61% of the approximately 400 platted lots at Mountain Park have been sold. The master plan for this development includes approximately 1,500 lots over the 5,000 acres after all development is completed. The number of full and part time associates employed at The Club at Mountain Park ranges, on a seasonal basis, between 10 and 18. The Club at Mountain Park currently has 162 Members.

### The Club at High Carolina

In November 2007, CCI and Tiger Woods Design entered into an agreement whereby professional golfer Tiger Woods would design his first North American signature golf course at The Club at High Carolina in a 1,000-acre community master-planned for approximately 1,200 homes in Buncombe County, North Carolina. CCI began acquiring land for this development in 2004, commenced development in 2006 and began marketing the lots starting in 2008. The Cliffs at High Carolina remains in the initial stages of development and is the newest of the eight Cliffs communities. The primary road through the project is partially graded with a gravel base, and numerous secondary roads are at a similar stage of development and some utilities have been installed. As of the Petition Date, less than 10% of the lots at The Cliffs at High Carolina have been platted, and 37 lots have been sold. Title to the land planned for the golf course and club amenities is vested in one of the DevCo affiliates of the

Debtors as of the Petition Date.  There are no  full or  part time associates employed at The Club at High Carolina. The Club at High Carolina currently has 31 Members.

## Corporate Structure

The ClubCos are one of five divisions of CCI, which is the parent holding company of multiple qualified sub-chapter S subsidiaries and single-member limited liability companies.  Each of CCI's subsidiaries represents specific communities, development companies, golf and country clubs and support organizations.  CCI is owned by James B. Anthony, who owns 79.12%; Victoria Anthony, who owns 0.80%; Cliffs Tradition, LLC, which owns .08%; and an Employee Stock Ownership Plan trust (the "ESOP"), which owns 20.00%.  CCI is governed by a Board of Directors.  Mr. Anthony serves as the Chairman of the Board of Directors, as well as the President of CCI.

CCI's organizational divisions primarily fall into one of five categories: (a) the Commercial Properties Division; (b) the Real Estate Sales & Marketing Division; (c) the Development Division; (d) the Operations Division; and (e) the Club Division or the ClubCos.  The Debtors solely comprise the ClubCos, and as subsidiaries of CCI own, with limited exceptions, or lease (with the right to purchase or assume leases) all of the core amenities necessary for the operation of the Clubs at Walnut Cove, Mountain Park, Glassy, Valley, Keowee Springs, Keowee Vineyards and Keowee Falls -- the Debtors do not currently own any property at High Carolina, including all golf courses, practice areas, clubhouses, wellness centers, pools, tennis courts, pavilions, nature centers, restaurants, an equestrian center and other clubhouse amenities. Furthermore, one of the Debtors, ServCo, employs the personnel who operate the amenities at the Clubs and provides administrative support to the other Debtors.  For example, all but one of the Debtors' bank accounts are in the name of ServCo which collects the revenues of the Debtors, pays the payroll expense of the personnel who operate the amenities for the Debtors and processes and pays accounts payable for the Debtors.

ServCo employs about 400 people during the low season and about 560 people during the high season.  There are between 40 and 50 administrative staff, including accounting, membership, purchasing, maintenance, human resources and information technology personnel who support the ClubCo operations for all of the Clubs, depending on the season.

None of CCI's other organizational divisions is included in these jointly administered Chapter 11 Cases, and no liability or secured debt obligation of CCI or any of its other subsidiaries is contemplated or affected in these Chapter 11 Cases. The descriptions of the debts set forth below relate solely to the obligations of the Debtors.

ATLANTA:5397829.2

C.    **DEBTORS' PRE-PETITION CAPITAL STRUCTURE**

Secured Financing

The Indenture

The Debtors' principal senior secured liabilities consist of $64,050,000 in the aggregate principal sum, plus accrued interest, owing to the holders (collectively, the "Note Holders") of those certain Series A Notes due 2017 (the "Series A Notes") and those certain Series B Notes due 2017 (the "Series B Notes" together with the Series A Notes, collectively, the "Notes") issued in connection with that certain Indenture dated as of April 30, 2010 (as in effect on the date hereof, the "Indenture"), by and among The Cliffs Club & Hospitality Group, Inc., the Guarantors (as defined in the Indenture), the Note Holders and Wells Fargo Bank, National Association, as trustee (in such capacity, the "Indenture Trustee"), and all promissory notes, security instruments and collateral and ancillary documents referenced therein or associated therewith are held by Wells Fargo Bank, National Association, as Collateral Trustee.

Under the Indenture, there are two series of Notes, the Series A Notes, which were issued in the original principal amount of $39,800,000, and the Series B Notes, which were issued in the original principal amount of $24,250,000. The obligations created by the Notes and any of the other Note Documents (as defined below) are referred to as the "Note Obligations". In order to secure the Note Obligations (among other obligations), The Cliffs Club & Hospitality Group, Inc. and each of the ClubCo guarantors granted to the Collateral Trustee a security interest in and a continuing lien on all of their right, title and interest in, to and under all of their personal property (the "Personal Property Collateral") pursuant to a Pledge and Security Agreement dated as of April 30, 2010. In addition, certain of the Debtors granted a mortgage, deed of trust, or leasehold mortgage as applicable (collectively, the "Mortgages") to the Collateral Trustee (collectively, the "Real Property Collateral") to secure the Note Obligations, among other obligations. Together, the Personal Property Collateral and the Real Property Collateral, are referred to as the "Prepetition Note Collateral". In addition to the Note Obligations, as provided in the Collateral Trust Agreement dated April 30, 2010 (the "Collateral Trust Agreement"), the Prepetition Note Collateral also secures on a subordinated basis certain membership deposit obligations (as defined in the Collateral Trust Agreement) owed to the Note Holders.

Further, payment of the Note Obligations was guaranteed jointly and severally by CCHG Holdings, Inc., each of The Cliffs Club & Hospitality Group, Inc. subsidiaries, and James B. Anthony, individually, pursuant to Article X of the Indenture. Collectively, the Indenture, the Notes, the Pledge and Security Agreement, the Mortgages, the Collateral Trust Agreement, and any other documents related to the Notes are referred to as the "Note Documents". The Series A Note Holders and certain of the Series B Note Holders hold a subordinate lien on the Prepetition Note Collateral junior to the Note Obligation to secure their Membership Deposit Obligations.

ServCo, which was not initially a guarantor under the Indenture, in September of 2011 executed signature pages that were attached to the Indenture, to the Collateral

Trust Agreement and to the Pledge & Security Agreement. The other Debtors executed the Indenture, the Collateral Trust Agreement and the Pledge & Security Agreement on or about April 30, 2010. UCC-1 Financing Statements regarding each of the Debtors have been filed and those Debtors that own real property executed mortgages or deeds of trust that were recorded, all more than ninety days before the commencement of these Chapter 11 cases. Except as provided in the immediately succeeding sentence, Debtors' obligations under the Indenture are secured by a first priority security interest in substantially all of the Debtors' assets, which pre-petition security interest is subordinate only to liens granted with respect to the Prepetition Bridge Loan Agreement and the Amended and Restated Prepetition Bridge Loan Agreement, described below. The Debtors lease and/or use equipment from several parties and TCF Equipment Finance, VGM Financial Services, Deere Credit, Inc., Agricredit Acceptance and General Electric have each filed one or more UCC financing statements to secure the equipment leased by them to the Debtors and any replacements or proceeds thereof. In addition, TCF Equipment Finance, Inc. and VGM Financial Services, a division of TCF Equipment Finance, Inc., hold perfected liens on the accounts, money, general intangibles, instruments, documents and chattel paper of The Cliffs Club & Hospitality Group, Inc. that are superior to the Indenture Trustee to secure that Debtor's guaranty of certain equipment lease obligations of six of its subsidiaries. However, that Debtor's only asset is its member interests in the subsidiary Debtors which have no value and are being canceled under the Plan and therefore such security interest has no value.

As of the Petition Date, the aggregate outstanding principal and accrued interest under the Indenture is approximately $73,531,505.

Bridge Loan

The Debtors' additional senior secured liabilities consist of approximately $2,000,000 owing with respect to that certain Agreement Relating to Bridge Loan executed by the Indenture Trustee, The Cliffs Club & Hospitality Group, Inc., and SP 50, on or about January 31, 2012 (as in effect on the date hereof, the "Prepetition Bridge Loan Agreement"); together with that certain Amended and Restated Agreement Relating to Bridge Loan executed by the Indenture Trustee, The Cliffs Club & Hospitality Group, Inc., and SP 50, on or about February 21, 2012 (as in effect on the date hereof, the "Amended and Restated Prepetition Bridge Loan Agreement"); and all promissory notes, security instruments and collateral and ancillary documents referenced therein or associated therewith.

The Debtors' obligations under the Prepetition Bridge Loan Agreement and the Amended and Restated Prepetition Bridge Loan Agreement have a priority right to repayment out of the trust administered by the Indenture Trustee.

As of the Effective Date, the aggregate outstanding principal and accrued interest under the Prepetition Bridge Loan Agreement and the Amended and Restated Prepetition Bridge Loan Agreement will be approximately $2,292,000.

ATLANTA:5397829.2

Other Secured Obligations

The Debtors directly or indirectly lease machinery and equipment such as golf carts, golf course maintenance equipment, copiers, containers and modular spaces under various secured leasing agreements. Also, as of the Petition Date, approximately $1,800,000 in Mechanic's Lien Claims have been asserted against the Debtors. The Debtors believe that several of the Mechanic's Lien Claims should be paid only as General Unsecured Claims, and some should be disallowed in their entirety because they were incurred by DevCo and not ClubCo.

Priority Taxes

As of the Petition Date, the Debtors owed approximately $1,100,000 in unpaid real property taxes.

Unsecured Debt

As of the Petition Date, more than $4,000,000 in litigation and potential litigation claims have been asserted against the Debtors, some of which are unliquidated claims and most of which the Debtors dispute.  As of the Petition Date, the Debtors have accounts payable of approximately $4,300,000 (not including mechanics' liens listed in paragraph 33) that are due and payable and other accrued expenses (not including interest accrued under the Notes or taxes) in the approximate amount of $1,400,000 not yet due and payable, all of which have arisen in the ordinary course of the Debtors' businesses.

Deposits Owing to Resigned Members, and Contingent Deposits Owing to Current Members

As set forth above, upon the resignation of any Member, the Debtors are obligated refund the amount of the club membership to the Member, pursuant to the Membership Plan.

As of the Petition Date, the Debtors owe, on a contingent basis, approximately $37,000,000 in club membership refunds to resigned Members.

As of the Petition Date, the Debtors owe, on a contingent basis, approximately $181,000,000 in face amount of potential club membership refunds to current Members, should any current Members elect to resign their memberships.  The estimated current fair market value of these Membership refunds is less than $18,000,000.

As of the Petition Date, the Debtors show a liability for dues prepayments and credits in the amount of approximately $6,600,000 owed to Members.

Equity Interests in the Debtors

ATLANTA:5397829.2

As of the Petition Date, Cliffs Communities, Inc. owned 100% of the stock of CCHG Holdings, Inc., CCHG Holdings, Inc. owned 100% of the stock of The Cliffs Club & Hospitality Group, Inc., and The Cliffs Club & Hospitality Group, Inc. was the sole member of the remaining Debtors, namely The Cliffs at Glassy Golf & Country Club, LLC, The Cliffs Valley Golf & Country Club, LLC, The Cliffs at Keowee Springs Golf & Country Club, LLC, The Cliffs at Keowee Falls Golf & Country Club, LLC, The Cliffs at Keowee Vineyards Golf & Country Club, LLC, The Cliffs at Mountain Park Golf & Country Club, LLC, The Cliffs at Walnut Cove Golf & Country Club, LLC, The Cliffs at High Carolina Golf & Country Club, LLC, and Cliffs Club & Hospitality Service Company, LLC.

## D.    DEBTORS' MANAGEMENT TEAM.

As of the Petition Date, the board of directors of the two Debtor holding companies (CCHG Holdings, Inc. and Cliffs Club & Hospitality Group, Inc.) consisted of:

    (1)    Tim Cherry, Chairman
    (2)    Brett Kist
    (3)    David Sawyer
    (4)    Geoffrey Carey
    (5)    David Bailey
    (6)    Steve Humphrey

David Bailey and Steve Humphrey are independent directors who are also Note Holders.

The Debtors' Chief Restructuring Officer is Katie S. Goodman.  The Debtors' controller is David McAda.

The Debtors' current and former officers and directors are listed in Plan Supplement Attachment 7.

Cliffs Communities, Inc. is the Debtors' direct (in the case of CCHG Holdings, Inc., the upper tier holding company Debtor) or indirect (in the case of all of the remaining Debtors) parent.  The current and former officers and directors of Cliffs Communities, Inc. are listed in Plan Supplement Attachment 7.

The Indenture Trustee is advised by the Negotiating Group and the Advisory Board whose members are listed in Plan Supplement Attachment 7.

The  Cliffs Member Ad Hoc Group, Inc. is a non-profit corporation formed to represent the interests of the Club Members and is affiliated with the Cliffs Member Advisory Group ("CMAG").  The directors of the Cliffs Member Ad Hoc Group, Inc. are listed in Plan Supplement Attachment 7.

The Cliffs Independent Property Owners Coalition, LLC ("CIPOC") is a non-profit limited liability company formed to represent the common interests of property

ATLANTA:5397829.2

owners and Club Members in property and club related issues including those associated with the Chapter 11 Cases.  The members of CIPOC are listed in Plan Supplement Attachment 7.

<div align="center">

**V.**

**EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES**

</div>

**A.    THE ECONOMIC DOWNTURN**

Debt historically plays a large role in the development and sale of real estate. As a result of the prolonged recession in the high-end real estate market, beginning in 2008, CCI began to look for replacement debt as banks and traditional lenders withdrew from the marketplace because of governmental regulations and the overall U.S. and global recession.  CCI, over the last two years, has engaged five different investment banking groups (Trilyn, LLC, a boutique real estate group, the Sonnenblick Goldman division of Cushman Wakefield, KPG Investments, LLC, the Carl Marks Advisory Group and Carlton, LLC) to run a process to identify potential investors and to facilitate the infusion of new capital as debt, equity or both, into the CCI entities. Those investment banking groups, through the course of time, led to the execution of over 40 nondisclosure agreements or led to significant business discussions with the various parties.  Few interested parties ultimately emerged from these groups, and the current interested investors have all come from other business relationships.

Additionally, the sale of certain notes owed by certain DevCos (but not the ClubCos) to The National Bank of South Carolina by that bank on December 31, 2010 to a third party, and a dispute with that third party have further exacerbated this situation, creating uncertainty in the marketplace and a decline in sales of lots by the DevCos.  Additionally, the third party, Urbana Communities, has been named in a lawsuit filed by one of the DevCo affiliates.  DevCo affiliates have also filed lis pendens on certain lots owned by Urbana Communities, which has further slowed the sale of lots in the Cliffs communities, thereby depressing the number of new members for ClubCo.

The Debtors have faced severe liquidity pressures that precipitated the decision to commence these bankruptcy cases.  The Debtors' revenues and liquidity have been severely impacted by the overall slowdown in the United States economy and real estate market.  As a result, the Debtors have experienced a slower than anticipated sales pace of club memberships, reduced utilization of club facilities, difficulty in servicing their existing debt, difficulty in obtaining additional or replacement financing, and challenges in funding the completion of planned club amenities and the renovation of existing amenities.

The Debtors undertook drastic cost-cutting measures in an attempt to curb their accelerating cash shortfall.  Construction at High Carolina, including the Tiger Woods-designed golf course, was temporarily halted, as well as at the Gary Player-designed golf course at Mountain Park.  Additionally, in the months leading up to the Petition Date, the Debtors engaged in various rounds of employee reductions.  Yet, these

<div align="center">-32-</div>

actions proved insufficient. The Debtors' deteriorating financial condition left the Debtors with no choice but to seek relief under chapter 11 of the Bankruptcy Code by filing the Petitions.

For the fiscal year ending December 31, 2011, the Debtors' consolidated financial statements reflect $29,000,000 in revenue, assets of $175,000,000 at book value, and liabilities of $333,000,000. Included in these liabilities are the full amounts of all refundable membership initiation deposits, regardless of the fact that these liabilities are only payable in the future, without interest, and only when certain cash flow and other requirements are met, or with the lapse of the 30 year refund period, as noted elsewhere.

## B.    RESTRUCTURING INITIATIVES AND OUTLOOK FOR THE FUTURE

Beginning in August, 2011, the Debtors began an intensive process to locate a "stalking horse" for the purchase of the Debtors' assets. The Debtors negotiated with, among other parties, Reed Development, Arendale Holdings, the Advisory Board of Note Holders and Carlile Development Group. ("Carlile"). The Board of Directors of the Debtors after a thorough and deliberative process selected Carlile as its "stalking horse" and executed a term sheet.

The transaction described in the Term Sheet was subject to higher and better offers in these Chapter 11 Cases pursuant to bidding procedures approved by the Bankruptcy Court, which for the payment of a "break up" fee to Carlile under certain circumstances.

<div align="center">

**VI.**
**THE CHAPTER 11 CASES**

</div>

## A.    SIGNIFICANT "FIRST DAY" MOTIONS

Concurrently with the filing of their Chapter 11 petitions, the Debtors filed certain applications, motions, and proposed orders. These included:

| DOCKET NUMBER | FIRST DAY MOTION |
|---|---|
| 10 | Motion of Debtors' for Order Authorizing the Debtors to (A) Prepare a Consolidated List of Creditors and Equity Security Holders in Lieu of a Mailing Matrix, (B) File a Consolidated List of the Debtors' Fifty Largest Unsecured Creditors, and (C) Mail Initial Notices |
| 12 | Motion for Entry of Order Establishing Certain Notice, Case Management and Administrative Procedures |
| 14 | Application of the Debtors for Order Authorizing Retention of BMC Group, Inc. as Claims, Noticing, and Balloting Agent Nunc Pro Tunc to the Petition Date |
| 16 | Motion for an Extension of Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired |

| | |
|---|---|
| | Leases, and Statement of Financial Affairs |
| 18 | Motion of Debtors for Order Authorizing (I) the Continued Maintenance and Use of the Debtors' Existing Cash Management System, (II) the Continued Maintenance and Use of the Debtors' Existing Bank Accounts, (III) the Continued Use of Existing Business Forms and Checks; and (IV) a Waiver of Investment and Deposit Requirements |
| 20 | Debtors' Motion for Entry of an Order Authorizing, but not Directing, the Debtors to: (i) Pay Prepetition Wages, Salaries, Employee Benefits and Other Compensation and Costs, and (ii) For Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations |
| 22 | Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a) and 363(b) Authorizing and Approving Debtors' (I) Retention and Employment of GGG Partners, LLC And (II) Employment of Katie S. Goodman as Chief Restructuring Officer, Nunc Pro Tunc to the Petition Date |
| 24 | Motion of the Debtors' For Entry of an Order Authorizing the Debtors to Pay Certain Prepetition Claims of Alcoholic Beverage Claimants |
| 26 | Motion for Entry of Order Authorizing the Payment of Prepetition Trust Fund Taxes in the Ordinary Course of Business |
| 28 | Motion For Order Under 11 U.S.C. §§ 105(a) and 366 (I) Prohibiting Utility Companies from Altering or Discontinuing Service on Account of Prepetition Invoices, (II) Approving Deposit as Adequate Assurance of Payment, and (III) Establishing Procedures for Resolving Requests by Utility Companies for Additional Assurance of Payment |
| 30 | Debtors' Motion Pursuant to Sections 105(a), 363, and 503(b)(1) of the Bankruptcy Code for Authorization to Honor Prepetition Obligations to Customers and Otherwise Continue Customer Programs in the Ordinary Course of Business |
| 32 | Debtors' Motion Pursuant to Sections 105(a), 362(d), 363(b), 363(c) and 503(b) of the Bankruptcy Code (i) For Authorization to (a) Continue Their Workers' Compensation, Liability, Property, and Other Insurance Programs, (b) Pay All Obligations in Respect Thereof and (c) Enter Into Premium Financing Agreements in the Ordinary Course of Business, and (ii) For Authorization for Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations |
| 34 | Debtors' Motion (A) for Authorization to (I) Utilize Cash Collateral Pursuant to 11 U.S.C. § 363; and (II) Provide Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363, and 364(d) and (B) to Schedule a Final Hearing Pursuant to Bankruptcy Rule 4001 |
| 36 | Debtors' Application for Entry of an Order Authorizing Retention and Employment of McKenna Long & Aldridge LLP as Counsel |

ATLANTA:5397829.2

| | |
|---|---|
| | to the Debtors, *Nunc Pro Tunc* to the Petition Date |
| 38 | Motion for Authority to Retain and Compensate Professionals Used in the Ordinary Course of Business |
| 39 | Motion to Establish Procedures for Monthly Compensation and Reimbursement of Expenses of Professionals |
| 40 | Debtors' Motion for Entry of an Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507(b) (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Status, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, and (V) Scheduling a Final Hearing |
| 42 | Debtors' Motion for Order (a) Approving Bidding Procedures for Auction to Become the Designated Sponsor of the Debtors' Chapter 11 Plan of Reorganization; (b) Approving Break Up Fee and Expenses Reimbursement Payable in Certain Circumstances to the Carlile Development Group; and (c) Approving the "Substitution Conditions" Contained in the DIP Loan Agreement |
| 44 | Declaration of Timothy P. Cherry in Support of First Day Motions |

## B.  OFFICIAL COMMITTEE OF UNSECURED CREDITORS

Shortly following the Petition Date, the United States Trustee for the District of South Carolina appointed the Official Committee of Unsecured Creditors Committee (the "Committee"). The Committee is comprised of John W. Sager; Janet D. Hilligoss; Harrell's, LLC; H. Michael Kimbrill; TJF Golf, Inc.; John Mack and Raymond O. Gibson.

The Committee has, with Bankruptcy Court approval, employed and retained Jonathan B. Alter, Bingham McCutchen LLP, One State Street, Hartford, CT 06103-3178 as its bankruptcy counsel and John B. Butler III, 1217 Anthony Avenue, Columbia, SC 29201 as its local counsel.

## C.  EXECUTORY CONTRACTS AND LEASES

As set forth above, one of the principal goals of these cases was the elimination of unprofitable and out-of-market executory contracts and personal property leases as part of the Debtors' efforts to stabilize its business and return to profitability. The Debtors have undertaken an extensive analysis of its contract and lease portfolio, which remains ongoing, to determine which agreements are no longer necessary to the operation of the Debtors' business or contain terms that are above market or overly burdensome to the Debtors. As a result, the Debtors filed their First Omnibus Motion to Reject Executory Contracts and Unexpired Leases on March 30, 2012 and intend to reject several other executory contracts and leases as a part of confirmation of the Plan.  By Order entered on May 9, 2012 [Docket Entry No. 342], the Bankruptcy Court granted the Debtors' Motion for an Order Extending the Time to Assume or to Reject Unexpired Leases of Nonresidential Real Property Pursuant to Section 365(d)(4) of the Bankruptcy Code. [Docket Entry No. 315]

ATLANTA:5397829.2

D.     **CLAIMS PROCESS**

On March 30, 2012, the Debtors filed their Schedules and Statements. By order dated April 10, 2012, the Bankruptcy Court established (i) May 31, 2012 as the general bar date by which all creditors (other than governmental units (as defined in the Bankruptcy Code)) must file proofs of pre-petition Claims against the Debtors, and (ii) August 28, 2012 as the date by which all governmental units (as defined in the Bankruptcy Code) must file proofs of pre-petition Claims against the Debtors (collectively, the "Bar Dates"). On June 27, 2012, the Debtors filed their Amended Schedules and a Statement of Changes by Amendment summarizing the revisions [Docket Entry No. 450].

The Debtors' claims, noticing and balloting agent, BMC Group, commenced service of notice of the Bar Dates to the holders of known claims against the Debtors, as well as other parties set forth in the creditors matrix maintained in these Chapter 11 Cases. As of this date, 1345 proofs of claim have been filed with BMC Group, the Debtors' Claims Agent in these cases. The Debtors will review and reconcile the proofs of claim as filed with BMC Group, and expect to file objections to Claims in the coming weeks and months.

E.     **BIDDING PROCEDURES, DEBTORS' MARKETING EFFORTS AND THE AUCTION OF PLAN SPONSOR RIGHTS**

The Debtors served the Bidding Procedures Motion, Bidding Procedures Order and the approved Bidding Procedures on approximately eighty-two (82) individuals and companies that the Debtors believed may have a specific interest in submitting a bid pursuant to the Bidding Procedures, including individuals and companies identified by the financial advisor to the Indenture Trustee.

Prior to and following the Petition Date (and service of the Bidding Procedures Motion, Bidding Procedures Order and the Bidding Procedures), numerous interested parties have contacted the Debtors expressing interest in potentially acquiring the Debtors and/or their assets. In sum, approximately thirty-three (33) individuals and companies have executed non-disclosure agreements to conduct due diligence regarding the Debtors' assets and liabilities. Since the Petition Date, approximately eleven (11) individuals and companies have requested and received access to the Debtors' secure on-line data room in order to conduct due diligence in connection with their interest in participating in the bidding process.

Four parties in particular expressed serious interest in making a bid, specifically: (i) Wayne Edmondson; (ii) Reed Development (Steve Duby); (iii) NatureFirst Real Estate Holdings, LLC ("NatureFirst"); and (iv) The Seaport Group ("Seaport"). Eventually, Mr. Edmondson and Reed Development advised the Debtors that they were not interested in making a bid by the bid deadline. On April 13, 2012, the Debtors received a bid from NatureFirst. After consulting with counsel for the Indenture Trustee and the Committee, the Debtors qualified NatureFirst as a Potential Qualified Bidder (as defined in the Bidding Procedures) subject to delivery to the Debtors of the required $1 million deposit by April 16, 2012. On April 16, 2012,

NatureFirst advised the Debtors that it was either not willing or not able to deliver the deposit, and withdrew from the bidding process. On April 13, 2012, the Debtors received a bid from Seaport, along with the required $1 million deposit. After consulting with counsel for the Indenture Trustee and the Committee, the Debtors qualified Seaport as a Potential Qualified Bidder. On April 20, 2012, Seaport advised the Debtors that it no longer desired to participate in the bidding process, and requested the return of its $1 million deposit, which the Debtors have returned.

On March 23, 2012, the Stalking Horse notified the Debtors that an entity named Cliffs Club Partners, LLC ("Cliffs Club Partners") had been formed to be the operating entity of the clubs should the Stalking Horse be successful at the auction. Silver Sun, LLC, whose members are SunTx Urbana GP I, L.P. ("Urbana"), Arendale Holdings Corp. ("Arendale"), and Carlile Cliffs Investment, LLC ("Carlile"), is the indirect parent of Cliffs Club Partners.

Despite the best efforts of the Debtors and the Debtors' CRO to market the Debtors' assets, no Qualified Bidders (as defined in the Bidding Procedures) existed as of the scheduled date of the auction. The Debtors filed their Status Report on Bidding Process on April 26, 2012 [Docket Entry No. 316 ].

On April 23, 2012, (i) the Debtors, the CRO, the Indenture Trustee, the Committee, and Cliffs Club Partners conducted an all day meeting at the Atlanta office of McKenna Long & Aldridge, LLP, the Debtors' legal counsel, to negotiate the terms on which the parties would proceed with a joint Chapter 11 plan and (ii) Debtors' counsel provided the counsel for the Plan Sponsor with an initial draft of a joint Chapter 11 plan and a disclosure statement. Thereafter, on May 9, 2012, the CRO, the Committee and representatives of the Indenture Trustee Negotiating Committee met with the Plan Sponsor in another all day meeting at the Atlanta office of McKenna Long & Aldridge, LLP, to discuss the New Club Membership Agreement and related documents, and counsel for the Plan Sponsor and counsel for the Debtors met to review the Plan Sponsor's proposed revisions to the joint Chapter 11 plan.

To provide the parties with additional time to complete the joint Chapter 11 plan and disclosure statement, on May 7, 2012, the DIP Lender, the Indenture Trustee and the Debtors entered into a stipulation to extend the May 13, 2012 deadline to file a plan and disclosure statement under the Cash Collateral Order and the DIP Financing Order through May 22, 2012 [Docket Entry No. 337].

## F.    THE OFFICE LEASE, COMPUTER AND IT LEASE PURCHASE AND WELLNESS CENTER LEASE AGREEMENTS

The Debtors filed a Motion under Sections 363 and 105 of the Bankruptcy Code to lease certain property some of which was owned by non-Debtor affiliates on March 30, 2012, in order to have access to their office space, computer equipment and information technology and a wellness center. The Court granted the motion by Order entered on April 10, 2012 [Docket Entry No. 275].

ATLANTA:5397829.2

**VII.**
**SUMMARY OF THE PLAN**

A.    **INTRODUCTION**

THE FOLLOWING IS A SUMMARY OF SOME OF THE SIGNIFICANT ELEMENTS OF THE PLAN.  THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN ITSELF.  CREDITORS ARE URGED TO READ THE PLAN IN ITS ENTIRETY. THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN WILL CONTROL THE TREATMENT OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

B.    **OVERALL STRUCTURE OF THE PLAN**

The Plan constitutes a plan of liquidation and sets forth the means for satisfying Claims against and Interests in the Debtors. Under the Plan, Claims against and Interests in the Debtors are divided into Classes according to their relative seniority and other criteria.

If the Plan is confirmed by the Bankruptcy Court and consummated: (a) the Claims in certain Classes will be Reinstated or modified and receive distributions equal to the full amount of such Claims, (b) the Claims of certain other Classes will be modified and receive distributions constituting a partial recovery on such Claims and (c) the Claims and Interests in certain other Classes will receive no recovery on such Claims or Interests. On the Effective Date and at certain times thereafter, the Debtors or the Liquidation Trustee will distribute Cash and other property in respect of certain Classes of Claims as provided in the Plan. The

-38-

Classes of Claims against and Interests in the Debtors created under the Plan, the treatment of those Classes under the Plan and the securities and other property to be distributed under the Plan are described below.

Attached as **Exhibit F** is a schematic chart highlighting the twelve major steps that will occur on the Effective Date provided the Plan is confirmed and becomes effective. Below is a description of those steps in narrative form.

On the Effective Date, the Plan provides that Wells Fargo as Indenture Trustee shall restructure the payment obligation owed to the Note Holders by the Debtors under the Notes. Pursuant to the terms of the Plan and the Note Restructuring Agreement, the payment obligation under the Notes will be amended by the Plan and Note Restructuring Agreement to provide for an aggregate obligation of $64,050,000, that does not bear interest. The Restructured Notes will have a maturity of 20 years from the Effective Date of the Plan (the "Maturity Date"), although the Plan pro forma projects full repayment within 11 years.

Repayment on the Restructured Notes will be made in annual payments, [beginning on the one-year anniversary of the Effective Date of the Plan], in an amount equal to the greater of $1 million or 50% of Net Cash Flow, with a final payment of the remaining principal, if any, upon the Maturity Date. Prior to any distribution to Note Holders, the Indenture Trustee's fees and expenses will be paid as required by the Indenture. As of the date of this Disclosure Statement, the Debtors have been advised by counsel for the Indenture Trustee that outstanding fees and expenses of the Indenture Trustee are approximately $1.20 million. The Debtors have not reviewed any invoices regarding such fees. The Debtors note that pursuant to the Cash Collateral Order the Debtors have been making monthly adequate protection payments of $235,000 per month to the Indenture Trustee. The Restructured Note obligations will continue to be secured by liens on the same collateral that secured the Notes – that is, the Clubs and related assets.

Once the Indenture Trustee and Debtors have restructured the debt, the Debtors will transfer the Clubs to Cliffs Club Partners, LLC ("CCP"). Pursuant to the Plan and the Debt Assumption and Assignment Agreement, CCP will assume the payment obligation owed to the Note Holders under the Restructured Notes. Although the Clubs will be transferred to CCP, the liens of the Indenture Trustee against these assets will remain intact.

In connection with its acquisition of the Clubs, CCP will make arrangements with its affiliate, Cliffs Club Holdings, LLC ("CCH"), for the Exit Facility and the Mountain Park Facility. CCH will be granted first priority liens on the Clubs to secure repayment of the Exit Facility and the Mountain Park Facility. The Indenture Trustee will be required to subordinate the lien securing the obligation to the Note Holders to the liens securing these new senior loan facilities and thus the liens securing the Restructured Notes will be in a junior position.

ATLANTA:5397829.2

The Exit Facility will fund the various obligations that must be satisfied prior to exiting the bankruptcy case to the extent that such obligations exceed the amount of the Transfer Fees to be paid by transferring members and the $1.6 million equity infusion from CCP earmarked for such costs. This debt will accrue interest at an annual rate of 8% and will be paid from Net Cash Flow ahead of the Mountain Park Facility and Restructured Note obligations; however, CCP will continue to make the $1 million minimum payment while the Exit Facility is outstanding. The Debtors currently estimate the Exit Facility will be approximately $3.4 million.

The Mountain Park Facility will fund golf course and amenity construction at the Mountain Park golf course. This facility carries a 0% interest rate and will be paid from Net Cash Flow ahead of the Restructured Notes; however, CCP will continue to make the $1 million minimum payment while the Mountain Park Facility is outstanding. The face amount of the Mountain Park Facility will be $7.5 million, but CCP estimates the amount necessary for funding the construction under the Mountain Park Facility will be approximately $5 million.

Based upon the anticipated amounts of the Exit Facility and the Mountain Park Facility, it is estimated that there will be approximately $10.90 million of senior liens against the Clubs. The Note Holders' liens and security interests will be in a junior position.

Once the senior debt facilities are put in place, CCP will contribute the Clubs and any additional golf course real property assets to IT-SPE, LLC ("IT-SPE") in exchange for a 100% economic interest in IT-SPE. An entity controlled by the Note Holders ("IT Representative") will hold a 0% economic interest in IT-SPE, and, through a unanimous voting provision in IT-SPE's operating agreement, will have control over major decisions by the IT-SPE, such as bankruptcy filing, mergers and asset sales. In addition, CCP will hold a funded reserve account in the amount of $1 million to be used for maintenance and repairs at the Clubs. On an annual basis, CCP will replenish the reserve account to the $1 million level.

In connection with the transfer of the Clubs to IT-SPE, IT-SPE will take such property subject to the liens that secured the Exit Facility, the Mountain Park Facility and will assume the payment obligation under the Restructured Notes, all of which will maintain the same lien priority they had at the CCP level. IT-SPE will also enter into new collateral security documents, including mortgages and/or deeds of trust, a security agreement, collateral assignment of the Master Lease and deed in lieu of foreclosure documents in order to grant and perfect the security interest and liens in the Clubs and any additional golf course real property assets owned by the IT-SPE. In addition, any improvements and/or new amenities built on the Clubs shall become collateral that secures repayment of the Restructured Notes.

At the same time as this transaction, IT-SPE and CCP will enter into a Master Lease, in which IT-SPE will lease the Clubs to CCP. The Master Lease will provide for lease payments that reflect the repayment terms of the Restructured Notes (e.g., annual payments in the amount equal to the greater of $1 million or 50% of Net Cash Flow, with

ATLANTA:5397829.2

a final payment of the remaining principal, if any, upon the Maturity Date).  IT-SPE will pass along the "rent payments" under the Master Lease to the Indenture Trustee for distribution pursuant to the terms of an Amended Indenture.

CCP will then enter into Subleases for each Golf Course with seven New Club entities owned by CCP.  The Subleases will contain nominal ($1.00) lease payments.

In the event the Indenture Trustee SPE defaults under the Note Restructuring Agreement subsequent to the Effective Date, the Indenture Trustee will have a number of remedies, including without limitation, the following:  (i) the right to foreclose on the assets subject to its liens; (ii) the right to require deeds in lieu of foreclosure; and (iii) the right to acquire the 100% economic member interest of the Plan Sponsor in the Indenture Trustee SPE.  The enforceability of the aforementioned remedies upon a default or subsequent bankruptcy of the Indenture Trustee SPE is not absolute.

On the Effective Date, all Property comprising the Estates of the Debtors not conveyed to the Plan Sponsor under the Asset Purchase Agreement, subject to the liens of the Indenture Trustee as modified in the Plan and free and clear of all other liens, claims and encumbrances, will automatically vest in the Liquidating Trust, free and clear of all Claims, Liens, contractually-imposed restrictions, charges, encumbrances and Interests of Creditors and equity security holders, with all such Claims, Liens, contractually-imposed restrictions, charges, encumbrances and Interests being extinguished subject to the rights of Holders of Rejecting Club Member Claims and General Unsecured Claims to obtain distributions provided for in this Plan. In no event will any property of any kind be returned by, or otherwise transferred from, the Liquidating Trust to any Debtor. A copy of the Liquidating Trust Agreement will be included with the Plan Supplement to be filed on or before the fifth day prior to the Confirmation Hearing.

The Plan establishes a Liquidating Trust to receive certain Property of the Debtors and to distribute such Property to certain Creditors in accordance with the Plan. The Liquidation Trustee will be Katie S. Goodman. The Debtors will attach the Liquidating Trust Agreement to a Plan Supplement. The Liquidation Trustee will have the authority to manage the day-to-day operations of the Liquidating Trust, including, without limitation, by disposing of the assets of the Liquidating Trust, appearing as a party in interest, calculating distributions, paying taxes and such other matters as more particularly described in Section 7.06 of the Plan and the Liquidating Trust Agreement. Expenses of the Liquidating Trust, including the expenses of the Liquidation Trustee and his or her representatives and professionals, will be satisfied from the assets of the Liquidating Trust and its proceeds, as set forth in the Liquidating Trust Agreement.

Except as otherwise expressly provided in the Plan with respect to Cash, pursuant to sections 1123(a)(5), 1123(b)(3) and 1141(b) of the Bankruptcy Code, all Property comprising the Estates of the Debtors not transferred to the Plan Sponsor under the Asset Purchase Agreement will automatically vest in the Liquidating Trust, free and clear of all Claims, Liens, contractually-imposed restrictions, charges,

-41-

encumbrances and Interests of Creditors and equity security holders on the Effective Date, with all such Claims, Liens, contractually-imposed restrictions, charges, encumbrances and Interests being extinguished subject to the rights of Holders of Rejecting Club Member Claims, General Unsecured Claims, and Administrative Convenience Claims to obtain distributions provided for in this Plan. In no event will any property of any kind be returned by, or otherwise transferred from, the Liquidating Trust to any Debtor.

## C.    SUBSTANTIVE CONSOLIDATION

The Plan is premised on the substantive consolidation of all of the Debtors with respect to the treatment of all Claims and Interests. The Plan will serve as a request by the Debtors, in lieu of a separate motion, to the Bankruptcy Court, that it grant substantive consolidation with respect to the treatment of all Claims and Interests as follows: on the Effective Date, (a) all assets and liabilities of the Debtors will be merged or treated as though they were merged; (b) all guarantees of the Debtors of the obligations of any of Debtor and any joint and several liability of any of the Debtors will be eliminated; and (c) each and every Claim and Interest against any Debtor will be deemed Filed against the consolidated Debtors and all Claims Filed against more than one Debtor for the same liability will be deemed one Claim against any obligation of the consolidated Debtors.

The proponent of substantive consolidation must show that (1) creditors dealt with the entities as a single economic unit and did not rely on separate identities in extending credit, or (2) when the affairs of the debtor are so entangled that substantive consolidation will benefit all creditors.  See, In re It's Greek to Me, Inc. also trading as AJ's Burgers, (slip opinion, March 7, 2012) (Bankr. D.S.C 2012) citing Campbell v. Cathcart (In re Derivium Cap., LLC), 380 B.R. 429, 441 (Bankr. D.S.C. 200) citing in turn, Union Savings Bank v. Augie/Restivo Baking Co., Ltd.), 860 F.2d 515, 518 (2d Cir. 1988).   Although no single factor is determinative in the substantive consolidation analysis, the following factors are often used:

(1)    the presence or absence of consolidated financial statements;

(2)    the unity of interests and ownership between various corporate entities;

(3)    the existence of parent and intercorporate guarantees on loans;

(4)    the Degree of difficulty in segregating and ascertaining individual assets and liabilities;

(5)    the existence of transfers of assets without formal observance of corporate formalities;

(6)    the commingling of assets and business functions and

(7) the profitability of consolidation at a single physical location. See, Eastgroup Props. v. S. Motel Assoc., Ltd., 935 F.2d 245 (11th Cir. 1991).

The Debtors believe substantive consolidation is appropriate in these cases. The first factor favors substantive consolidation because the Debtors' financial statements are prepared, reviewed and audited on a consolidated basis. The second factor supports substantive consolidation because all of the Debtors, are owned directly or indirectly, by CCI. The third factor supports substantive consolidation because all of the Debtors are jointly and severally liable on the Debtors' major secured obligations to the Indenture Trustee. The sixth factor supports substantive consolidation because the Debtors have commingled business functions and commingled cash generated from operations. ServCo. employs all of the Debtors' employees. All of the subsidiary Debtors are under the control of The Cliffs Club and Hospitality Group Inc., d/b/a The Cliffs Golf and Country Club, and customers, vendors and other creditors typically assume they are doing business with The Cliffs Golf and Country Club.

Without substantive consolidation, the Debtors will incur significant administrative expenses identifying and assessing intercompany claims that the Debtors hold against one another. The Debtors believe that such an exercise is not justified because, as discussed below, no individual creditor will be impaired by substantive consolidation.

Because of the nature of the Debtors' operations, nearly all customers, vendors and creditors typically assume they are transacting with Cliffs Golf and Country Club. The Indenture Trustee and the Note Holders dealt with the Debtors as a single economic unit and relied on all of the Debtors when entering into the Indenture Trust. See, In re It's Greek to Me, at p. 5, citing In re Gyro-Trac (USA), Inc., 441 B.R. 470, 487 (Bankr. D.S.C. 2010) (finding that despite the fact that "the loan issued by [creditor] was given to [debtor #2]," substantive consolidation of the three bankruptcy cases was appropriate in part because "[creditor] required personal guarantees of both [debtor #1] and [debtor #3] and obtained a lien on the assets of all of the entities"). Accordingly, it is very unlikely that any creditor relied on the separate credit of any one of the Debtors. No creditor will be harmed by substantive consolidation because substantially all unsecured creditor claims are obligations of ServCo for the benefit of the other Debtors and because the Club members had privileges at all Clubs notwithstanding their home club membership.

Because no creditor will be harmed by substantive consolidation and because substantive consolidation will decrease the administrative expenses of these cases, the Debtors believe the substantive consolidation is appropriate.

## D.    RECHARACTERIZATION OF DEBT TO EQUITY

In addition to the presence of intercompany payables and receivables among the Debtors, the books and records of the parent of Debtor CCHG Holdings, Inc. also reflect intercompany payables and receivables among the Debtors, on the one hand, and

ATLANTA:5397829.2

Affiliates of the Debtors, on the other hand.  These books and records are prepared on a consolidated basis.  Intercompany payables on the books reflect that the Debtors owe to the DevCo Affiliates the total sum of $44,817,112 while the DevCo Affiliates owe to the Debtors the total sum of $87,051,437, leaving a net balance due to the Debtors by the DevCo Affiliates of $42,234,325.  The Plan will serve as a request by the Debtors, in lieu of a separate motion, to the Bankruptcy Court to recharacterize intercompany payables by the Debtors to the DevCo Affiliates as equity.  While the Bankruptcy Code does not expressly provide for the recharacterization of debt to equity, most of the appellate courts that have considered the issue, including the Fourth Circuit Court of Appeals, have determined that the bankruptcy courts have the power to recharacterize debt to equity based on their equitable authority under Bankruptcy Code Section 105 in a manner consistent with the priority scheme for the distribution of the debtor's assets found in section Bankruptcy Code Section 726.  The Fourth Circuit precedent is In re Dornier Aviation, 453 F.3d 225 (4th Cir. 2006) (Implementation of the Code's priority scheme requires a determination of whether a particular obligation is debt or equity and given the broad language of section 105(a) and the larger purpose of the Bankruptcy Code, a bankruptcy court's power to recharacterize is essential to the proper and consistent application of the Code.).

The Fourth Circuit has joined other circuits that use an eleven factor test, stating, "None of these factors is dispositive and their significance may vary depending upon circumstances."  The factors that a court may consider in determining whether it should recharacterize a claim include:

> (1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claim of outside creditors; (10) the extent to which the advances were used to acquire capital assets; (11) the presence or absence of a sinking fund to provide repayments.  AutoStyle Plastics, 269 F.3d at 749-506.  These factors all speak to whether the transaction 'appears to reflect the characteristics of … an arm's length negotiation." Id. at 750 (quoting Cold Harbor, 204 B.R. at 915) (amendment in original).  This test is a highly fact-dependent inquiry that will vary in application from case to case.

In re Dornier, at 233.

By way of example, applying these factors to the intercompany payable from The Cliffs at Keowee Falls Golf & Country Club, LLC ("Keowee Falls South") to Affiliate

-44-

Keowee Investment Group ("KFIG") itself a Chapter 11 debtor, equity recharacterization is amply justified. In that regard:

| | |
|---|---|
| (1) the names given to the instruments, if any, evidencing the indebtedness | No documentation exists between KFIG and Keowee Falls South |
| (2) the presence or absence of a fixed maturity date and schedule of payments | As noted above, no documentation exists. Furthermore, no evidence exists that repayment was ever expected or required of Keowee Falls South |
| (3) the presence or absence of a fixed interest rate and interest payments | An interest rate was not established. No interest was ever accrued or paid. |
| (4) the source of repayments | No cash payments occurred. |
| (5) the adequacy or inadequacy of capitalization | As of 3/31/12 Falls South was very undercapitalized. Total liabilities were $44 million and equity was negative $26 million.<br><br>As of 12/31/2008 Falls South had total liabilities of $50 million and equity was negative $19 million.<br><br>(12/2008 total liabilities are likely understated because intercompany accounts are net) |
| (6) the identity of interests between the creditor and stockholder | Both KFIG and Falls South are under the common control of CCI and James B. Anthony |
| (7) the security, if any, for the advances | None |
| (8) the corporation's ability to obtain financing from outside lending institutions | Unlikely given negative equity book value. |
| (9) the extent to which the advances were subordinated to the claims of outside creditors | The advances were not subordinated. |
| (10) the extent to which the advances were used to acquire capital assets | The advance themselves were in many times on account of capital assets (land and building) purchased or constructed by KFIG and were transferred at cost rather than fair market value |
| (11) the presence or absence of a sinking fund to provide repayments | None |

E.      **CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

        a)      Introduction.

ATLANTA:5397829.2

Section 1122 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with section 1122 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than Administrative Claims, DIP Facility Claims, Priority Tax Claims and Other Priority Claims which, pursuant to section 1123(a)(1), do not need to be classified). The Debtors also are required, under section 1122 of the Bankruptcy Code, to classify Claims against and Interests in the Debtors into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Class.

The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law, but it is possible that a Holder of a Claim or Interest may challenge the Debtors' classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In that event, the Debtors intend, to the extent permitted by the Bankruptcy Code, the Plan and the Bankruptcy Court, to make such reasonable modifications of the classifications under the Plan to permit confirmation and to use the Plan acceptances received for purposes of obtaining the approval of the reconstituted Class or Classes of which each accepting Holder ultimately is deemed to be a member. Any such reclassification could adversely affect the Class in which such Holder initially was a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

Except as to Claims specifically Allowed in the Plan, the amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and accordingly the total Claims ultimately Allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the value of the property that ultimately will be received by a particular Holder of an Allowed Claim under the Plan may be adversely or favorably affected by the aggregate amount of Claims ultimately Allowed in the applicable Class.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized below. The Debtors believe that the consideration, if any, provided under the Plan to Holders of Claims and Interests reflects an appropriate resolution of their Claims and Interests, taking into account the differing nature and priority (including applicable contractual and statutory subordination) of such Claims and Interests and the fair value of the Debtors' assets. In the event any Class rejects the Plan, the Debtors will seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code as to any dissenting Class. Section 1129(b) of the Bankruptcy Code permits confirmation of a chapter 11 plan in certain circumstances even if the plan has not been accepted by all Impaired classes of Claims and Interests. Although the Debtors believe that the Plan can be confirmed under section 1129(b) of the

ATLANTA:5397829.2

Bankruptcy Code, there can be no assurance that the Bankruptcy Court will find that the requirements to do so have been satisfied.

       b)      Treatment Of Administrative and Priority Claims, and Classification of Claims And Equity Interests Under The Plan

          (a)      Unclassified Claims are as follows:
                  Administrative Expense Claims
                  DIP Financing Claims
                  Professional Fee Claims
                  Priority Tax Claims
                  Other Priority Claims

          (b)      Classification of Claims and Interests

                  Class 1 – Indenture Trustee – Note Holder Claims
                  Class 2 – Indenture Trustee – Bridge Lender Claim
                  Class 3 – Mechanic's Lien Claims
                  Class 4 – Other Senior Secured Party Claims
                  Class 5 – General Unsecured Claims
                  Class 6 – Administrative Convenience Claims
                  Class 7 – Club Member Claims
                  Class 8 – Equity Interests

      Only administrative expenses, claims and equity interests that are "allowed" may receive distributions under a chapter 11 plan. An "allowed" administrative expense, claim or equity interest simply means that the Debtors agree, or in the event of a dispute, that the Bankruptcy Court determines, that the administrative expense, claim or equity interest, including the amount thereof, is in fact a valid obligation of, or equity interest in, the Debtors. Section 502(a) of the Bankruptcy Code provides that a timely filed administrative expense, claim or equity interest is automatically "allowed" unless the debtor or another party in interest objects. However, section 502(b) of the Bankruptcy Code specifies certain claims that may not be "allowed" in a bankruptcy case even if a proof of claim is filed. These include, without limitation, claims that are unenforceable under the governing agreement or applicable non-bankruptcy law, claims for unmatured interest on unsecured and/or undersecured obligations, guaranty claims, property tax claims in excess of the debtor's equity in the property, claims for certain services that exceed its reasonable value, nonresidential real property lease and employment contract rejection damage claims in excess of specified amounts, and late-filed claims. In addition, Bankruptcy Rule 3003(c)(2) prohibits the allowance of any claim or equity interest that either is not listed on the debtor's schedules or is listed as disputed, contingent, or unliquidated if the holder has not filed a proof of claim or equity interest before the deadline to file proofs of claim and equity interests.

      The Bankruptcy Code also requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims against, and equity interests in, the debtor into separate classes based upon its legal nature. Claims of a substantially similar legal

nature are usually classified together, as are equity interests of a substantially similar legal nature. Because an entity may hold multiple claims and/or equity interests which give rise to different legal rights, the holders of such claims and/or equity interests may find themselves as members of multiple classes of claims and/or equity interests.

Under a chapter 11 plan, the separate classes of claims and equity interests must be designated either as "impaired" (altered by the plan in any way) or "unimpaired" (unaltered by the plan). If a class of claims or interests is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims or interests, such as the right to vote on the plan (unless the plan provides for no distribution to the holder, in which case, the holder is deemed to reject the plan), and the right to receive an amount under the chapter 11 plan that is not less than the value that the holder would receive if the debtor were liquidated under chapter 7. Under section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless, with respect to each claim or interest of such class, the plan (i) does not alter the legal, equitable or contractual rights of the holders of such claims or interests or (ii) irrespective of the holder's right to receive accelerated payment of such claims or interests after the occurrence of a default, cures all defaults (other than those arising from, among other things, the debtor's insolvency or the commencement of a bankruptcy case), reinstates the maturity of the claims or interests in the class, compensates the holders of such claims or interests for any damages incurred as a result of its reasonable reliance upon any acceleration rights and does not otherwise alter its legal, equitable or contractual rights. Typically, this means that the holder of an unimpaired claim will receive on the later of the effective date of the plan of reorganization or the date on which amounts owing are due and payable, payment in full, in cash, with post petition interest to the extent permitted and provided under the governing agreement between the parties (or, if there is no agreement, under applicable non-bankruptcy law), and the remainder of the debtor's obligations, if any, will be performed as they come due in accordance with its terms. Thus, other than its right to accelerate the debtor's obligations, the holder of an unimpaired claim will be placed in the position it would have been in had the debtor's case not been commenced.

Consistent with these requirements the Plan divides the Claims against, and equity interests in, the Debtors into the following Classes and affords the treatments described:

For purposes of computing distributions under the Plan, Allowed Claims do not include post petition interest unless otherwise specified in the Plan.

c)       Unclassified — Administrative Claims

Administrative Claims include any right to payment constituting a cost or expense of administration of the Chapter 11 Case of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under section 507(a)(1), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, without limitation, any actual and necessary costs and expenses of preserving the Debtors' Estates, any actual and necessary costs and expenses of operating the Debtors' business, any indebtedness or obligations incurred or assumed by the Debtor in Possession in connection with the

ATLANTA:5397829.2

conduct of their business, including, without limitation, for the acquisition or lease of property or an interest in property or the rendition of services, any fees or charges assessed against the Debtors' Estates under section 1930 of chapter 123 of title 28 of the United States Code and Section 503(b)(9) Claims.

Except as otherwise provided for in the Plan, on the later of (i) the Initial Distribution Date, if an Administrative Claim is Allowed as of the Effective Date, or (ii) as soon as practicable after the date such Administrative Claim becomes an Allowed Claim, if an Administrative Claim is not Allowed as of the Effective Date, each holder of an Allowed Administrative Claim will receive from the Debtors (before the Effective Date) or the Liquidation Trustee or Plan Sponsor thereafter, in full satisfaction, settlement and release of, and in exchange for, such Allowed Administrative Claim, (a) Cash equal to the unpaid portion of such Allowed Administrative Claim, or (b) such less favorable treatment to which the Debtors (with the consent of the Plan Sponsor) or Liquidation Trustee and the holder of such Allowed Administrative Claim will have agreed upon in writing; provided, however, that Allowed Ordinary Course Trade Claims will be paid in the ordinary course of business of New ClubCo and/or its sublessees in accordance with the terms and subject to the conditions of any agreements governing or relating thereto.

Unless a prior date has been established pursuant to the Bankruptcy Code, the Bankruptcy Rules or a prior order of the Bankruptcy Court, the Confirmation Order will establish a bar date for filing applications for allowance of Administrative Claims (except for Professional Fee Claims, Ordinary Course Administrative Claims and Section 503(b)(9) Claims), which date will be the first business day that is thirty (30) days after the Confirmation Date. Holders of Administrative Claims, except for Professional Fee Claims, Ordinary Course Administrative Claims and Section 503(b)(9) Claims, not paid prior to the Confirmation Date must submit requests for payment by filing a proof of Administrative Expense Claim with the Clerk of the Bankruptcy Court and in accordance with the instructions set forth in the Confirmation Order or notice of entry of the Confirmation Order on or before the applicable Administrative Claims Bar Date or forever be barred from doing so. The notice of confirmation to be delivered pursuant to Bankruptcy Rules 3020(c) and 2002(f) will set forth the Administrative Claims Bar Date, the appropriate address to submit claims and constitute good and sufficient notice of the Administrative Claims Bar Date. For the avoidance of doubt, Section 503(b)(9) Claims were and continue to be subject to the Bar Dates set forth in the Pre-Petition Claims Bar Date Order, and nothing set forth in the Plan will be deemed an extension of the Bar Dates with respect to Section 503(b)(9) Claims.

        d)      Unclassified — DIP Facility Claims

DIP Facility Claims are all Claims arising under or relating to the DIP Credit Documents and all agreements and instruments relating thereto.

The DIP Facility Claims will be repaid by the Plan Sponsor in full, in Cash, on the Effective Date in full and final satisfaction, settlement and release of such DIP Facility Claims.

e)    Unclassified — Professional Fee Claims

Professional Fee Claims are Administrative Claims under section 327, 328, 330(a), 331, 503 or 1103 of the Bankruptcy Code for compensation of a Professional or other Person for services rendered or expenses incurred in the Chapter 11 Case on or prior to the Effective Date (including reasonable expenses of the members of the Committee incurred as members of the Committee in discharge of its duties as such). For the avoidance of doubt, professional fees and expenses incurred by the Indenture Trustee and the DIP Lender are not Professional Fee Claims.

Except as otherwise provided for in the Plan, all requests for compensation or reimbursement of Professional Fee Claims for services rendered from the Petition Date through the Effective Date will be Filed and served on the Debtors, counsel to the Debtors, the United States Trustee, counsel for the Indenture Trustee, counsel to the Committee, counsel to the Plan Sponsor, the Liquidation Trustee, and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, prior to the end of the Administrative Claim Bar Date for Professional Fee Claims, which is sixty (60) days after the Effective Date, unless such date is otherwise modified by order of the Bankruptcy Court. Holders of Professional Fee Claims that are required to file and serve applications for final allowance of its Professional Fee Claims and that do not file and serve such applications by the required deadline will be forever barred from asserting such Claims against the Debtors, the Plan Sponsor or the Indenture Trustee, and such Professional Fee Claims will be deemed discharged as of the Effective Date. Objections to any Professional Fee Claims must be filed and served on counsel for the Debtors, counsel for the Plan Sponsor, counsel for the Committee, counsel for the Indenture Trustee, and the Liquidation Trustee and the requesting party on or before twenty-one (21) days after the filing and service of such request.

f)    Unclassified — Priority Tax Claims

Priority Tax Claims include any unsecured Claim that is entitled to a priority in right of payment under section 507(a)(8) of the Bankruptcy Code. The Debtors estimate that after accounting for Claims already paid and Claims subject to potential disallowance or reduction pursuant to objections sustained by the Bankruptcy Court, the potential amount of Allowed Priority Tax Claims will be approximately $1,943,000.

Except as otherwise provided for in the Plan, on (i) the Initial Distribution Date, if a Priority Tax Claim is Allowed as of the Effective Date, or (ii) the first Distribution Date after the date such Priority Tax Claim becomes Allowed, each holder of an Allowed Priority Tax Claim will receive from the New ClubCo, in full satisfaction, settlement and release of, and in exchange for, such Allowed Priority Tax Claim, (A) Cash of New ClubCo equal to the amount of such Allowed Priority Tax Claim, (B) such less favorable treatment as to which such Debtors (with the consent of the Plan Sponsor), and the holder of such Allowed Priority Tax Claim will have agreed upon in writing; or (C) at the option of the Debtors, Cash of New ClubCo in an aggregate amount of such Allowed Priority Tax Claim payable in installment

payments over a period of not more than five (5) years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.

g)    Unclassified — Other Priority Claims

Other Priority Claims include any unsecured Claim that is entitled to a priority in right of payment under section 507 other than 507(a)(8) of the Bankruptcy Code. The Debtors estimate that after accounting for Claims already paid and Claims subject to potential disallowance or reduction pursuant to objections sustained by the Bankruptcy Court, the potential amount of Allowed other Priority Claims will be approximately $0.00.

h)    Class 1 – Indenture Trustee - Note Holder Claims.

(a)    Classification: Class 1 consists of the Indenture Trustee – Note Holder Claims against the Debtors.

(b)    Treatment: On the Effective Date, (i) the Allowed Secured Claims of the Note Holders represented by the Indenture Trustee will be satisfied through a combination of (x) a modification of the terms of the Notes to provide for repayment of $64,050,000, without interest, in twenty (20) annual payments beginning on the one year anniversary of the Effective Date in the amount of the greater of $1 million or 50% of New ClubCo Net Cash Flow and with a balloon payment of the remaining principal, if any, at maturity, all paid through the Indenture Trustee to the Note Holders subject to the terms of the Notes and Indenture, as may be modified and amended, and (y) the modification of the Prepetition Facility Documents, including without limitation, the Pledge and Security Agreement and the Collateral Trust Agreement to subordinate the Liens of the Indenture Trustee to the Exit Facility and the Mountain Park Facility, after which the Debtors will transfer the Real Property Collateral and substantially all other property of the Debtors to the Plan Sponsor, subject only to the Permitted Liens and otherwise free and clear of all liens, claims and encumbrances, and the Plan Sponsor will assume the payment obligations under the modified Notes until the Indenture Trustee SPE assumes the payment obligations under the modified Notes, as described below, followed by the Plan Sponsor's and/or Indenture Trustee SPE's execution of the Exit Facility and the Mountain Park Facility, and then the Plan Sponsor will contribute these assets to the Indenture Trustee SPE, subject to the Permitted Liens, in return for a 100% economic and managing membership interest in the Indenture Trustee SPE (the Indenture Trustee will hold a 0% non-economic membership interest in the Indenture Trustee SPE), and the Indenture Trustee SPE will assume the payment obligations under the modified Notes, all in satisfaction of the Note Holder Claims against the Debtors and the Guarantors of the Note Holder Claims (provided, however, that James B. Anthony will not receive a release without satisfaction of the following: (a) he becomes a D&O Releasee; and (b) he and any non-Debtor affiliates he directly or indirectly owns or controls: (i) waive and release any and all claims of any kind against the Debtors; (ii) transfer and convey to the Debtors or to the Plan Sponsor all real property, personal property and other assets used by the Debtors, or necessary to operate the businesses of the Debtors, or which is necessary to satisfy any condition precedent under the Plan or the Asset Purchase Agreement; (iii) fully cooperate with the transfer of the Acquired

-51-

Assets, the Sale and the orderly transition of the Debtors' businesses to the Plan Sponsor; (iv) do not object to or oppose confirmation of the Plan; (v) vote to accept the Plan to the extent he or any of them hold a Claim entitled to vote, and (vi) otherwise cooperate fully with the consummation of the Plan) as well as against NewCo or New ClubCo arising under the Notes or the Notes as modified and amended. Then, the Indenture Trustee SPE will enter into the Lease(s) with New ClubCo (or its subsidiary entities, at the sole option and in the sole discretion of New ClubCo) and New ClubCo, in turn, shall enter into subleases with its subsidiaries or affiliates. From and after the Effective Date, the Debtors will have no liability to the Indenture Trustee or to the Note Holders. Upon receipt of title to the Acquired Assets, the Indenture Trustee SPE will execute such documents as are required to evidence its assumption of the payment obligations under the modified Notes and underlying security interest(s) as modified pursuant to the Plan and to secure the obligations thereunder. In the event the Indenture Trustee SPE defaults under the Note Restructuring Agreement subsequent to the Effective Date, the Indenture Trustee will have a number of remedies, including without limitation, the following: (i) the right to foreclose on the assets subject to its liens; (ii) the right to require deeds in lieu of foreclosure; and (iii) the right to acquire the 100% economic member interest of the Plan Sponsor in the Indenture Trustee SPE. The enforceability of the aforementioned remedies upon a default or subsequent bankruptcy of the Indenture Trustee SPE is not absolute. The foregoing will be effectuated and governed by the terms of certain operative documents, which will include but will not be limited to: Note Restructuring Agreement by and between the Debtors and the Indenture Trustee; Assumption Agreement by and between Cliffs Club Partners and the Indenture Trustee; Assumption Agreement by and between Indenture Trustee SPE and the Indenture Trustee; Master Lease by and between Indenture Trustee SPE and Cliffs Club Partners; Mortgages/Deeds of Trust by and between Indenture Trustee SPE and the Indenture Trustee; Security Agreement by and between Indenture Trustee SPE and the Indenture Trustee; Collateral Assignment of IP/License Agreement by and between Indenture Trustee SPE and the Indenture Trustee; Deeds in Lieu/Escrow Agreement by and between Indenture Trustee SPE and the Indenture Trustee; Amendment to Indenture; Indenture Trustee SPE Operating Agreement; Establishment of IT Representative, LLC; and Subleases by and between Cliffs Club Partners and the golf operating subsidiaries. Each of the Note Holders by voting its Class 1 Claim to accept the Plan is deemed to consent to the use of the Indenture Trustee's cash collateral by the Debtors to fund Distributions under the Plan, to the subordination of its Liens to those of the Exit Facility and the Mountain Park Facility and to all other provisions of the Plan that affect the Note Holders. By accepting the Plan, the Note Holders and the Indenture Trustee will be deemed to waive the right: (i) to any dues credits or club credits; (ii) the right to any subordinate lien securing their Membership Deposit obligations; and (iii) the right to any deficiency claim against the Debtors and Guarantors of the Note Holder Claims (but not their Membership Deposit Obligations that are treated under Plan Class 7).

  (c)  Voting: Class 1 is Impaired and the Holders of the Class 1 Claims are entitled to vote to accept or reject the Plan.

   i)  Class 2: The Indenture Trustee - Bridge Loan Claim.

(a)    Classification: Class 2 consists of the Indenture Trustee - Bridge Loan Claim.

(b)    Treatment:  The Class 2 Indenture Trustee - Bridge Loan Claim is Unimpaired. The Bridge Lender as the Holder of the Allowed Class 2 Indenture Trustee - Bridge Loan Claim will receive in full satisfaction, settlement, release, and extinguishment of such Claim, and of any lien securing such Claim, Cash equal to the amount of such Allowed Bridge Loan Claim, including all interest accrued thereon as and to the extent provided by the Bridge Loan Documents, on or as soon as practicable after the Effective Date.

(c)    Voting: Class 2 is Unimpaired and the Holder of Class 2 Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holder of the Claim in Class 2 is not entitled to vote to accept or reject the Plan.

j)    <u>Class 3: Mechanic's Lien Claims</u>.

(a)    Classification: Class 3 consists of the Mechanic's Lien Claims against the Debtors.

(b)    Treatment: The Class 3 Claims are Impaired. Each Holder of an Allowed Class 3 Claim will receive, in full satisfaction, settlement, release, and extinguishment of such Claim, and of any lien securing such Claim, and as a condition precedent thereto, the following treatment:

Payment in full of the principal amount, in Cash, without pre-petition or post-petition interest, costs or attorneys' fees, by New ClubCo directly to all holders of Claims that are Allowed and that are secured by Mechanic's Liens on the Effective Date.

(c)    Voting: Class 3 is Impaired and pursuant to section 1126 of the Bankruptcy Code Holders of Allowed Class 3 Claims are entitled to vote to accept or reject the Plan.

k)    <u>Class 4: Other Senior Secured Party Claims</u>.

(a)    Classification: Class 4 consists of Other Senior Secured Party Claims against the Debtors.

(b)    Treatment:  Each Holder of an Allowed Class 4 Other Senior Secured Party Claim will receive, at the election of the Debtors (with the consent of the Plan Sponsor), in full satisfaction, settlement, release, and extinguishment of such Claim: (a) Cash equal to the amount of such Allowed Other Senior Secured Party Claim on or as soon as practicable after the later of (i) the Effective Date, (ii) the date that such Other Senior Secured Party Claim becomes Allowed, and (iii) a date agreed to by the Debtors and the Holder of such Class 4 Other Senior Secured Party Claim; (b) Cure and Reinstatement of one or more equipment leases with such Other Senior Secured Party but not any guaranty that gives rise to such Allowed Other Senior Secured Party Claim; (c) the Equipment that is the subject of one or more leases with such Other Senior Secured

ATLANTA:5397829.2

Party securing such Other Senior Secured Party Claim without representation or warranty by or recourse against the Debtors; or (d) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors.

(c)     Voting: Class 4 is Impaired and pursuant to section 1126 of the Bankruptcy Code Holders of Allowed Class 4 Claims are entitled to vote to accept or reject the Plan.


l)     <u>Class 5: General Unsecured Claims</u>.

(a)     Classification: Class 5 consists of all General Unsecured Claims against the Debtors.

(b)     Treatment:  The Class 5 Claims are impaired.  Each Holder of an Allowed Class 5 General Unsecured Claim will receive, in full satisfaction, settlement, release, and extinguishment of such Claim, and as a condition precedent thereto, the following treatment:

Each Holder of an Allowed Class 5 Claim will receive its Pro Rata Share of the General Unsecured Claims Fund less a reserve established by the Liquidation Trustee for expenses of administration of the Liquidating Trust, on or as soon as practicable after the later of (i) the first Distribution Date after the Claims Objection Deadline has occurred, if no objection to such Claim has been timely filed, or (ii) the first Distribution Date after the date on which any objection to such General Unsecured Claim is settled, withdrawn or overruled pursuant to a Final Order of the Bankruptcy Court. On each subsequent Distribution Date or as soon thereafter as is reasonably practicable, the Liquidation Trustee will continue to make Pro Rata Distributions of the General Unsecured Claims Fund to Holders of Allowed Class 5 Claims.

(c)     Voting: Class 5 is Impaired and pursuant to section 1126 of the Bankruptcy Code Holders of Allowed Class 5 Claims are entitled to vote to accept or reject the Plan.

m)     <u>Class 6: Administrative Convenience Claims</u>.

(a)     Classification: Class 6 consists of all Administrative Convenience Claims against the Debtors.

(b)     Treatment: Class 6 is Impaired. On either (i) the Effective Date, (ii) the first Distribution Date after the Claims Objection Deadline has occurred, if no objection to such Claim has been timely filed, or (iii) the first Distribution Date after the date on which any objection to such Administrative Convenience Claim is settled, withdrawn or overruled pursuant to a Final Order of the Bankruptcy Court, each Holder of an Allowed Class 6 Administrative Convenience Claim will receive, in full satisfaction, settlement, release, and extinguishment of such Claim, Cash in an amount equal to the full amount of

ATLANTA:5397829.2

such Allowed Claim, without interest, costs or fees, from the Liquidation Trustee from the Administrative Convenience Claims Fund.

(c)     Voting: Class 6 is Impaired and pursuant to section 1126 of the Bankruptcy Code Holders of Allowed Class 6 Claims entitled to vote to accept or reject the Plan.

n)     <u>Class 7: Club Member Claims</u>.

(a)     Classification: Class 7 consists of the Holders of all Club Member Claims against the Debtors including Contingent Membership Deposit Obligations (but not including Non-Contingent Membership Deposit Obligations, which are included in Class 4).

(b)     Treatment: The Class 7 Claims are Impaired.  Each Holder of an Allowed Class 7 Club Member Claim will receive in full satisfaction, settlement, release, and extinguishment of such Claim, the following treatment:

Option to Join the New Clubs:  A Club Member may elect in the ballot the New Club Membership Option and become one of the Accepting Club Members.  If so, then upon payment of the applicable Transfer Fee, and any Membership Reinstatement Fee, if applicable, and execution of an agreement to pay at least one year of dues under the New ClubCo Membership Plan, the Class 7 Claimant will receive a membership with New ClubCo under the New ClubCo Membership Plan as well as the right to satisfaction by New ClubCo of any Membership Deposit Obligations in accordance with the Vesting Schedule.  Accepting Club Members will also receive a release of claims by the Debtors.

Option not to Join the New Clubs:  A Club Member who does not (i) elect in the ballot the New Club Membership Option and (ii) become one of the Accepting Club Members, will thereby become one of the Rejecting Club Members and will receive its Pro Rata Share of the Rejecting Member Fund on or as soon as practicable after the later of (i) the first Distribution Date after the Claims Objection Deadline has occurred, if no objection to such Claim has been timely filed, or (ii) the first Distribution Date after the date on which any objection to such Rejecting Club Member Claim is settled, withdrawn or overruled pursuant to a Final Order of the Bankruptcy Court. On each subsequent Distribution Date or as soon thereafter as is reasonably practicable, the Liquidation Trustee will continue to make Pro Rata Distributions to Holders of Allowed Class 7 of the Rejecting Member Fund.

(c)     Voting: Class 7 is an Impaired Class and pursuant to section 1126 of the Bankruptcy Code, the Holder of Allowed Class 7 Claims are is entitled to vote to accept or reject the Plan.

o)     <u>Class 8: Equity Interests</u>.

(a)     Classification: Class 8 consists of all Equity Interests in any of the Debtors.

(b)     Treatment: Holders of Class 8 Interests in all of the Debtors will not receive or retain any Property under the Plan on account of such Interests.  On the Effective Date, all Interests will be canceled.

(c)     Voting: Class 8 is impaired.  The Holders of the Class 8 Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of the Class 8 Interests are not entitled to vote to accept or reject the Plan.

## F.    PROVISIONS REGARDING UNCLASSIFIED PRIORITY CLAIMS

The Plan contains provisions that set forth the treatment of Claims of a kind specified in Sections 507(a)(2) and 507(a)(8) of the Bankruptcy Code.  The treatment of these Unclassified Claims in the Plan is consistent with the requirements of Section 1129(a)(9) of the Bankruptcy Code, and the holders of such Claims are not entitled to vote on the Plan.  Notwithstanding any other provision of the Plan, pursuant to Section 1123(a)(1) of the Bankruptcy Code, Claims under Sections 507(a)(2) and 507(a)(8) of the Bankruptcy Code are not designated as Classes of Claims for purposes of the Plan.

## VIII.
## MEANS FOR IMPLEMENTATION OF THE PLAN AND EFFECTS OF CONFIRMATION

## A.    POST-CONSUMMATION CORPORATE STRUCTURE, MANAGEMENT AND OPERATION

a)     Cancellation of Interests

On the Effective Date, except as otherwise provided for in the Plan, (a) all of the Interests, and any other note, bond, or indenture evidencing or creating any indebtedness or obligation of any Debtor will be cancelled, and (b) the obligations of the Debtors under any agreements, indentures, or certificates of designations governing the Interests and any other note, bond, or indenture evidencing or creating any indebtedness or obligation of any Debtor will be extinguished.

b)     Corporate Action

The entry of the Confirmation Order will constitute authorization for the Debtors to take or to cause to be taken all corporate and limited liability company actions necessary or appropriate to consummate and implement the provisions of the Plan prior to, on and after the Effective Date, and all such actions taken or caused to be taken will be deemed to have been authorized and approved by the Bankruptcy Court, including, without limitation, the execution and delivery of the Asset Purchase Agreement. Subject to the terms and conditions of the Asset Purchase Agreement, all such actions will be deemed to have occurred and will be in effect pursuant to applicable non-bankruptcy law and the Bankruptcy Code, without any requirement of further action by the stockholders or directors of the Debtors. On the Effective Date, the appropriate officers and managers of the Debtors, including without limitation the CRO, are authorized and directed to

ATLANTA:5397829.2

execute and deliver the agreements, documents and instruments contemplated by the Plan, the Plan Supplement and the Sale Documents in the name and on behalf of the Debtors.

## B.    CONFIRMATION AND/OR CONSUMMATION

Described below are certain important considerations under the Bankruptcy Code in connection with confirmation of the Plan.

a)    Requirement for Confirmation of the Plan

Before the Plan can be confirmed, the Bankruptcy Court must determine at the Confirmation Hearing that the following requirements for confirmation, set forth in section 1129 of the Bankruptcy Code, have been satisfied:

(i)    The Plan complies with the applicable provisions of the Bankruptcy Code.

(ii)    The Debtors have complied with the applicable provisions of the Bankruptcy Code.

(iii)    The Plan has been proposed in good faith and not by any means forbidden by law.

(iv)    Any payment made or promised by the Debtors or by a Person acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

(v)    With respect to each Class of Claims or Interests, each Impaired Claim and Impaired Interest Holder either has accepted the Plan or will receive or retain under the Plan, on account of the Claims or Interests held by such Holder, property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on such date under Chapter 7 of the Bankruptcy Code.  See Section XIII.D.

(vi)    The Plan provides that Administrative Claims and Priority Claims other than Priority Tax Claims will be paid in full on the Effective Date and that Priority Tax Claims will receive on account of such Claims: (a) the amount of such unpaid Allowed Priority Tax Claim in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Priority Tax Claim becomes Allowed and (iii) a date agreed to by the Debtors and the Holder of such Priority Tax Claim; or (b) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Priority Tax Claim and the Debtors or as the Bankruptcy Court may order.

ATLANTA:5397829.2

(vii)    If a Class of Claims is Impaired under the Plan, at least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by insiders holding Claims in such Class.

(viii)    The Debtors believe that, upon receipt of the votes required to confirm the Plan, the Plan will satisfy all the statutory requirements of chapter 11 of the Bankruptcy Code, that the Debtors have complied or will have complied with all of the requirements of chapter 11 and that the Plan has been proposed and submitted to the Bankruptcy Court in good faith.

(ix)    Further, even if all of the foregoing are satisfied, if any Class of Claims is Impaired and votes to reject the Plan, the Debtors must satisfy the applicable "cramdown" standard with respect to that Class. Section 1129(b) of the Bankruptcy Code requires that the plan "not discriminate unfairly" and be "fair and equitable" with respect to such class. The Debtors do not anticipate that any Class of Claims will vote to reject the Plan. However, in the event any Class votes to reject the Plan, and because Class 8 is deemed to reject the Plan, the Debtors believe they will satisfy the cramdown standards in section 1129(b) with respect to any such rejecting class.

b)    Conditions to Confirmation Date and Effective Date

The Plan specifies conditions precedent to the Confirmation Date and the Effective Date. Each of the specified conditions must be satisfied or waived in whole or in part by the Debtors, without any notice to interested parties or the Bankruptcy Court and without a hearing.

The conditions precedent to the occurrence of the Confirmation Date, which is the date of entry by the clerk of the Bankruptcy Court of the Confirmation Order, are that: (a) the form and substance of the Confirmation Order, as well as any amendments to the Plan, will have been approved by the Debtors; (b) the Confirmation Order will authorize the transactions contemplated by the Plan; and (c) the Confirmation Order will provide that the provisions of the Confirmation Order are non-severable and mutually dependent.

The conditions that must be satisfied on or prior to the Effective Date, which is the Business Day upon which all conditions to the consummation of the Plan have been satisfied or waived, and is the date on which the Plan becomes effective, are that: (a) the Bankruptcy Court will have approved the information contained in the Disclosure Statement as adequate; (b) the Confirmation Order in form and substance satisfactory to the Debtors and the Plan Sponsor will have been entered and will not be stayed by order of a court of competent jurisdiction; (c) those holders of Membership Claims opting to become members of New ClubCo will be sufficient in number to generate over a projected twelve month period an amount equal to the New ClubCo Dues Revenues; (d) all Allowed Claims (i) in any Class that is the subject of the Claims Caps, (ii) any unclassified claims and (iii) the Cure Amounts, in the aggregate, will not exceed 110% of the Claim Caps, in the aggregate; (e) all conditions precedent to the obligations of the Debtors and the Plan Sponsor under the Asset Purchase Agreement

-58-

have occurred or have been waived; (f) the transactions contemplated in the Asset Purchase Agreement, as well as the subsequent transfer to the Indenture Trustee SPE, have been consummated (which condition may not be waived without the express consent of the Indenture Trustee); (g) the Bankruptcy Court will have entered an order (contemplated to be part of the Confirmation Order) authorizing and directing the Debtors to take all actions necessary or appropriate to enter into, implement, and consummate the documents created, amended, supplemented, modified or adopted in connection with the Plan; (h) all authorizations, consents and regulatory approvals required, if any, in connection with the Plan's effectiveness will have been obtained; (i) the Debtors will have appointed the Liquidation Trustee, the Liquidating Trust Agreement and the other Liquidating Trust Documents will have been executed, and the Liquidating Trust will have received the General Unsecured Creditors Fund, the Administrative Convenience Claims Fund, the Rejecting Club Members Fund, the Post-Effective Date Plan Sponsor Funding from the Plan Sponsor, and an assignment from the Debtors of the Retained Actions; and (j) no order of a court will have been entered and will remain in effect restraining the Debtors from consummating the Plan.

## C.    RELEASES, INJUNCTIONS, EXCULPATION AND INDEMNIFICATION

### a)    Releases by Debtors

The Plan provides for certain releases to be granted by the Debtors on and as of the Effective Date. Specifically, effective as of the Effective Date, and except as otherwise provided in the Plan or the Confirmation Order, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, in their individual capacities and as debtors in possession, will be deemed to have forever released, and waived the Releasees and the D&O Releasees from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities (other than the rights of the Debtors or the Liquidation Trustee to enforce the Plan and the contracts, instruments, releases, indentures and other agreements or documents delivered thereunder), whether for tort, contract, violations of federal or state securities laws, or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other occurrence, including actions in connection with indebtedness for money borrowed by the Debtors, taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, or the Plan; provided, however, that (a) no Releasee or D&O Releasee will be released from any Claims, obligations, suits, judgments, debts or Causes of Action arising out of or in connection with indebtedness for money borrowed by any such person from any of the Debtors and (b) no Cause of Action against any insurer arising out of or relating to matters for which the Debtors would otherwise be liable or suffer an insurable loss will be released, including without limitation, any Cause of Action against the Debtors' Directors and Officers insurance carrier(s).   For the avoidance of doubt, James B. Anthony, Lucas Anthony and Timothy Cherry are not being released by Plan Section 10.03(a) or (b) unless James B. Anthony satisfies all of the following: (a) he becomes a

D&O Releasee; and (b) he and any non-Debtor affiliates he directly or indirectly owns or controls: (i) waive and release any and all claims of any kind against the Debtors; (ii) transfer and convey to the Debtors or to the Plan Sponsor all real property, personal property and other assets used by the Debtors, or necessary to operate the businesses of the Debtors, or which is necessary to satisfy any condition precedent under the Plan or the Asset Purchase Agreement; (iii) fully cooperate with the transfer of the Acquired Assets, the Sale and the orderly transition of the Debtors' businesses to the Plan Sponsor; (iv) do not object to or oppose confirmation of the Plan; (v) vote to accept the Plan to the extent he or any of them hold a Claim entitled to vote, and (vi) otherwise cooperate fully with the consummation of the Plan.

Each officer and director of the Debtors who is a D&O Releasee must affirmatively elect the benefit of the releases provided for in the Plan no later than September 15, 2012.

In consideration for these releases, the D&O Releasees are required to agree to forever release, waive and discharge those Claims, obligations, suits, judgments, remedies, damages, demands, debts, rights, causes of action, and liabilities whatsoever against the Debtors, the Estates, the Liquidating Trust, or the Liquidation Trustee, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence, taking place on or prior to the Effective Date in any way relating to the Debtors, the Estates, the conduct of the Debtors' businesses, the Chapter 11 Case, the Plan, the Liquidating Trust or the Liquidation Trustee, other than any Note Holder Claim or Club Member Claim they hold.

After investigating the circumstances surrounding the commencement of these cases, the Debtors believe that they do not have any viable causes of action against either the Releasees or the D&O Releasees.

The Releasees include the Indenture Trustee, which the Debtors have already released pursuant to the Cash Collateral Order. The Committee or any other party in interest had 70 days following the Petition Date commence an action against the Indenture Trustee and none did.

b)      Releases by Holders of Claims and Interests

Effective as of the Effective Date, and except as otherwise provided in the Plan or the Confirmation Order, to the fullest extent permitted under applicable law, in consideration for the obligations of the Persons set forth below under the Plan and, if applicable, the Cash, securities, contracts, releases and other agreements or documents to be delivered in connection with the Plan, each Holder of a Claim or Interest who votes in favor of the Plan or is presumed to have voted in favor of the Plan pursuant to section 1126(f) of the Bankruptcy Code will be deemed to have forever waived and released (i) the Debtors, (ii) the Liquidation Trustee, (iii) the Liquidating Trust, (iv) the Releasees, and (v) the D&O Releasees from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities (other than

ATLANTA:5397829.2

the rights of such Holders of Allowed Claims under the Plan to enforce the Plan and the contracts, instruments, releases, indentures and other agreements or documents delivered thereunder), whether for tort, contract, violations of federal or state securities laws, or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other occurrence, including actions in connection with indebtedness for money borrowed by the Debtors, taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, or the Plan; provided, however, that the Plan will not release any Releasees or the D&O Releasee from any Causes of Action held by a Governmental Unit existing as of the Effective Date based on (i) any criminal laws of the United States or any domestic state, city or municipality or (ii) sections 1104-1109 and 1342(d) of ERISA.

In consideration for these releases, holders of General Unsecured Claims will receive their Pro Rata Share of the General Unsecured Creditors Fund, and the holders of Rejecting Club Member Claims will receive their Pro Rata Share of the Rejecting Members Fund.

      c)      Injunction

      (a)      <u>Claims and Interests.</u> *THE PLAN PROVIDES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THE PLAN OR THE CONFIRMATION ORDER, AND TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED BY THE BANKRUPTCY CODE, INCLUDING SECTIONS 524 AND 1141 THEREOF, THE ENTRY OF THE CONFIRMATION ORDER WILL, PROVIDED THAT THE EFFECTIVE DATE OCCURS, PERMANENTLY ENJOIN ALL PERSONS THAT HAVE HELD, CURRENTLY HOLD OR MAY HOLD A CLAIM OR OTHER DEBT OR LIABILITY OR AN INTEREST OR OTHER RIGHT OF AN EQUITY SECURITY HOLDER THAT IS IMPAIRED OR TERMINATED PURSUANT TO THE TERMS OF THE PLAN FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST THE DEBTORS, THE LIQUIDATING TRUST, THE LIQUIDATION TRUSTEE, OR THE PROPERTY OF ANY OF THE FOREGOING ON ACCOUNT OF ANY SUCH CLAIMS, DEBTS OR LIABILITIES OR SUCH TERMINATED INTERESTS OR RIGHTS: (A) COMMENCING, CONDUCTING OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY SUIT, ACTION OR OTHER PROCEEDING OF ANY KIND; (B) ENFORCING, LEVYING, ATTACHING, COLLECTING OR OTHERWISE RECOVERING IN ANY MANNER OR BY ANY MEANS, WHETHER DIRECTLY OR INDIRECTLY, ANY JUDGMENT, AWARD, DECREE OR ORDER; (C) CREATING, PERFECTING OR ENFORCING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY LIEN OR ENCUMBRANCE OF ANY KIND; (D) ASSERTING ANY SETOFF, OFFSET, RIGHT OF SUBROGATION OR RECOUPMENT OF ANY KIND, DIRECTLY OR INDIRECTLY, AGAINST ANY DEBT, LIABILITY OR OBLIGATION DUE TO ANY OF THE DEBTORS; AND (E) PROCEEDING IN ANY MANNER IN ANY PLACE WHATSOEVER, INCLUDING EMPLOYING ANY PROCESS, THAT*

ATLANTA:5397829.2

*DOES NOT CONFORM TO OR COMPLY WITH OR IS INCONSISTENT WITH THE PROVISIONS OF THE PLAN; PROVIDED, HOWEVER, THAT THIS INJUNCTION WILL NOT APPLY TO (A) ANY CLAIMS CREDITORS MAY ASSERT UNDER THE PLAN TO ENFORCE THEIR RIGHTS THEREUNDER TO THE EXTENT PERMITTED BY THE BANKRUPTCY CODE OR (B) ANY CLAIMS CREDITORS OR OTHER THIRD PARTIES MAY HAVE AGAINST EACH OTHER, WHICH CLAIMS ARE NOT RELATED TO THE DEBTORS, IT BEING UNDERSTOOD, HOWEVER, THAT ANY DEFENSES, OFFSETS OR COUNTERCLAIMS OF ANY KIND OR NATURE WHATSOEVER WHICH THE DEBTORS MAY HAVE OR ASSERT IN RESPECT OF ANY OF THE CLAIMS OF THE TYPE DESCRIBED IN (A) OR (B) OF THIS PROVISO ARE FULLY PRESERVED.*

(b)   Released Claims. *THE PLAN PROVIDES THAT, AS OF THE EFFECTIVE DATE, THE CONFIRMATION ORDER WILL CONSTITUTE AN INJUNCTION PERMANENTLY ENJOINING ANY PERSON THAT HAS HELD, CURRENTLY HOLDS OR MAY HOLD A CLAIM, DEMAND, DEBT, RIGHT, CAUSE OF ACTION OR LIABILITY THAT IS RELEASED PURSUANT TO THE PLAN FROM ENFORCING OR ATTEMPTING TO ENFORCE ANY SUCH CLAIM, DEMAND, DEBT, RIGHT, CAUSE OF ACTION OR LIABILITY AGAINST (I) ANY DEBTOR, (II) THE LIQUIDATING TRUST, (III) ANY RELEASEE, (IV) ANY D&O RELEASEE, OR (V) ANY EXCULPATED PERSON, OR ANY OF ITS PROPERTY, BASED ON, ARISING FROM OR RELATING TO, IN WHOLE OR IN PART, ANY ACT, OMISSION, OR OTHER OCCURRENCE TAKING PLACE ON OR PRIOR TO THE EFFECTIVE DATE WITH RESPECT TO OR IN ANY WAY RELATING TO THE CHAPTER 11 CASE, ALL OF WHICH CLAIMS, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION OR LIABILITIES WILL BE DEEMED RELEASED ON AND AS OF THE EFFECTIVE DATE; PROVIDED, HOWEVER, THAT WITH RESPECT TO THE FORMER DIRECTORS, OFFICERS AND EMPLOYEES OF THE DEBTORS, THIS INJUNCTION WILL APPLY ONLY TO THE ENFORCEMENT OF CLAIMS, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION OR LIABILITIES WITH RESPECT TO WHICH SUCH FORMER DIRECTORS, OFFICERS AND EMPLOYEES WOULD BE ENTITLED TO INDEMNIFICATION FROM THE DEBTORS UNDER CONTRACT OR LAW; AND, PROVIDED FURTHER, HOWEVER, THAT THIS INJUNCTION WILL NOT APPLY TO (A) ANY CLAIMS CREDITORS MAY ASSERT UNDER THE PLAN TO ENFORCE THEIR RIGHTS THEREUNDER TO THE EXTENT PERMITTED BY THE BANKRUPTCY CODE OR (B) ANY CLAIMS CREDITORS OR OTHER THIRD PARTIES MAY HAVE AGAINST EACH OTHER, WHICH CLAIMS ARE NOT RELATED TO THE DEBTORS, IT BEING UNDERSTOOD, HOWEVER, THAT ANY DEFENSES, OFFSETS OR COUNTERCLAIMS OF ANY KIND OR NATURE WHATSOEVER WHICH THE DEBTORS MAY HAVE OR ASSERT IN RESPECT OF ANY OF THE CLAIMS OF THE TYPE DESCRIBED IN (A) OR (B) OF THIS PROVISO ARE FULLY PRESERVED.  THESE RELEASES INCLUDE CLAIMS AGAINST THE INDIVIDUALS LISTED IN PLAN SUPPLEMENT ATTACHMENT 7 .*

d)      Exculpation Relating to Chapter 11 Cases

The Plan contains standard exculpation provisions applicable to the key parties in interest with respect to their conduct in the Chapter 11 Cases. Specifically, the Plan provides that, none of the Debtors, the Liquidation Trustee, the Indenture Trustee, the Negotiating Group, the Advisory Board, the Plan Sponsor or any Exculpated Person will have or incur any liability to any Person, including, without limitation, any Holder of a Claim or Interest or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys or affiliates or any of their successors or assigns, for any act taken or omission made in connection with, relating to, or arising out of, the Chapter 11 Cases, Filing, negotiating, prosecuting, administering, formulating, implementing, confirming or consummating the Plan, or the Property to be distributed under the Plan, including all activities leading to the promulgation and confirmation of the Plan, the Disclosure Statement (including any information provided or statement made in the Disclosure Statement or omitted therefrom), or any contract, instrument, release or other agreement or document created in connection with or related to the Plan or the administration of the Debtors or these Chapter 11 Cases, provided, however, that the foregoing exculpation will not apply to any act of gross negligence or willful misconduct. For the avoidance of doubt, the execution and delivery by the CRO on behalf of the Debtors of any documents contemplated under the Plan, including, without limitation, any of the documents described in that certain exhibit to the Plan Supplement that contains the Plan Effective Date steps schematic chart, is only in her representative capacity and not individually, and neither she nor GGG shall have any liability thereunder. The individuals listed in Plan Supplement Attachment 7 as being exculpated are included in the persons who are being exculpated under the Plan.

## D.      PRESERVATION OF RIGHTS OF ACTION

Except as otherwise provided in the Plan, the Asset Purchase Agreement or the Confirmation Order, in accordance with section 1123(b)(3) of the Bankruptcy Code, the Liquidation Trustee (as a representative of the Debtors' Estates) will retain and may exclusively enforce any Retained Actions subject only to any express waiver or release thereof in the Plan or in any other contract, instrument, release, indenture or other agreement entered into in connection with the Plan, and the Confirmation Order's approval of the Plan will be deemed a res judicata determination of such rights to retain and exclusively enforce such Retained Actions, and none of such Retained Actions is deemed waived, released or determined by virtue of the entry of the Confirmation Order or the occurrence of the Effective Date, notwithstanding that the specific Retained Actions are not identified or described. Absent such express waiver or release by the Debtors, the Liquidation Trustee may pursue Retained Actions, as appropriate, in accordance with the best interests of the Liquidating Trust.

Attached as Attachment 10 to the Plan Supplement is a non-exclusive listing of the Retained Actions, including potential avoidance actions.

Absent an express waiver or release as referenced above, nothing in the Plan will (or is intended to) prevent, estop or be deemed to preclude the Liquidation Trustee

from utilizing, pursuing, prosecuting or otherwise acting upon all or any of its Retained Actions and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches will apply to such Retained Actions upon or after Confirmation, the Effective Date or the consummation of the Plan. By example only, and without limiting the foregoing, the utilization or assertion of a Retained Action, or the initiation of any proceeding with respect thereto against a Person, by the Liquidation Trustee will not be barred (whether by estoppel, collateral estoppel, res judicata or otherwise) as a result of (a) the solicitation of a vote on the Plan from such Person or such Person's predecessor in interest; (b) the Claim, Interest or Administrative Claim of such Person or such Person's predecessor in interest having been listed in a Debtor's Schedules, list of Holders of Interests, or in the Plan, Disclosure Statement or any exhibit thereto; (c) prior objection to or allowance of a Claim or, Interest of the Person or such Person's predecessor in interest; or (d) Confirmation of the Plan.

Notwithstanding any allowance of a Claim, the Debtors and the Liquidation Trustee reserve the right to seek, among other things, to have such Claim disallowed if any of the Debtors or the Liquidation Trustee, as the case may be, at the appropriate time, determines that it has a defense under section 502(d) of the Bankruptcy Code, e.g., any of the Debtors or the Liquidation Trustee holds an Avoidance Action against the Holder of such Claim and such Holder after demand refuses to pay the amount due in respect thereto.

## E.    RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain after the Effective Date and until the Chapter 11 Cases are closed, exclusive jurisdiction of all matters arising out of, arising in or related to the Chapter 11 Cases to the fullest extent permitted by applicable law, including, without limitation, jurisdiction to:

a)    classify or establish the priority or secured or unsecured status of any Claim (whether Filed before or after the Effective Date and whether or not contingent, Disputed or unliquidated) or resolve any dispute as to the treatment of any Claim pursuant to the Plan;

b)    grant or deny any applications for allowance of compensation or reimbursement of expenses pursuant to sections 328, 330, 331 or 503(b) of the Bankruptcy Code or otherwise provided for in the Plan, for periods ending on or before the Effective Date;

c)    determine and resolve any matters related to the assumption, assumption and assignment or rejection of any executory contract or unexpired lease to which any Debtors is a party or with respect to which any Debtors may be liable, and to hear, determine and, if necessary, liquidate any Claims arising therefrom;

ATLANTA:5397829.2

d)      ensure that all payments due under the Plan and performance of the provisions of the Plan are accomplished as provided herein and resolve any issues relating to Distributions to Holders of Allowed Claims pursuant to the provisions of the Plan;

e)      construe, take any action and issue such orders, prior to and following the Confirmation Date and consistent with section 1142 of the Bankruptcy Code, as may be necessary for the enforcement, implementation, execution and consummation of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan, including, without limitation, the Disclosure Statement and the Confirmation Order, for the maintenance of the integrity of the Plan and protection of the Debtors or the Liquidation Trustee in accordance with sections 524 and 1141 of the Bankruptcy Code following consummation;

f)      determine and resolve any case, controversies, suits or disputes that may arise in connection with the consummation, interpretation, implementation or enforcement of the Plan (and all Exhibits to the Plan and a Plan Supplement) or the Confirmation Order, including the indemnification and injunction provisions set forth in and contemplated by the Plan or the Confirmation Order, or any Entity's rights arising under or obligations incurred in connection therewith;

g)      hear any application of the Debtors or the Liquidation Trustee to modify the Plan after the Effective Date pursuant to section 1127 of the Bankruptcy Code and Section 12.04 hereof or modify the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code and the Plan;

h)      issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

i)      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

j)      determine any other matters that may arise in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order, the Liquidating Trust, or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement, or the Confirmation Order, except as otherwise provided in the Plan;

ATLANTA:5397829.2

k)      determine such other matters and for such other purposes as may be provided in the Confirmation Order;

l)      hear and determine any other matters related hereto and not inconsistent with chapter 11 of the Bankruptcy Code;

m)      hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan or the Liquidating Trust;

n)      enter one or more Final Decrees closing each of the Chapter 11 Cases;

o)      determine and resolve any and all controversies relating to the rights and obligations of the Liquidation Trustee in connection with the Chapter 11 Cases;

p)      allow, disallow, determine, liquidate or estimate any Claim, including the compromise, settlement and resolution of any request for payment of any Claim, the resolution of any Objections to the allowance of Claims and to hear and determine any other issue presented hereby or arising hereunder, including during the pendency of any appeal relating to any Objection to such Claim (to the extent permitted under applicable law);

q)      permit the Debtors (and the Liquidation Trustee, to the extent provided for in the Plan, or the Liquidating Trust Agreement) to recover all assets of the Debtors and Property of their Estates, wherever located;

r)      hear and determine any motions or contested matters involving taxes, tax refunds, tax attributes and tax benefits and similar or related matters with respect to the Debtors or the Debtors' Estates arising prior to the Effective Date or relating to the period of administration of the Chapter 11 Case, including, without limitation, matters concerning federal, state and local taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

s)      hear and determine any motions, applications, adversary proceedings, contested matters and other litigated matters pending on, Filed or commenced after the Effective Date that may be commenced by the Liquidation Trustee thereafter, including Retained Actions, proceedings with respect to the rights of the Liquidation Trustee to recover Property under sections 542, 543 or 553 of the Bankruptcy Code, or proceedings to otherwise collect to recover on account of any claim or Cause of Action that the Debtors may have had;

t)      to consider and act on the compromise of any Claim against, or Interest in, the Debtor, or any Cause of Action asserted on behalf of the Debtors' Estates; provided, however, that there will be no requirement that the Debtors or the Liquidation Trustee seek Bankruptcy Court approval of compromises and settlements except as provided herein; and

u)      hear any other matter not inconsistent with the Bankruptcy Code.

ATLANTA:5397829.2

If the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction over any matter arising under, arising in or related to the Debtors, including with respect to the matters set forth above in Plan Section 11.01, Plan Article XI will not prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such subject matter.

## F.  AMENDMENT, ALTERATION AND REVOCATION OF PLAN

The Debtors and the Plan Sponsor may alter, amend or modify the Plan in accordance with section 1127 of the Bankruptcy Code or as otherwise permitted at any time prior to the Confirmation Date. After the Confirmation Date and prior to the substantial consummation of the Plan, and in accordance with the provisions of section 1127(b) of the Bankruptcy Code and the Bankruptcy Rules, the Debtors may, so long as the treatment of Holders of Claims or Interests under the Plan is not adversely affected, institute proceedings in the Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order and any other matters as may be necessary to carry out the purposes and effects of the Plan; provided, however, prior notice of such proceedings will be served in accordance with Bankruptcy Rules 2002 and 9014.

The Debtors and the Plan Sponsor reserve the right, at any time prior to Confirmation of the Plan, to withdraw the Plan. If the Plan is withdrawn or if the Confirmation Date does not occur, the Plan will be null and void and have no force and effect. In such event, nothing contained herein will be deemed to constitute a waiver or release of any claims by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors.

## G.  PLAN IMPLEMENTATION DOCUMENTS

The documents necessary to implement the Plan include the following:

(a)    Asset Purchase Agreement

(b)    Mountain Park Facility loan documents

(c)    Exit Facility loan documents

(d)    Subordination and Intercreditor Agreement between NewCo, New ClubCo and the Indenture Trustee

(e)    Liquidating Trust Agreement

(f)    Schedule of Assumed Contracts

(g)    form of release agreements to be executed y the D&O Releasees

(h)    list of the present and former officers and directors of the Debtors, the Debtors' Parent, CMAG, CMAHG, CIPOC, the members of the Negotiating Group and of the Advisory Board

(i)    Note Restructuring Agreement

(j)    Debt Assumption and Assignment Agreement

(k)    Mortgage Assignment, Security Agreement and Fixture Filing between the Indenture Trustee and the IT SPE

(l)    Assignment of Leases by the IT SPE to the Indenture Trustee

ATLANTA:5397829.2

(m)    Collateral Assignment of Master Lease by IT SPE to the Indenture Trustee

(n)    Security Agreement between the IT SPE and the Indenture Trustee

(o)    Collateral Assignment of IP/License Agreement between the IT SPE and the Indenture Trustee

(p)    Agreement for Deed in Lieu of Foreclosure and Escrow Agreement between the IT SPE and the Indenture Trustee and Escrow Agent

(q)    Amendment to the Indenture

(r)    IT SPE limited liability company agreement

(s)    formation documents of IT Representative, LLC

(t)    Master Lease by and between the IT SPE and New ClubCo

(u)    form of Subleases between New ClubCo and the golf operating subsidiaries

(v)    Description of Use of Mountain Park Facility

(w)    Revised New ClubCo Membership Plan

(x)    Plan Effective Date steps schematic chart

(y)    Chart of Retained Actions

(z)    Narrative Supplement to the Plan Sponsor Projections

Such documents will be submitted in substantially the form to be implemented on the Effective Date as part of a Plan Supplement. A Plan Supplement was filed on June __, 2012 [Docket Entry No __]. All documents in the Plan Supplement will be in form, scope, and substance satisfactory to the Debtors and the Plan Sponsor. Upon such filing, all documents included in the Plan Supplement may be viewed and downloaded free of charge from the Debtors' case website at www.bmcgroup.com/cliffs, viewed and downloaded from the Bankruptcy Court electronic case filing system or inspected in the office of the Clerk of the Bankruptcy Court during normal court hours. Holders of Claims or Interests may obtain a copy of any document included in the Plan Supplement upon written request to the Debtors' Voting Agent at the address set forth in Section XV(G). or to the Debtors' counsel, McKenna Long & Aldridge LLP, 303 Peachtree Street, Suite 5300, Atlanta, Georgia 30308 Attn: Bryan E. Bates.

ATLANTA:5397829.2

## H.    MEMBERSHIP INFORMATION

Confirmation of the Plan will maintain continuity of the Club Members' use of the club amenities.  The Club Members, including inactive Club Members who have terminated their membership and are waiting for return of their deposit, will have the opportunity to join the New Membership Programs. Lot owners who have never been Club Members will also be given an opportunity to join the New Clubs. Club Members will receive additional details regarding the New Membership Programs, including additional details about the dues, along with the Plan Supplement. This will ensure that Club Members have ample time to review the information and determine how to vote on the Plan on or before the Voting Deadline. Club Members will also receive a form of ballot with the Plan Supplement, which will enable the Club Members to indicate whether they choose to opt in to or out of the New Membership Programs.

Membership Deposits and Prepaid Dues

New ClubCo will reimburse the members admitted to New Clubs for their Membership Deposits in accordance with the New ClubCo club documents. Vesting will be at the rate of 20% per year.  Those members and former members who elect not to join the New Clubs will receive treatment afforded Holders of Allowed Rejecting Club Member Claims.

Transfer Fees

New ClubCo will charge a one-time fee (the "Transfer Fee") to any existing member of a Club of the Debtors who waives its general unsecured claim against the Debtors and becomes a member of one of the New Clubs to be owned New ClubCo (a "Rejoining Member").

The Transfer Fee will be payable by a member who is in good standing in the payment of post-Petition dues and other charges within 30 days of the Effective Date of the Plan for each type of membership and will be no less than:

- Golf/Charter or Corporate – Either $5,000 in one payment or $5,740 paid as follows:  an initial payment of $2,500 within 30 days of the Effective Date of the Plan followed by twenty-four (24) monthly payments of $135 each.
- Family/Sports – $2,500.
- Wellness – $1,500
- Residence Club – $2,500.

The Reinstatement Fee will be payable by a resigned member who is in good standing in the payment of post-Petition dues and other charges within 30 days of the Effective Date of the Plan and wants his or her Membership Deposit Obligation assumed as follows:

- Golf/Charter or Corporate – 2,500.

-69-

ATLANTA:5397829.2

- Family/Sports – $1,500.
- Wellness – $750
- Residence Club – $1,500 .

Amnesty Program

Resigned Club Members and all other persons who own property in The Cliffs and who are not current Club Members may elect to acquire new membership on or before August 31, 2012 by paying an activation fee, plus initiation fee, less a $20,000 discount, as follows:

- Golf or Corporate – $35,000 total (with a financing option that includes an initial payment of at least ½ of the total fee, with the remaining balance paid in two (2) semi-annual payments with interest at the rate of 8% per annum.)
  $5,000 Activation Fee
  $50,000 Initiation Fee
  -$20,000 Discount

- Sports – $17,500 total (with same financing option for golf)
  $2,500 Activation Fee
  $35,000 Initiation Fee
  -$20,000 Discount

- Wellness or Social – $1,500 total
  $1,500 Activation Fee
  $20,000 Initiation Fee
  -$20,000 Discount

Member Dues

New ClubCo's will charge on a monthly basis each member 1/12 of the applicable annual dues, for each type of membership of:

- Full Golf – $10,380
- Home Golf – $9,340
- Non-Resident Golf – $8,300
- Full Sports – $5,280
- Non-Resident Sports – $4,225
- Wellness – $3,720
- Social – $1,860
- Corporate – $10,380 plus $5,190 per each designee over 2
- Residence Club – $1,875

ATLANTA:5397829.2

Membership Categories

At the New Clubs, New ClubCo will offer, at minimum, the following membership categories: a full golf membership, a home golf membership, a non-resident golf membership, a full sports membership, a non-resident sports membership, a wellness membership, a social membership, a corporate membership and a residence club membership. New ClubCo reserves the right to establish such additional membership classes as it deems appropriate, including, but not limited to, a social membership. New ClubCo will endeavor to have all property owners join a New Club at some level of membership.

Membership Level

Electing Club Members will have the opportunity to upgrade or to downgrade their membership as provided in the New ClubCo Membership Plan. Until such time as the Electing Club Members execute the New Membership Programs agreements, Club Members will remain at their current membership level and will continue to pay dues at this level. The Plan Sponsor anticipates that agreements to enter into the New Membership Programs will be effective September 1, 2012.

Filing Claims and Eligibility in New Clubs

Club Members who file a proof of claim in the Chapter 11 Cases will nevertheless be offered membership in the new clubs. The filing of a proof of claim in no way affects a Club Member's ability to join the new clubs or retain the deposits previously paid. The Schedules filed by the Debtors provide a claim for each Club Member in the amount of his or her deposit, as listed in the Debtors' records. Club Members may review the Debtors' Schedules for accuracy at www.bmcgroup.com/cliffs.

<div style="text-align:center">

**IX.**
**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

</div>

**A.    REJECTION OF CONTRACTS AND LEASES**

Pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between the Debtors and any other person or entity will be deemed rejected by the Debtors (with the consent of the Plan Sponsor) as of the Effective Date, except for any executory contract or unexpired lease that: (a) has previously been assumed, assumed and assigned, or rejected pursuant to an order of the Bankruptcy Court on or prior to the Confirmation Date, (b) is the subject of a pending motion to assume, assume and assign, or reject as of the Confirmation Date, or (c) is listed on the Schedule of Assumed Contracts set forth in Exhibit 1 to the Plan. The listing of a document on the Schedule of Assumed Contracts will not constitute an admission by the Debtors that such document is an executory contract or unexpired lease or that the Debtors have any liability thereunder.

ATLANTA:5397829.2

Pursuant to the Plan, the entry of the Confirmation Order will, subject to and upon the occurrence of the Effective Date, constitute the approval, pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption and rejection of the executory contracts assumed and rejected pursuant to Article VI of the Plan.

## B.     CURE OF DEFAULTS, REJECTION DAMAGES, AND AMENDMENT OF SCHEDULE

Pursuant to Plan Section 6.02, the Debtors have included in the Schedule of Assumed Contracts the amount necessary to cure any default under any executory contract or unexpired lease to be assumed under the Plan, which amount will be paid in Cash by the Plan Sponsor on the Effective Date, except as set forth in the Plan.  To the extent that any counterparty of any assumed executory contract asserts that any Debtor or non-Debtor affiliate has any liability on any assumed executory contract, upon payment by the Plan Sponsor of the full amount of each cure amount as set forth herein, any Debtor or non-Debtor affiliate such will have no liability to any counterparty of any assumed executory contract.

Any party to an executory contract or unexpired lease to be assumed will have twenty one (21) days after service of the Schedule of Assumed Contracts within which to file with the Bankruptcy Court an objection to the cure amount listed by the Debtors, an objection to the adequacy of assurance of future performance by the Plan Sponsor, or any other objection to the assumption of such executory contracts or unexpired lease. Any such objection will be resolved by the Bankruptcy Court at the Confirmation Hearing or, if the Court does not hear such objection at the Confirmation Hearing, at such other time as agreed to by the affected parties. If the Bankruptcy Court determines that the cure amount with respect to an executory contract or unexpired lease is greater than the amount listed by the Debtors, then the Debtors may elect to reject the contract or lease at issue.

Pursuant to Plan Section 6.03, any holder of a Claim arising out of the rejection of any executory contract or unexpired lease pursuant to Article VI of the Plan will file with the Bankruptcy Court proof of such claim no later than the later of (a) thirty (30) days after the Effective Date, or (b) thirty (30) days after the entry of an order rejecting such executory contract or unexpired lease. Any Claim not filed within such time period will be forever barred.

The Debtors and the Plan Sponsor will have the right, on or before the hearing on Plan Confirmation, to modify the Schedule of Assumed Contracts by filing a Plan Supplement, subject to the consent of the Agents, thus, by removing an executory contract or unexpired lease, providing for its rejection pursuant to Plan Section 6.01 or by adding any executory contract or unexpired lease, providing for its assumption and assignment pursuant to Plan Section 6.01.  The Debtors will provide notice of any such modification to the parties to any executory contract or unexpired lease affected thereby and an opportunity for such parties to be heard.

## C.     SURVIVAL OF CERTAIN CORPORATE INDEMNITIES

ATLANTA:5397829.2

Pursuant to Plan Section 5.18, the obligations of the Debtors pursuant to their operating agreements and other governing documents to indemnify persons serving on or after the Petition Date as officers, directors, agents, or employees of the Debtors with respect to actions, suits, and proceedings against the Debtors or such officers, directors, agents, or employees, based upon any act or omission for or on behalf of the Debtors occurring on or after the Petition Date, will not be impaired by the confirmation of the Plan. Such obligations will be deemed and treated as executory contracts to be assumed by the Debtors pursuant to the Plan and will continue as obligations of the Debtors to the extent of available insurance only.

## D.   CLUB MEMBERSHIP AGREEMENTS

As provided in Plan Section 6.06, except and to the extent previously rejected by an order of the Bankruptcy Court on or before the Effective Date, all Club Membership Agreements entered into before or after the Petition Date and not since terminated, will be deemed to be, and will be treated as though they are, executory contracts that are rejected under Plan Section 6.01.  Notwithstanding the above, each party (other than the Debtors) to a Club Membership Agreement will be entitled to elect to have its Claims against the Debtors arising under the Club Membership Agreement treated pursuant to the terms of Class 7 in full satisfaction of such claims.  In the event a Club Member does not elect in writing to have his or her Claim treated as provided in Class 7, all Claims of such Club Member under the applicable Club Membership Agreement, including any Rejection Claim, will be treated in accordance with Plan Section 6.04.

## E.   EASEMENTS

The Debtors and the Plan Sponsor are currently reviewing all known or asserted easements with respect to property, including without limitation the Clubs, owned or used by the Debtors.  The Debtors and the Plan Sponsor are analyzing: (i) the validity of any such easements under state law; (ii) the avoidability of any such easements under bankruptcy law; and (iii) whether the property proposed to be conveyed pursuant to the Plan can be conveyed free and clear of such easements.

<p align="center">X.<br/>CERTAIN RISK FACTORS TO BE CONSIDERED</p>

The Holders of Claims in Classes 1, 3, 4, 5, 6 and 7 should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or reject the Plan. These risk factors should not, however, be regarded as constituting the only risks associated with the Plan and its implementation.

## A.   GENERAL CONSIDERATIONS

The Plan sets forth the means for satisfying the Claims against each of the Debtors. See Section VII.E. of this Disclosure Statement entitled "Classification and Treatment of Claims and Interests" for a description of the treatments of each class of Claims and Interests. The Interests receive no distributions pursuant to the Plan.

ATLANTA:5397829.2

### B.    CERTAIN BANKRUPTCY CONSIDERATIONS

Even if all voting Impaired Classes vote in favor of the Plan, and if with respect to any Impaired Class deemed to have rejected the Plan the requirements for "cramdown" are met, the Bankruptcy Court may choose not to confirm the Plan. Section 1129 of the Bankruptcy Code requires, among other things, a showing that confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization of the Debtors, and that the value of distributions to dissenting Holders of Claims and Interests will not be less than the value such Holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Although the Debtors believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion. See **Exhibit D** for a liquidation analysis of the Debtors.

The Plan Sponsor may not close if it does not acquire certain non-Debtor assets indirectly controlled by James B. Anthony, including, without limitation, the Waterfall property, the Chapel property, the High Carolina property and intellectual property.

In the event that the Plan is not confirmed, then it is highly likely that the Debtors would have to close the Clubs with little advance notice once funds for operations under the DIP Facility are exhausted.  The Debtors would have few options available but might convert the Chapter 11 Cases to Chapter 7 Cases, which constitute events of default under the Cash Collateral Order and the Financing Order, entitling the Indenture Trustee and the DIP Lender to stay relief; or attempt to sell the Clubs in the Chapter 11 Cases under less advantageous terms. Treatment of holders of all Claims under each of those alternatives will be much less favorable than the treatment proposed under the Plan because the Debtors will not be able to keep the Clubs open and the cost to reopen the Clubs will be problematic once the golf courses lie fallow and deteriorate.  Under such circumstances, there is a substantial risk that only the DIP Lender and the Bridge Lender Claims will be repaid unless the Note Holders raise sufficient funds to satisfy such Claims, that there will be no distribution to Mechanic's Lien Claims or General Unsecured Claims and that the existing Club Members will lose all of their Membership Initiation Deposits and may have to pay a new deposit in order to become a member in any club established by a new owner should the clubs reopen after closing.  Because the DIP Lender and the Bridge Lender have blanket liens in all of the Debtors' property, any groups of Club Members at specific Clubs interested in opening only one Club would have to raise sufficient funds to deal with the existing secured indebtedness (i.e., pay the $9.5 million principal plus interest and fees necessary to satisfy those loans and also make arrangements with the Indenture Trustee regarding the more than $70 million in Note Holder Claims, and the approximately $1.5 million in Mechanic's Lien Claims and pay the priority taxes of $1.9 million) and then cover the costs of reopening a closed golf course and operating the golf course going forward.

### C.    CLAIMS ESTIMATIONS

There can be no assurance that any estimated Claim amounts set forth in this Disclosure Statement are correct. The actual Allowed amount of Claims likely

ATLANTA:5397829.2

will differ in some respect from the estimates. The estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should any underlying assumptions prove incorrect, the actual Allowed amount of Claims may vary from those estimated herein.

### D.    CONDITIONS PRECEDENT TO CONSUMMATION

The Plan provides for certain conditions that must be satisfied (or waived) prior to confirmation of the Plan and for certain other conditions that must be satisfied (or waived) prior to the Effective Date. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, even if the Bankruptcy Court confirms the Plan, there can be no assurance that the Plan will be consummated and the restructuring completed.

### E.    CERTAIN TAX CONSIDERATIONS

There are a number of income tax considerations, risks and uncertainties associated with consummation of the Plan. Interested parties should read carefully the discussions set forth in Section XII regarding certain U.S. federal income tax consequences of the Plan to the Debtors and to the Holders of Claims who are entitled to vote to accept or reject the Plan.

### F.    SUBSEQUENT DEFAULT

It is possible that the Plan Sponsor and/or New ClubCo may subsequently default on its obligations under the Plan, and there is a chance of a subsequent bankruptcy.

## XI.
## APPLICABILITY OF FEDERAL AND OTHER SECURITIES LAWS

It is not currently expected that any registration statement will be filed under the Securities Act or any state securities laws with respect to any transfer under the Plan.

## XII.
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain U. S. federal income tax consequences of the implementation of the Plan to the Debtors and to certain Holders of Claims, is for general information purposes only, and should not be relied upon for determining the specific tax consequences of the Plan with respect to a particular Holder of a Claim.  The following summary does not address the federal income tax consequences to Holders whose Claims are:  (i) unimpaired or otherwise entitled to payment in full in cash under the Plan (*e.g.*, Allowed Administrative Claims, Professional Fee Claims, Allowed Priority Tax Claims, DIP Facility Claims, and the Class 2 Claim (the Indenture Trustee – Bridge Loan Claim); (ii) not entitled to vote under the Plan; and (iii) not entitled to receive or retain any property under the Plan.

-75-

The following summary is based on the Internal Revenue Code of 1986, as amended (the "IRC" or the "Code"), U.S. Treasury Regulations promulgated thereunder (the "regulations"), judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof.  Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below.

In addition, this summary does not address foreign, state or local tax consequences of the Plan, nor does it address the federal income tax consequences of the Plan to special classes of taxpayers (such as non-U.S. persons, foreign taxpayers, broker-dealers, traders that mark-to-market their securities, banks, mutual funds, insurance companies, other financial institutions, small business investment companies, persons whose functional security is not the U.S. dollar, persons subject to the alternative minimum tax, regulated investment companies, real estate investment trusts, tax-exempt organizations (including, without limitation, certain pension funds), persons holding Claims as part of a "straddle," "hedge," "constructive sale" or "conversion transaction" with other investments, pass-through entities and investors in pass-through entities.  If a partnership (including any entity treated as a partnership for tax purposes) holds Claims, the tax treatment of a partner (or member) will generally depend upon the status of the partner and upon the activities of the partnership.  Moreover, the following discussion generally does not address U.S. federal taxes other than income taxes, nor does it apply to any person that acquires any of the consideration provided under the Plan in the secondary market.  This discussion assumes, except where otherwise indicated, that the respective Claims, the Series A Notes and the Series B Notes are each held as "capital assets" (generally, property held for investment) within the meaning of Section 1221 of the IRC.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  The following summary of certain federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a Holder of a Claim.

IRS Circular 230 Notice:   To ensure compliance with IRS Circular 230, Holders of Claims or Interests are hereby notified that:  (a) any discussion of federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by Holders of Claims or Interests for the impose of avoiding penalties that may be imposed on them under the IRC; (b) such discussion is written in connection with the promotion or marketing by the Debtors of the transactions or matters addressed herein; and (c) Holders of Claims should seek advice based on their particular circumstances from an independent tax advisor.

EACH HOLDER OF A CLAIM IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE TAX CONSEQUENCES (INCLUDING STATE, LOCAL AND NON-U.S.) OF THE PLAN TO SUCH HOLDER.

A SUBSTANTIAL AMOUNT OF TIME MAY ELAPSE BETWEEN THE DATE OF THIS DISCLOSURE STATEMENT AND THE RECEIPT OF A FINAL DISTRIBUTION UNDER THE PLAN. EVENTS SUBSEQUENT TO THE DATE OF THIS DISCLOSURE STATEMENT, SUCH AS ADDITIONAL TAX LEGISLATION, COURT DECISIONS, OR ADMINISTRATIVE CHANGES, COULD AFFECT THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREUNDER. NO RULING HAS BEEN OR IS EXPECTED TO BE SOUGHT FROM THE IRS WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN AND NO OPINION OF COUNSEL HAS BEEN OR IS EXPECTED TO BE OBTAINED BY THE DEBTORS WITH RESPECT THERETO.

## A.    TAX CONSEQUENCES TO THE DEBTORS

The Cliffs Club & Hospitality Group, Inc. ("ClubCo Parent") and CCHG Holdings, Inc. ("CCHG Holdings") are each a "qualified subchapter S subsidiary" (a "QSSS") of CCI within the meaning of Section 1361(b)(3)(B) of the Code, and as such, these QSSS entities are disregarded for federal income tax purposes. The rest of the ClubCos have ClubCo Parent as their sole member and as such, each of these single member limited liability companies are also disregarded for federal income tax purposes. Accordingly, prior to the Effective Date, each of the Debtors have been and continue to be treated as a "disregarded entity" for federal income tax purposes.

In general, for federal income tax purposes, items of income, gain, loss or deduction of the Debtors as disregarded entities, and the related federal income tax consequences of such items, are the responsibility of CCI, as the sole owner of the ClubCo Parent and CCHG Holdings as the disregarded entities, not the QSSSs themselves. Accordingly, to the extent that the transactions contemplated by the Plan would otherwise trigger federal income tax consequences to the Debtors as disregarded entities, the Plan contemplates and the Debtors believe that the federal income tax consequences of such transactions will not be borne by the Debtors as disregarded entities, but instead will be reported by CCI, the ultimate owner of the Debtors.

For federal income tax purposes, CCI is treated as a subchapter S corporation under Section 1361 of the Code. Since CCI is treated as a S corporation for federal income tax purposes, its owners will ultimately bear their respective portions of the federal income tax consequences of the transactions that the Debtors will undertake on the Effective Date as contemplated by the Plan. In general, for federal income tax purposes, the shareholders of an S corporation, and not the S corporation itself, are subject to taxation annually under the IRC on their respective distributive shares of items of income, gain, loss or deduction of the S corporation, whether or not they receive any distributions of cash for such year from the S corporation.

a)    Modified Notes as "Debt" or "Equity".

The discussion in this summary assumes that both the old Notes and the modified Notes are treated as "debt" versus "equity" for federal income tax purposes.

-77-

Both the IRS and the courts indicate that the characterization of a debt instrument as "debt" or "equity" depends on the terms and conditions of the instrument, and all of the surrounding facts and circumstances analyzed in terms of economic and practical realities.  Among the many factors that may be evaluated in making this determination are two fundamental considerations:  (i) whether there is a written unconditional promise to pay on demand or on a specified date a sum certain in money in return for an adequate consideration in money or money's worth, and to pay a fixed rate of interest; and (ii) whether the debt instruments are intended to be treated as debt or equity for nontax purposes, including regulatory, rating agency, or financial accounting purposes.

The Debtors have treated the Notes as constituting "debt" for federal income tax purposes and the Debtors currently intend to also treat the modified Notes as "debt" as well.  The Debtors also understand that New ClubCo intends to treat the modified Notes as "debt" for tax purposes (for New ClubCo to do otherwise would mean it could not include the Section 1274 "issue price" of the modified Notes in its tax basis for the Acquired Assets).

However, no opinion of counsel will be issued that the modified Notes are "debt" for federal income tax purposes.  There can be no assurance given to Holders of Claims that the IRS will not challenge the Debtors' and New ClubCo's treatment of the modified Notes as "debt" for tax purposes.

The tax consequences of this "debt" versus "equity" treatment of the modified Notes with respect to Holders of Class 1 Claims is discussed in the applicable instances below.  The Indenture Trustee as well as each Holder of a Class 1 Claim are each strongly urged to consult with their own tax advisors regarding whether the modified Notes should be treated as "debt" or "equity" for federal income tax purposes.

Notwithstanding anything else in the Plan, this Disclosure Statement or otherwise, the Notes shall not be deemed satisfied and thus extinguished, but rather restructured under the terms of the Plan and related documents, such that the payment obligation of the obligor under those Notes shall be to deliver payments totaling $64,050,000 to the Indenture Trustee.

b)      Cancellation of Indebtedness Income.

A debtor generally must recognize income from the cancellation of debt ("COD Income") in the event that its debt is discharged for consideration to a creditor for an amount that is less than the amount of such debt.  However, Section 108(a) of the Code provides that COD income is not required to be recognized, and is excluded from gross income, if the debtor is under the jurisdiction of a bankruptcy court in a case under Chapter 11 and the discharge is granted or is effectuated pursuant to a plan confirmed by the court (the "Bankruptcy Exception").  If the Bankruptcy Exception applies, the debtor is required to reduce certain of its tax attributes – such as net operating loss ("NOL") carryforwards, current year NOLs capital loss carryforwards,

tax credits and tax basis in assets – by the amount of COD income created pursuant to the plan (collectively, "Attribute Reduction"). For taxpayers outside bankruptcy, COD income from the cancellation of debt is not recognized by an insolvent debtor to the extent of insolvency (the "Insolvency Exception"). For this purpose, "insolvency" is defined as the excess of liabilities over the fair market value (the "FMV") of assets, both of which are to be calculated immediately before the exchange.

In this regard, as discussed above, because the Debtors are <u>each</u> disregarded from its respective owner and ultimately CCI, for federal income tax purposes, the Bankruptcy Exception cannot be applied to any of the Debtors for federal income tax purposes even though such Debtors are debtors in a Chapter 11 proceeding, nor can the Bankruptcy Exception be applied to the Debtors' ultimate owner CCI, since CCI is not a Chapter 11 debtor.

However, by virtue of Section 108(d)(7)(A) of the Code, Insolvency Exception determinations are generally made at the corporate level. Since the Debtors are each disregarded for federal income tax purposes, what matters is whether CCI as the S corporation is "insolvent" as defined under Section 108(d)(3) of the Code. That is, with respect to the discharge of the Debtors' indebtedness under the Plan, whether CCI is insolvent and the amount by which CCI is insolvent, is determined by whether CCI's liabilities exceed the FMV of its assets immediately before the discharge. The amount of the COD income that can be excluded under the Insolvency Exception cannot exceed the amount by which CCI is insolvent (as determined above).

For purposes of this Insolvency Exception and although this matter is not free from doubt, because each of the Debtors is disregarded for federal income tax purposes, the Debtors currently expect to take the position that the "indebtedness" of CCI within the meaning of Section 108(d)(1) of the Code should include the indebtedness of the Debtors. Neither the Code nor the regulations provide guidance on the definition of "liability" for purposes of the Insolvency Exclusion. This is particularly true in the case of "contingent liabilities", which would include the membership deposit obligations of the Debtors. Discounting the face amount of such contingent liabilities to their present value based on the probability of occurrence (the "discounting approach"), represents a broadly accepted method of valuing contingent liabilities under both general tax law principles and in bankruptcy case law. However, the IRS or the courts may not agree with this approach. In 1999, the Ninth Circuit announced a narrow standard upon which to treat contingent liabilities for purposes of the Insolvency Exception. Under this rule, contingent liabilities are included in the insolvency calculation only if the taxpayer can prove it is more likely than not that it will be called upon to pay the liability as compared with a discounting approach. Further, both the U.S. Tax Court and the Ninth Circuit indicated that if such contingent obligations were reflected on the face of the balance sheet of the taxpayer for GAAP purposes (versus solely being footnoted as contingent liabilities), this was a significant factor in determining whether to include such liabilities in the liabilities for Section 108(d)(3) purposes. In this regard, the Debtors 2007, 2008 and 2009 audited balance sheet and subsequent unaudited balance sheets of the Debtors continue to reflect the

ATLANTA:5397829.2

full gross amount of such contingent liabilities (subject to a mark-to-market adjustment) of over $240 million.

Based on the foregoing, it would appear both reasonable and conservative for the Debtors to adopt the discounting approach to value the membership deposit obligations for Section 108(d)(3) liability purposes. Therefore, following such discounting approach, the Debtors currently estimate that for purposes of the Insolvency Exception, the <u>excess</u> of CCI's liabilities over the FMV of its assets is approximately $90 million, which is therefore the estimated amount of CCI's insolvency for purposes of the Insolvency Exception. If such calculations are respected, this also constitutes the estimated amount of COD income of the Debtors that can be excluded under the Insolvency Exception.

The Debtors believe that the modification of the Notes pursuant to the Plan will likely constitute a "significant modification" of the Notes which, as discussed below, results in a deemed taxable exchange for federal income tax purposes by the Holders of their "old" Notes for "new" debt in the form of the modified Notes. *See* Section XII.B.3., *"Holders of Class 1 Claims - Indenture Trustee's Claims (e.g., the Noteholders)"* below. Because no joint election will be filed by the Debtors and New ClubCo with the IRS electing to treat New ClubCo (as the buyer of the Debtors' assets) as modifying the Notes under Section 1.1274-5(b)(2) of the regulations, and assuming the Notes are "significantly modified," then Section 1.1274-5(b)(1) of the regulations provides that: (i) such significant modification of the Notes will be treated as a separate transaction for federal income tax purposes taking place *immediately before the sale of property by the Debtors to New ClubCo* pursuant to the Asset Purchase Agreement; and (ii) such separate Section 1001 "deemed exchange" transaction is attributed to the Debtors for federal income tax purposes.

Assuming the modified Notes are treated as "debt" for tax purposes, the significant modification of the Notes and the related collateral documents under Section 1.1001-3 of the regulations create the potential for COD income recognition by the Debtors as a result of: (i) the deemed issuance by the Debtors of the "new" modified Notes to the extent that the amount of the debt has been decreased; (ii) the discharge of the prepetition interest on the Notes of $9,481,505; and (iii) the release of the guarantees of the Notes issued by the Debtors. *See* Section XII.A.1. *"Modified Notes as "Debt" or "Equity"*, above. If the modified Notes were treated as "equity" for tax purposes, there could be no COD income resulting from such modification.

However, pursuant to Section 1.1001-2(a)(4)(i) of the regulations, since the modified Notes are nonrecourse debt, the IRS and the courts have traditionally taken the position that the Debtors' amount realized on the sale of the Acquired Assets to New ClubCo includes the full principal amount of the modified Notes, but that there is not also any COD income under Sections 61(a)(12) and 108 of the Code. Next, Section 108(e)(2) of the Code provides that there is no COD income from the discharge of indebtedness to the extent that the Debtors' payment of such prepetition accrued interest on the Notes would have given rise to an interest deduction under Section 163 of the Code, which would be the case here. Finally, as a general rule, the

release of a guarantee before it is called upon by the creditor does not result in any COD income.

Therefore, despite the potential for COD income recognition by the Debtors from the modification of the Notes, the Debtors currently expect to take the position that the Debtors should not recognize any COD income from the significant modification of the Notes pursuant to the Plan.

Based on the terms of the Plan, the Debtors currently estimate that absent the Insolvency Exception, the Debtors would separately generate COD income by virtue of the cancellation of indebtedness with respect to the Class 5 Claims and Class 7 Claims in an amount which is not likely to exceed $20 million. This result occurs because as of the Effective Date, the adjusted issue price of such indebtedness Claims being cancelled will exceed the sum of the cash paid on behalf of the Debtors pursuant to the Plan, plus the FMV of any additional consideration (beneficial interests in the Liquidation Trust) given in satisfaction of such Claims.  That excess generally constitutes the amount of COD income that must be recognized for tax purposes.

Accordingly, to the extent these estimated calculations are accurate, the Debtors currently believe that the entire amount of estimated COD income that would likely be generated by the Debtors pursuant to the Plan can be excluded from CCI's taxable income under the Insolvency Exception for its calendar 2012 taxable year (assuming the Effective Date occurs in 2012).

For CCI as an S corporation, the price for such exclusion of the estimated COD income under the Insolvency Exception is the required reduction of certain tax attributes of CCI and its shareholders in the order and the manner set forth in Section 108(b)(1) of the Code and the regulations thereunder.

        c)      OID with respect to the Modified Notes.

As discussed below in Section XII.B.3., *"Holders of Class 1 Claims – Indenture Trustee's Claims (e.g., the Noteholders"),* the modification of the Notes on the Effective Date is expected to constitute a "significant modification" of the Notes within the meaning of Section 1.1001-3 of the regulations.  For federal income tax purposes, such significant modification of the Notes will result in a deemed taxable exchange of the "old" Notes for the "new" modified Notes issued by the Debtors. Assuming the modified Notes are treated as "debt" for federal income tax purposes, the modified Notes will likely be treated as a new debt instrument issued for nonpublicly traded property (*i.e.*, the old Notes) under Section 1.1275-4(c) of the regulations.

Further, the modified Notes issued by the Debtors will likely constitute "contingent payment debt instruments" under Section 1.1275-4(c) of the regulations. Because the modified Notes do not provide for "adequate stated interest" (or any interest), a portion of the payments (both the annual fixed payments as well as the contingent payments) made on the modified Notes would likely be recharacterized as

original issue discount ("OID") under Section 1274 of the Code.  Based on the assumption of the modified Notes by the Indenture Trustee SPE on the Effective Date, this OID will be deductible as interest by the Indenture Trustee SPE.  If the IRS instead determines that the modified Notes are instead "equity" for federal income tax purposes, then there would not be any OID created with respect to the issuance of the modified Notes.

        d)       Sale of the Real Property and Personal Property Collateral.

After the "significant modification" of the Notes occurs pursuant to the Plan as described above:  (i) the Debtors will  transfer the Real Property Collateral and the Personal Property Collateral to New ClubCo in accordance with the Asset Purchase Agreement in exchange for the Sale Consideration (as that term is defined in Article I of the Plan); and (ii) New ClubCo will then contribute those Acquired Assets (subject to the Permitted Liens) to the Indenture Trustee SPE in exchange for 100% of its outstanding membership interests.  Immediately following its receipt of such asset contributions from New ClubCo, the Indenture Trustee SPE will assume the payment obligations under the modified Notes for state law purposes.

Although the Debtors currently anticipate that the Indenture Trustee will receive a non-economic interest in the Indenture Trustee SPE, neither the Indenture Trustee nor the Holders of the modified Notes will receive any economic interest whatsoever in the Indenture Trustee SPE pursuant to the Plan.  Further, the Debtors will also have no economic interest whatsoever in the Indenture Trustee SPE.

For federal income tax purposes, these asset transfers by the Debtors will be treated as taxable sales of the Debtors' assets to New ClubCo in exchange for: (a) the principal amount of the modified Notes secured by such assets; and (b) receipt of the Sale Consideration, which is comprised, *inter alia*, of certain specified cash payments on the Effective Date, certain post-Effective Date payment obligations and certain other executory promises) to be provided by New ClubCo pursuant to the Plan and the Asset Purchase Agreement.

Under Section 1001 of the Code, the "amount realized" by the Debtors on the sale of their assets *generally* equals the sum of the cash received plus the FMV of any property (other than cash) received and also, plus the principal amount of nonrecourse liabilities (*e.g.*, the modified Notes) from which the Debtors are relieved of as a result of the sale (notwithstanding the fact that the FMV of the security for such nonrecourse debt is less than such principal amount pursuant to Sections 1.1001-2(a)(4)(i) and 1.1001-2(b) of the regulations).

However, in this case, and although this matter is not free from doubt, the Debtors currently expect to take the position that, the Debtors' "amount realized" equals the "issue price" of the modified Notes on the Effective Date, as determined under Section 1.1274-2(g) of the regulations, increased in this case, by the FMV of the contingent payments payable pursuant to the modified Notes (*see* Section 1.1001-2(g)(ii) of the regulations) because the modified Notes are "contingent payment debt

instruments" issued for nonpublicly traded property under Section 1.1275-4(c) of the regulations. Finally, both the IRS and the courts generally take the position that there is no COD income recognized from such sales transaction and instead, the Debtors' must simply treat the assumption of the modified Notes as "amount realized" for Section 1001 purposes, in the manner calculated above.

Accordingly, the Debtors will recognize either gain or loss with respect to each asset sold based on the portion of the amount realized allocated to each asset sold and the Debtors' adjusted tax basis in that asset. Such gain would likely be capital gain or loss, except that the portion of such gain attributable to the recapture of depreciation on both depreciable real property and tangible personal property under Sections 1245 and 1250 of the Code would be treated as ordinary income.

As discussed above, the gains and losses recognized by the Debtors from these asset sales would flow through to CCI and be reportable by the CCI shareholders in CCI's calendar 2012 tax year assuming the Effective Date occurs in 2012. The Debtors currently estimate that the Debtors are unlikely to recognize any substantial gains from the sale of the Acquired Assets, and in the aggregate, the Debtors may recognize a net loss. Pursuant to Section 10.4 of the Asset Purchase Agreement, the specific amounts to be calculated as of the Effective Date will be based on an allocation of the aggregate purchase price to the specific assets sold which will be attached to the Asset Purchase Agreement.

As discussed above under Section XII.A.1., *"Modified Notes as "Debt" or "Equity"*, the discussion set forth above assumes the modified Notes are treated as "debt" for federal income tax purposes. If instead, the IRS took the position that they were "equity", then it is unclear how this would be treated. From a state contract law standpoint, New ClubCo (and the Indenture Trustee SPE) would presumably still treat the modified Notes as "debt" for state law purposes, but the Debtors would be relieved of these payment obligations for state law purposes. Therefore it would seem likely that the IRS would likely assert that the Debtors still need to include in their amount realized on the sale of assets, the FMV of the relief from having to honor the contractual obligations under the modified Notes.

e)      Transfer of Liquidation Trust Assets to the Liquidation Trust.

Pursuant to the Plan, on the Effective Date, the Debtors will transfer certain assets to the Liquidation Trust on behalf of the respective Holders of Claims comprising the Liquidation Trust beneficiaries. *See* Section VII.B., *"Overall Structure of the Plan*," above. The transfer of assets by the Debtors to the Liquidation Trust pursuant to the Plan may result in the recognition of gain or income by the Debtors, depending in part on the FMV of such assets on the Effective Date and the Debtors' tax basis in such assets.

Although not free from doubt, the Debtors currently also anticipate that the gain or income, if any, recognized by the Debtors for tax purposes upon the transfer by the Debtors to the Liquidation Trust of the Retained Actions and certain other assets pursuant to the Plan is not likely to be substantial.

-83-

f)      Debtors' Estimated Calendar 2012 Losses.

No current estimates exist for 2012.

## B.      TAX CONSEQUENCES TO U.S. HOLDERS OF CERTAIN CLAIMS

The federal income tax consequences to U.S. Holders of Claims and the character and amount of income, gain or loss recognized as a consequence of the Plan and the distributions provided for thereby will depend upon, among other things: (1) the manner in which a Holder acquired a Claim; (2) the length of time the Claim has been held; (3) whether the Claim was acquired at a discount; (4) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or any prior year; (5) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim; (6) the Holder's method of tax accounting; and (7) whether the Claim is an installment obligation for federal income tax purposes.

a)      Distributions in Discharge of Accrued Interest.

In general, to the extent that any consideration received pursuant to the Plan (whether in cash or other property, including without limitation, beneficial interests in the Liquidating Trust), by a Holder of a Claim is received in satisfaction of interest accrued during its holding period, such amount will be taxable to the Holder as interest income (if not previously included in the Holder's gross income). Conversely, a Holder generally recognizes a deductible loss to the extent of any accrued interest or OID was previously included in its gross income and is not paid in full. Section 10.13 of the Plan provides that consideration received in respect of a Claim is allocable first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent of any excess, to the remainder of the Claim for accrued but unpaid interest. There is no assurance that the IRS will respect such allocation for federal income tax purposes.

Each Holder of a Claim is urged to consult its own tax advisor regarding the allocation of consideration received under the Plan, as well as the deductibility of accrued but unpaid interest and the character of any loss claimed with respect to accrued but unpaid interest previously included in gross income for federal income tax purposes.

b)      Character of Gain or Loss.

Where gain or loss is recognized by a Holder of a Claim upon the satisfaction of its Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among others, the tax status of the Holder, whether the Claim constitutes a capital asset in the hands of the Holder and how long it has been held, whether and to what extent the Holder previously had claimed a bad debt deduction, and the nature and tax treatment of any fees, costs or expense reimbursements to which consideration is allocated. Each Holder of a Claim is urged to consult its own tax advisor to determine

ATLANTA:5397829.2

the character of any gain or loss recognized with respect to the satisfaction of its Claim.

Individual Holders of Claims who recognize capital losses as a result of the distributions under the Plan will be subject to the specific limits under the Code on their use of capital losses.

c)    Holders of Class 1 Claims – Indenture Trustee's Claims (*e.g.* the Note Holders).

Pursuant to the Plan, the Notes will be modified on the Effective Date to provide for repayment of the $64,050,000 principal amount, without interest, in twenty (20) annual payments beginning on the one year anniversary of the Effective Date. The payments will be the greater of $1 million or 50% of New ClubCo Net Cash Flow with a balloon payment of the remaining principal, if any, at maturity.  The collateral securing the Notes will also become subordinate to the Exit Facility and the Mountain Park Facility.  Further, the guarantees of both the Debtors and the Guarantors will be released.

Section 1001 of the Code provides for the recognition of gain or loss on the sale or exchange of property.  Section 1.1001-1(a) of the regulations provides that gain or loss is recognized from the exchange of property for other property differing materially either in kind or in extent.  Section 1.1001-3 provides *inter alia*, that a debt instrument differs materially in kind or in extent if it has undergone a "significant modification", and provides rules for determining whether there has been a "modification" and whether such modification is "significant".   Based on the combination of changes in the Notes and the related collateral documents that will occur pursuant to the Plan, the Debtors currently believe that the Notes will undergo a "significant modification" within the meaning of these regulations.

Therefore, for federal income tax purposes, the Holders of the Notes will be deemed to exchange in a taxable transaction, their "old" debt (the Notes) for "new" debt in the form of the modified Notes (the post-modification Notes being treated as a new debt instrument issued for nonpublicly traded property under Sections 1.1001-2(g)(2)(ii) and 1.1275.4(c) of the regulations).

This means that the Holders of the Notes will be required to recognize gain or loss for federal income tax purposes equal to the difference between the "amount realized" attributable to the modified Notes and such Holder's adjusted tax basis in the pre-modification Notes, in each case calculated as the Effective Date.  A Holder's adjusted tax basis in the Notes will be increased by the amount of OID previously included in taxable income with respect to the Note and decreased by the amount of principal payments on the Notes prior to the Effective Date.

Because of the terms of the modified Notes, the modified Notes will likely be treated as "contingent payment debt instruments" (or "CPDIs") issued for nonpublicly traded property (*i.e.,* the old Notes) under Section 1.275-4(c) of the regulations.

ATLANTA:5397829.2

Sections 1.1275-4(c) and 1.1001-2(g)(ii) of the regulations provide in the case of the deemed exchange for CPDIs, the "amount realized" attributable to the modified Notes is equal to the "issue price" of the modified Notes on the Effective Date, as determined under Section 1.1274-2(g) of the regulations, increased by the FMV of the contingent payments payable pursuant to the modified Notes.

Based on these preliminary calculations made by New ClubCo, it appears likely that the Holders of the Notes will recognize a loss on this taxable deemed exchange of their Notes for the modified Notes pursuant to the Plan. Loss recognized on the taxable disposition of a Note prior to its 2017 maturity date will generally be treated as ordinary loss to the extent of such Holder's prior inclusions of OID on the Note. Any loss in excess of such amount (which would be substantially all of such loss given that the OID inclusions would only be for part of 2010, the 2011 calendar year and the portion of 2012 prior to the Effective Date) will be treated as a capital loss by such Holder. The deductibility of capital losses by individuals is subject to specific limitations under the Code.

The discussion set forth above assumes the Section 1001 deemed taxable exchange is a "closed transaction" for tax purposes. In a "closed transaction", the taxpayer must recognize the entire amount of the gain or loss in the year of the sale or exchange under Section 1001. However, Section 1001 and Section 1.1001-1(g)(2)(ii) cited above would not apply if the IRS were to determine that the FMV of the contingent payments on the modified Notes is not reasonably ascertainable and/or is so speculative that it has no ascertainable FMV, then the amount realized cannot be calculated and the deemed sale transaction remains held "open" in order to determine the ultimate tax consequences (a so-called "open transaction" for tax purposes.) In an "open transaction", the taxpayer allocates payments received first to the recovery of its basis and begins to recognize gains only after it has fully recovered its basis in such modified Notes. Under the present facts, the Debtors currently believe that "open transaction" treatment would most likely prevent the Holder of Notes from recognizing its loss on the Section 1001 deemed exchange until it was clear that no further payments would be forthcoming on the modified Notes.

It should be noted that the IRS position as set forth in Section 1.1001-1(g)(2) of the regulations itself as cited above, and a 1931 decision of the U.S. Supreme Court indicates that only in rare and extraordinary cases will the FMV of the contingent payments be treated as not reasonably ascertainable.

Therefore, the Debtors currently expect that the Section 1001 deemed exchange described above should be reported by the Holders of Notes as a closed transaction with such Holders recognizing the entire amount of their loss in the year in which the Effective Date occurs. Under such "closed transaction" treatment, the Holders would obtain a tax basis in the modified Notes equal to the "amount realized" from the Section 1001 deemed exchange. In future years, until and unless such Holder receives payments on the modified Notes that exceed such Effective Date-established tax basis, such Holder would have no annual tax reporting obligations with respect to the

ATLANTA:5397829.2

modified Notes, other than with respect to the annual inclusion as interest income the amount of OID reportable by such Holder on such modified Notes.

As discussed above under Section XII.A.3., *"OID with respect to the Modified Notes",* the Debtors currently believe that the modified Notes will be issued with OID. The Debtors currently anticipate that the Indenture Trustee SPE, which will be making the annual payments to the Indenture Trustee under the modified Notes, will:   (i) provide each Holder of modified Notes with an annual statement of the amount of OID that is reportable by such Holder with respect to the modified Notes; and (ii) satisfy all of the IRS annual withholding and information reporting obligations with respect to the modified Notes.

Finally, the discussion above with respect to the Holders' Section 1001 taxable deemed exchange of its Notes for modified Notes assumes that the modified Notes are treated as "debt" rather than "equity" for federal income tax purposes.  As discussed above under Section XII.A.1., *"Modified Notes as "Debt" or "Equity",* there can be no assurance given Holders of Notes that the IRS will treat the modified Notes as "debt" for tax purposes.

If instead, the modified Notes are treated as "equity" for tax purposes, the Debtors currently believe that the Holders would likely have to calculate their "amount realized" on the Section 1001 taxable deemed exchange as being equal to the FMV of the modified Notes as an equity instrument in New ClubCo (or the Indenture Trustee SPE) because the Debtors' obligations under the modified Notes will be discharged on the Effective Date pursuant to the Plan.

The Indenture Trustee and the Holders of the Notes are both strongly urged to consult with their own tax advisors regarding whether the modified Notes should be treated as "debt" or "equity" for federal income tax purposes.

     d)     Holders of the Class 3 Claims – Mechanic's Lien Claims.

The Holder of a Class 3 Claim will realize gain or loss for federal income tax purposes as a result of the consummation of the Plan equal to the difference between (i) the Holder's adjusted tax basis in its Claim determined immediately prior to the Effective Date, and (ii) the cash it receives from the Liquidation Trustee (funded by New ClubCo) on the Effective Date.  A Holder of such Claim will recognize the full amount of its gain or loss realized on the exchange.

     e)     Holders of Class 4 Claims – Other Senior Secured Party Claims.

The Holder of a Class 4 Claim will realize gain or loss for federal income tax purposes as a result of the consummation of the Plan equal to the difference between (i) the Holder's adjusted tax basis in its Claim determined immediately prior to the Effective Date, and (ii) at the election of the Debtors (with the consent of the Plan Sponsor) either (a) the cash it receives after the Effective Date under the Plan, or (b) the FMV of the equipment under one or more leases securing its Claim received by such Holder under the Plan.

ATLANTA:5397829.2

f)      Holder of a Class 5 Claim – General Unsecured Claims.

The Holder of a Class 5 Claim will realize gain or loss for federal income tax purposes as a result of the consummation of the Plan equal to the difference between (i) the Holder's adjusted tax basis in its Claim determined immediately prior to the Effective Date, and (ii) the FMV of the interest in the Liquidating Trust it receives.

As discussed below in Section XII.G., *"Tax Treatment of Liquidation Trust and Beneficial Interests Holders,"* the Holder of a Class 5 Claim that receives a beneficial interest in the Liquidating Trust will be treated for federal income tax purposes as directly receiving, and as a direct owner of, its respective share of the Liquidating Trust assets (consistent with its economic rights in the trust) in a taxable transaction. Pursuant to the Plan, the Liquidation Trustee will in good faith value the Debtors' assets transferred to the Liquidating Trust, and all parties to the Liquidating Trust must consistently use such valuation for all federal income tax purposes.

The Holder's share of any cash proceeds subsequently received from the Liquidating Trust should not be included, for federal income tax purposes, in the Holder's amount realized in respect of its respective Claim, but should be separately treated as amounts realized in respect of such Holder's ownership interest in the underlying assets of the Liquidating Trust.

The Holder's tax basis in its respective share of the Liquidating Trust assets will generally equal the FMV of such interest on the Effective Date, and the Holder's holding period generally will begin the day following the establishment of the Liquidating Trust.

g)      Holders of Class 6 Claims – Administrative Convenience Claims.

A Holder of a Class 6 Claim will realize gain or loss for federal income tax purposes as a result of the consummation of the Plan equal to the difference between (i) the Holder's adjusted tax basis in its claim determined immediately prior to the Effective Date, and (ii) the cash it receives from the Liquidation Trustee (funded by New ClubCo) on the Effective Date.  A Holder of such Claim will recognize the full amount of its gain or loss realized on the exchange.

h)      Holders of Class 7 Claims – Club Member Claims.

A Holder of a Class 7 Claim who elects in the ballot the New Club Membership Option will realize gain or loss for federal income tax purposes as a result of the consummation of the Plan equal to the difference between (i) the Holder's adjusted tax basis in its Claim determined immediately prior to the Effective Date, and (ii) the FMV of a membership with New ClubCo under the New ClubCo Membership Plan, plus the FMV of the right to satisfaction by New ClubCo of such Holder's Membership Deposit Obligations in accordance with the Vesting Schedule.  It is unclear whether such Holder will be required to recognize the full amount of the gain realized on the exchange as of the Effective Date or whether such Holder will be allowed to recognize any gain realized over time based on the Vesting Schedule as an

ATLANTA:5397829.2

installment sale under Section 453 of the Code. If the Holder realizes a loss on the exchange, then such Holder will be required to recognize the full amount of such loss in the year in which the Effective Date occurs. Any such loss would likely constitute a capital loss. For individuals, the Code provides specific limitations on the utilization of such capital losses in any one tax year.

Alternatively, a Holder of a Class 7 Claim who does not elect in the ballot the New Club Membership Option and complies with its requirements and conditions will realize gain or loss for federal income tax purposes as a result of the consummation of the Plan equal to the difference between (i) the Holder's adjusted tax basis in its Claim determined immediately prior to the Effective Date, and (ii) the FMV of the interest in the Liquidating Trust it receives.

As discussed below in Section XII.G., *"Tax Treatment of Liquidation Trust and Beneficial Interests Holders,"* each Holder of a Class 7 Claim that receives a beneficial interest in the Liquidating Trust will be treated for federal income tax purposes as directly receiving, and as a direct owner of, its respective share of the Liquidating Trust assets (consistent with its economic rights in the trust) in a taxable transaction. Pursuant to the Plan, the Liquidation Trustee will in good faith value the Debtors' assets transferred to the Liquidating Trust, and all parties to the Liquidating Trust must consistently use such valuation for all federal income tax purposes.

A Holder's share of any cash proceeds subsequently received from the Liquidating Trust should not be included, for federal income tax purposes, in the Holder's amount realized in respect of its respective Claim, but should be separately treated as amounts realized in respect of such Holder's beneficial interest in the underlying assets of the Liquidating Trust.

A Holder's tax basis in its respective share of the Liquidating Trust assets will generally equal the FMV of such interest on the Effective Date, and the Holder's holding period generally will begin the day following the establishment of the Liquidating Trust.

## C.    TAX CONSEQUENCES FOR NOTE HOLDERS OF INDENTURE TRUSTEE SPE

The Debtors currently anticipate that neither the Indenture Trustee nor any of the Holders of the Notes will have any economic interest in the Indenture Trustee SPE. All of the Indenture Trustee SPE's profits and losses are to be allocated to New ClubCo and none to the Indenture Trustee or the Holders of the modified Notes. Accordingly, although this matter is not free from doubt, the Debtors currently believe that the Holders of the modified Notes would not have any federal income tax consequences as a result of the formation and operation of the Indenture Trustee SPE.

However, as discussed above under Section XII.A.1., *"Modified Notes as "Debt" or Equity"*, this discussion again assumes that the modified Notes are treated as "debt" for federal income tax purposes. If instead, the IRS took the position that

they were "equity", then either the Indenture Trustee or more likely, the Holders of modified Notes themselves, would be treated for tax purposes as having an "equity interest" in the Indenture Trustee SPE, even though they would not be actual owners of membership interests in this Delaware limited liability company.  It is unclear exactly how the IRS would attempt to tax the Holders of modified Notes under these circumstances.  For example, it is unclear whether such Holders of modified Notes would be treated as receiving a distributive share allocation of the Indenture Trustee SPE's operating income or profits for tax purposes equal to the cash payments made by the Indenture Trustee SPE on the modified Notes each year.  As discussed above, the Holders of modified Notes would still have tax basis in such "equity interest" in the Indenture Trustee SPE equal to the "amount realized" they reported for federal income tax purposes in the Section 1001 taxable deemed exchange described above.  Therefore, to the extent of such outside tax basis in such equity interest, such Holders could receive cash distributions from the Indenture Trustee SPE without recognizing gain for tax purposes.  However, it remains unclear whether and to what extent the IRS would require such Holders to report both allocations of profits and losses for tax purposes as well as cash distributions based on such "equity interest" for federal income tax purposes in the Indenture Trustee SPE.

The Indenture Trustee and the Holders of Notes are both strongly urged to consult with their own tax advisors regarding whether the modified Notes should be treated as "debt" or "equity" for federal income tax purposes.

However, it is anticipated that the Indenture Trustee will be a non-economic member in the Indenture Trustee SPE and will hold certain rights upon certain defaults under the modified Notes and the Lease  Prior to the exercise of such rights by the Indenture Trustee, and assuming the modified Notes are treated as "debt" rather than "equity" for tax purposes, the Debtors currently believe that the Holders of Notes would not have any federal income tax consequences from the Indenture Trustee's ownership of such rights.

The Indenture Trustee and Holders of the Notes are urged to consult their tax advisors regarding the tax consequences to them of both the modification of the Notes pursuant to the Plan and the formation of the Indenture Trustee SPE and the non-economic membership interest to be held in the Indenture Trustee SPE Post-Effective Date.

## D.    INFORMATION REPORTING AND BACKUP WITHHOLDING

All distributions to holders of Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding.  Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 28%).  Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under

ATLANTA:5397829.2

penalty of perjury, that the TIN provided is its correct number and that it is a U.S. person that is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is supplied to the IRS. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, from an information reporting perspective, the regulations generally require disclosure by a taxpayer on its federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

The Debtors or the Liquidation Trustee, as the case may be, will withhold all amounts required by law to be withheld from payments of interest and will each comply with all applicable reporting requirements of the Code.

## E.      PROFESSIONAL TAX ASSISTANCE

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN. THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING DISCUSSION DOES NOT ADDRESS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM AND IS NOT A SUBSTITUTE FOR TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, CLAIM HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL, AND APPLICABLE FOREIGN INCOME, AND OTHER TAX CONSEQUENCES OF THE PLAN.

## F.      RESERVATION OF RIGHTS

This tax section is subject to change (possibly substantially) based on subsequent changes to other provisions of the Plan. The Debtors and its advisors reserve the right to further modify, revise or supplement this discussion and the other tax related sections of the Plan in accordance with the terms of the Plan and the Bankruptcy Code.

ATLANTA:5397829.2

G.    **TAX TREATMENT OF THE LIQUIDATION TRUST AND BENEFICIAL INTEREST HOLDERS**

a)    Gain or Loss Recognition.

Each Holder of an Allowed Class 5 and 7 Claim who receives an interest in the Liquidation Trust will recognize gain or loss in an amount equal to the difference between (i) the amount realized by such Holder in satisfaction of its Claim (other than any Claim for accrued but unpaid interest) and (ii) such Holder's adjusted tax basis in such Claim (other than any Claim for accrued but unpaid interest). The amount realized by a Holder of a Claim will equal the FMV as of the Effective Date of the beneficial interest in the Liquidation Trust received by such Holder pursuant to the Plan.

Because the holders of Disputed Class 5 and 7 Claims will not receive a beneficial interest in the Liquidation Trust until such time, if any, as their Claims become Allowed Claims, the full value of the assets transferred to the Liquidation Trust should be deemed to have been received by those Holders whose Claims are Allowed Claims as of the end of the year in which the Liquidation Trust is formed. As a result, the FMV of the beneficial interests that such Holders would be deemed to have received upon the formation of the Liquidation Trust may exceed the amount that such Holders eventually receive from the Liquidation Trust. If this occurs, any gain recognized by such Holders would be overstated and any loss recognized by such Holders would be understated for the taxable year in which the Liquidation Trust is formed. Although such Holders would recognize additional losses in subsequent years (as additional Claims become Allowed Claims and/or when the Liquidation Trust makes a final distribution) that would offset the amount by which the gain (or loss) was overstated (or understated), such Holders would lose the benefit of the time value of the additional money paid in taxes with respect to the taxable year in which the Liquidation Trust is formed. Characterization differences also are possible, and Holders should note that capital losses generally are deductible only against capital gains. Holders should consult their tax advisors regarding the possible alternative treatments and characterizations of these transactions, including the possible treatment of the amount realized by a Holder in a manner that takes into account the subsequent allowance of Disputed Claims.

Any Holder of a Disputed Claim whose claim becomes an Allowed Claim after implementation of the Plan will be taxed on the receipt of the beneficial interest in the Liquidation Trust in the manner set forth above in the year in which such Holder's Claim is allowed. Specifically, such holder would be deemed to have received a beneficial interest in the Liquidation Trust in such year and would recognize gain or loss equal to the difference between the fair market value of such Holder's beneficial interest in the Liquidation Trust and such Holder's basis in its Claim. To the extent that other Disputed Claims become Allowed Claims in subsequent years, such Holder's gain (or loss) may be overstated (or understated) for the year in which the Holder receives its initial beneficial interest in the Liquidation Trust, subject to possible offsetting losses in subsequent years.

ATLANTA:5397829.2

b)    Classification of the Liquidation Trust.

The Liquidation Trust created pursuant to the Plan is intended to qualify as a "liquidating trust" for federal income tax purposes.  In general, a liquidating trust is not a separate taxable entity, but rather is treated for federal income tax purposes as a "grantor trust" (*i.e.*, a pass-through type entity).  However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for federal income tax purposes.  The Liquidation Trust will be structured to comply with the general criteria set forth in IRS Revenue Procedure 94-45.  Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties will be required to treat, for federal income tax purposes, the Liquidation Trust as a grantor trust of which the Liquidation Trust beneficiaries are the owners and grantors.  The following discussion assumes that the Liquidation Trust will be so respected for federal income tax purposes.  However, no opinion of counsel has been requested, and neither the Debtors, the Reorganized Debtors nor the Liquidation Trustee will seek a ruling from the IRS, concerning the tax status of the Liquidation Trust as a grantor trust.  Accordingly, there can be no assurance that the IRS would not take a contrary position.  If the IRS were to challenge successfully the classification of a Liquidation Trust, the federal income tax consequences to the Liquidation Trust, the Liquidation Trust beneficiaries and the Debtors could vary from those discussed herein (including the potential for an entity-level tax on income of the Liquidation Trust).

c)    General Tax Reporting by the Liquidation Trust and Beneficiaries.

For all federal income tax purposes, all parties must treat the transfer of the Liquidation Trust assets to the Liquidation Trust in accordance with the terms of the Plan.  Pursuant to the Plan, the Liquidation Trust assets are treated, for federal income tax purposes, as having been transferred, subject to any obligations relating to those assets, directly to the Holders of the respective Allowed Class 5 or 7 Claims receiving an interest in the Liquidation Trust (with each Holder receiving in a taxable transaction an undivided interest in such assets in accordance with its economic interests in such assets) as of the Effective Date, followed by the transfer by the Holders to the Liquidation Trust of such assets in exchange for the interest in the Liquidation Trust.  Accordingly, all parties must treat the Liquidation Trust as a grantor trust of which the holders of interests in the Liquidation Trust are the owners and grantors, and treat the Liquidation Trust beneficiaries as the direct owners of an undivided interest in the Liquidation Trust assets, consistent with their economic interests therein, for all federal income tax purposes.

Allocations of taxable income or loss of the Liquidation Trust will be allocated by reference to the manner in which an economic gain or loss would be borne immediately after a hypothetical liquidating distribution of the remaining Liquidation Trust assets.  The tax book value of the Liquidation Trust assets for purpose of this paragraph will equal their FMV on the date the Liquidation Trust assets are transferred to the Liquidation Trust, adjusted in accordance with tax accounting principles prescribed by the IRC, the applicable Treasury regulations, and other applicable administrative and judicial authorities and pronouncements.

-93-

As soon as reasonably practicable after the transfer of the Liquidation Trust assets to the Liquidation Trust, the Liquidation Trustee will make a good faith valuation of the Liquidation Trust assets, and will inform the Liquidation Trustee of its determination. The Liquidation Trustee will notify the holders of interests in the Liquidation Trust of the FMV determination in writing.  All parties to the Liquidation Trust must consistently use such valuation for all federal income tax purposes.  The valuation will be made available, from time to time, as relevant for tax reporting purposes.

Taxable income or loss allocated to a Liquidation Trust beneficiary will be treated as income or loss with respect to such Liquidation Trust beneficiary's undivided interest in the Liquidation Trust assets, and not as income or loss with respect to its prior respective Claim.  The character of any income and the character and ability to use any loss will depend on the particular situation of the Liquidation Trust beneficiary. Interests in the Liquidation Trust will not be transferable.

Subject to the satisfaction of certain dollar thresholds to making such distributions, the Liquidation Trust is generally obligated to make annual cash distributions to the holders of interests in the Liquidation Trust. However, the federal income tax obligations of a holder with respect to its interest in the Liquidation Trust are not dependent on the Liquidation Trust distributing any cash or other proceeds.  Thus, a holder may incur a federal income tax liability with respect to its allocable share of Liquidation Trust income even if the Liquidation Trust does not make a concurrent distribution to the holder.  In general, a distribution of cash by the Liquidation Trust will not be separately taxable to a Liquidation Trust beneficiary because the beneficiary is already regarded for federal income tax purposes as owning the underlying assets (and was taxed at the time the cash was earned or received by the Liquidation Trust). Further, the Liquidation Trust will provide for the distribution of the available liquidation proceeds to the holders on each Distribution Date. The Liquidation Trustee will determine proportionate shares of the Liquidation Trust's income and distributable liquidation proceeds by treating any holder of a Disputed Claim as a current holder of an Allowed Claim. The Liquidation Trustee will maintain an escrow of any amounts required to be set aside on account of Disputed Claims. Taxes on the income of the Liquidation Trust attributable to this escrow will be paid by the escrow.

The Liquidation Trustee will file with the IRS returns for the Liquidation Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a).  The Liquidation Trustee also will annually send to each holder of an interest in the Liquidation Trust a separate statement regarding the receipts and expenditures of the Liquidation Trust as relevant for federal income tax purposes and will instruct all such holders to use such information in preparing their federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their federal income tax returns.

ATLANTA:5397829.2

# XIII.
## FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS

### A.      FEASIBILITY OF THE PLAN

In connection with confirmation of the Plan, the Bankruptcy Court will be required to determine whether the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code, which means that the confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors.

The Plan itself proposes a Sale of substantially all of the Debtors' assets, and thus meets the feasibility test embodied in section 1129(a)(11) of the Bankruptcy Code. The Debtors believe that the Plan Sponsor can and will close the transaction and pay the Sale Consideration.  In that regard, the Plan Sponsor has provided an affidavit of satisfaction of the $85 million in Cliffs Community properties having been acquired, and the Plan Sponsor and its controlling members have provided evidence to the Debtors of their ability to fund the Mountain Park Facility and the Exit Facility and to make all Plan distributions due to be paid on the Effective Date. The Plan contemplates the liquidation of the Debtors. The Debtors should have sufficient cash to fund their activities through the closing of the Sale contemplated by the Plan. Accordingly, the Debtors believe that the Plan complies with the financial feasibility standard of section 1129(a)(11) of the Bankruptcy Code.

### B.      ACCEPTANCE OF THE PLAN

As a condition to Confirmation, the Bankruptcy Code requires that each Class of Impaired Claims vote to accept the Plan, except under certain circumstances.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the Plan. Thus, Holders of Claims in each of Classes 1, 3, 4, 5, 6 and 7 will have voted to accept the Plan only if two-thirds (2/3) in amount and a majority in number of the Claims actually voting in each Class cast their ballots in favor of acceptance. Holders of Claims who fail to vote are not counted as either accepting or rejecting the Plan.

### C.      BEST INTERESTS TEST

As noted above, even if a plan is accepted by each class of claims and interests, the Bankruptcy Code requires a bankruptcy court to determine that the plan is in the best interests of all holders of claims or interests that are impaired by the plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of

ATLANTA:5397829.2

a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor were liquidated under chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its chapter 11 case were converted to a chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtors' assets by chapter 7 trustee(s).

The amount of liquidation value available to unsecured creditors would be reduced by, first, the claims of secured creditors to the extent of the value of their collateral and, second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the chapter 7 cases and the chapter 11 cases. Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid administrative expenses incurred by the debtors in their chapter 11 cases that are allowed in the chapter 7 cases, litigation costs and claims arising from the operations of the debtor during the pendency of the chapter 11 case. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity security interests. The liquidation would also prompt the rejection of a large number of executory contracts and unexpired leases and thereby significantly enlarge the total pool of unsecured claims by reason of resulting rejection damages claims.

Once the bankruptcy court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under the plan, then the plan is not in the best interests of creditors and equity security holders.

## D.    LIQUIDATION ANALYSIS

For purposes of the best interests test, in order to determine the amount of liquidation value available to Creditors, the Debtors, with the assistance of their financial advisors, prepared a liquidation analysis, annexed hereto as **Exhibit D** (the "Liquidation Analysis"), which concludes that in the event of a liquidation of the Debtors' assets under chapter 7, the aggregate value to be realized by the Debtors' estates would be in the range of $7,154,000 to $9,303,000. All such value would be distributed to pay DIP Facility Claims, accrued unpaid post-petition professional fees, property taxes, sales and use taxes, post-petition trade accounts payable, and a portion of the Indenture Trustee Claims. No other Holder of a Claim would receive a distribution. These conclusions are premised upon the

assumptions set forth in **Exhibit D**, which the Debtors and GGG Partners, LLC believe are reasonable.

The Debtors believe that any liquidation analysis with respect to the Debtors is inherently speculative. The Liquidation Analysis for the Debtors necessarily contains estimates of the net proceeds that would be received from a forced or orderly sale of assets and/or business units, as well as the amount of Claims that would ultimately become Allowed Claims. Claims estimates are based solely upon the Debtors' books and records.

The liquidation analysis assumes that the highest and best use of the Real Property Collateral is as operating country clubs.  Operating as country clubs, the Real Property Collateral does not generate sufficient income to service the Note Obligations, and is worth substantially less than the obligations of the Debtors under the DIP Loan, the Bridge Loan and the Note Holder Claims, and no party has argued otherwise.  The Debtors do not have a current appraisal of the Prepetition Note Collateral. The Debtors have received an estimate of $70,000 to $100,000 to complete current appraisals which would take at least 30 days to complete.  The Debtors do not have the money or time to obtain appraisals at this point in time, and pursuant to the Cash Collateral Order, are not permitted to value the Prepetition Note Collateral.  The Debtors conducted an auction and no party other than the Plan Sponsor made a bid for the Real Property Collateral. The values set forth in the Liquidation Analysis are the Debtors' best estimate of the liquidation value of the Real Property Collateral and is based, in part, on an EBITDA multiple analysis.

No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the Liquidation Analysis. In preparing the Liquidation Analysis, the Debtors have projected an amount of Allowed Claims that represents their best estimate of the chapter 7 liquidation dividend to Holders of Allowed Claims. The estimate of the amount of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims under the Plan.

E.    **APPLICATION OF THE "BEST INTERESTS" OF CREDITORS TEST TO THE LIQUIDATION ANALYSIS AND THE VALUATION**

It is impossible to determine with certainty the value each Holder of a Claim will receive under the Plan as a percentage of any Allowed Claim. Notwithstanding the difficulty in quantifying recoveries with precision, the Debtors believe that the financial disclosures contained herein imply a greater recovery to Holders of Claims in Impaired Classes than the recovery available in chapter 7 liquidation. Accordingly, the Debtors believe that the "best interests" test of section 1129 of the Bankruptcy Code is satisfied.

F.    **CONFIRMATION WITHOUT ACCEPTANCE OF ALL IMPAIRED CLASSES: THE "CRAMDOWN" ALTERNATIVE**

In the event any Class of Impaired Claims rejects the Plan, the Debtors may seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code.

Section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if all impaired classes do not accept the plan, as long as at least one impaired class of claims has accepted it. The Bankruptcy Court may confirm a plan at the request of a debtor if the plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not accepted the plan. A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank. The Debtors believe the Plan does not discriminate unfairly with respect to the Claims and Interests in Classes 1, 3, 4, 5, 6 and 7.

A plan is "fair and equitable" as to holders of unsecured claims that reject the plan if the plan provides either that: (a) each holder of a claim of such class receives or retains on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (a) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled or the value of such interest or (b) that the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property at all.

The Debtors believe that they could, if necessary, meet the "fair and equitable" requirements of section 1129(b) of the Bankruptcy Code with respect to Holders of Claims and Interests in Classes 1, 3, 4, 5, 6 and 7.

## XIV.
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors believe that the Plan affords Holders of Claims in Classes 1, 3, 4, 5, 6 and 7 the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such Holders. If, however, the requisite acceptances are not received, or the Plan is not confirmed and consummated, the theoretical alternatives include (a) formulation of an alternative Chapter 11 plan or plans or (b) liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

ATLANTA:5397829.2

A.     **ALTERNATIVE PLAN(S) OF LIQUIDATION**

If the requisite acceptances are not received or if the Plan is not confirmed, the Debtors (or, if the Debtors' exclusive periods in which to file and solicit acceptances of a plan of reorganization have expired, any other party-in-interest) could attempt to formulate and propose a different plan or plans of liquidation. Such a plan or plans might involve an orderly liquidation of assets. The Debtors believe that the Plan enables Creditors to realize the greatest possible value under the circumstances and has the greatest chance to be confirmed and consummated.

B.     **LIQUIDATION UNDER CHAPTER 7**

If no plan is confirmed, the Debtors' cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. It is impossible to predict with certainty how the proceeds of the liquidation would be distributed to the respective Holders of Claims against or Interests in the Debtors. It is, however, possible to predict that the Secured Lenders would assert that they held security interests in substantially all assets to be liquidated, likely resulting in nothing to distribute to any other Class of Claims or Interests.

The Debtors believe that liquidation under chapter 7 would cause a substantial diminution in the Debtors' Estates given the substantial premium in the enterprise value of their businesses over the liquidation value of their assets, and the additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist such trustees. The assets available for distribution to Creditors would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, arising by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of operations and the failure to realize the greater going concern value of the Debtors' assets. More importantly, conversion to a chapter 7 liquidation would likely result in the immediate cessation of the Debtors' businesses, as most chapter 7 trustees are disinclined to continue operations.

**XV.**
**THE SOLICITATION; VOTING PROCEDURES**

A.     **PARTIES IN INTEREST ENTITLED TO VOTE**

In general, a holder of a claim or interest may vote to accept or to reject a plan if the claim or interest is "allowed," which means generally that no party in interest has objected to such claim or interest, and (b) the claim or interest is "impaired" by the plan but entitled to receive or retain property under the plan.

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (a) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the

holder thereof or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan and, accordingly, holders of such claims and interests do not actually vote on the plan. If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the plan.

## B.    CLASSES ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN

Holders of Claims in Classes 1, 3, 4, 5, 6 and 7 are entitled to vote to accept or reject the Plan. By operation of law, each Unimpaired Class of Claims is deemed to have accepted the Plan and each Impaired Class of Claims or Interests that will receive nothing under the Plan is deemed to have rejected the Plan and, therefore, the Holders of Claims or Interests in such Classes are not entitled to vote to accept or reject the Plan. Consequently, Class 2 is deemed to have accepted the Plan and Class 8 is deemed to have rejected the Plan and, therefore, none of the Holders of Claims or Interests in such Class are entitled to vote to accept or reject the Plan.

## C.    SOLICITATION ORDER

Upon approval of this Disclosure Statement, the Bankruptcy Court entered an order that, among other things, determines the dates, procedures and forms applicable to the process of soliciting votes on the Plan and establishes certain procedures with respect to the tabulation of such votes (the "Solicitation Order"). Parties in interest may obtain a copy of the Solicitation Order through the Bankruptcy Court's electronic case filing system, by downloading the Solicitation Order from the Debtors' case website at www.bmcgroup.com/cliffs or by making written request upon the Debtors' counsel or Voting Tabulation Agent.

## D.    WAIVERS OF DEFECTS, IRREGULARITIES, ETC.

All questions with respect to the validity, form, eligibility (including time of receipt), acceptance and revocation or withdrawal of ballots will be determined by the Bankruptcy Court. As indicated below under "Withdrawal of Ballots; Revocation," effective withdrawals of ballots must be delivered to the Voting Agent prior to the Voting Deadline. The Debtors reserve the absolute right to contest the validity of any such withdrawal. The Debtors also reserve the right to seek rejection of any and all ballots not in proper form. The Debtors further reserve the right to seek waiver of any defects or irregularities or conditions of delivery as to any particular ballot. Neither the Debtors nor any other Person will be under any duty to provide notification of defects or irregularities with respect to deliveries of ballots nor will any of them incur any liabilities for failure to provide such notification. Ballots previously furnished (and as to which

ATLANTA:5397829.2

any irregularities have not theretofore been cured or waived) may be invalidated by the Bankruptcy Court.

## E.    WITHDRAWAL OF BALLOTS; REVOCATION

Any party who has delivered a valid ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Voting Tabulation Agent at any time prior to the Voting Deadline. A notice of withdrawal, to be valid, must (a) contain the description of the Claim(s) to which it relates and the aggregate principal amount represented by such Claim(s), (b) be signed by the withdrawing party in the same manner as the ballot being withdrawn, (c) contain a certification that the withdrawing party owns the Claim(s) and possesses the right to withdraw the vote sought to be withdrawn and (d) be received by the Voting Tabulation Agent in a timely manner via regular mail, at BMC Group Attn: Cliffs Ballot Processing, P.O. Box 3020, Chanhassen, MN 55317-3020, or via overnight courier or hand delivery at BMC Group, Inc., Attn: Cliffs Ballot Processing, 18675 Lake Drive East, Chanhassen, MN 55317-3020. The Debtors intend to consult with the Voting Tabulation Agent to determine whether any withdrawals of ballots were received and whether the requisite acceptances of the Plan have been received. As stated above, the Debtors expressly reserve the absolute right to contest the validity of any such withdrawals of ballots.

Unless otherwise directed by the Bankruptcy Court, a purported notice of withdrawal of ballots which is not received in a timely manner by the Voting Tabulation Agent will not be effective to withdraw a previously cast ballot.

Any party who has previously submitted to the Voting Tabulation Agent prior to the Voting Deadline a properly completed ballot may revoke such ballot and change its vote by submitting to the Voting Tabulation Agent prior to the Voting Deadline a subsequent properly completed ballot for acceptance or rejection of the Plan. In the case where more than one timely, properly completed ballot is received, only the ballot that bears the latest date will be counted for purposes of determining whether the requisite acceptances have been received.

## F.    VOTING RIGHTS OF DISPUTED CLAIMANTS

Holders of Disputed Claims in Classes 1, 3, 4, 5, 6 and 7 whose Claims are (a) asserted as wholly unliquidated or wholly contingent in Proofs of Claim filed prior to the Voting Record Date (except for Holders of Contingent Club Member Claims) or (b) whose Claims are asserted in Proofs of Claim as to which an objection to the entirety of the Claim is pending as of the Voting Record Date (collectively, the "Disputed Claimants") are not permitted to vote on the Plan except as provided in the Solicitation Order. Pursuant to the procedures outlined in the Solicitation Order, Disputed Claimants may obtain a ballot for voting on the Plan only by filing a motion under Bankruptcy Rule 3018(a) seeking to have their Claims temporarily Allowed for voting purposes (a "Rule 3018 Motion"). Any such Rule 3018 Motion must be filed and served upon the Debtors' counsel and

the Voting Agent no later than 5:00 p.m. (Eastern time) on the seventh (7th) day after the later of (i) the Solicitation Date and (ii) the date of service of an objection, if any, to such claim. The ballot of any creditor filing such a motion, will not be counted unless temporarily allowed by the Bankruptcy Court for voting purposes, after notice and a hearing. Any party timely filing and serving a Rule 3018 Motion will be provided a ballot and be permitted to cast a provisional vote to accept or reject the Plan. If and to the extent that the Debtors and such party are unable to resolve the issues raised by the Rule 3018 Motion prior to the Voting Deadline established by the Bankruptcy Court, then at the Confirmation Hearing the Bankruptcy Court will determine whether the provisional ballot should be counted as a vote on the Plan. Nothing herein affects the Debtors' right to object to any Proof of Claim after the Distribution Record Date. With respect to any such objection, the Debtors may request that any vote cast by the Holder of the Claim subject to the objection be disallowed and not counted in determining whether the requirements of section 1126(c) of the Bankruptcy Code have been met.

## G.    FURTHER INFORMATION; ADDITIONAL COPIES

If you have any questions or require further information about the voting procedures for voting your Claim or about the package of materials you received, or if you wish to obtain an additional copy of the Plan or this Disclosure Statement, or any exhibits or appendices to such documents (at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d) or the Solicitation Order), please contact the Voting Tabulation Agent at:

**If by regular mail:**

BMC Group, Inc.
Attn:  Cliffs Ballot Processing
P.O. Box 3020
Chanhassen, MN  55317-3020

**If by overnight courier or hand delivery:**

BMC Group, Inc.
Attn:  Cliffs Ballot Processing
18675 Lake Drive East
Chanhassen, MN  55317-3020

**If by telephone:**

(888) 909-0100

ATLANTA:5397829.2

## XVI.
## RECOMMENDATION

Based on the foregoing analysis of the Debtors and the Plan, the Debtors believe that the best interests of all parties would be served through confirmation of the Plan. **ALL CREDITORS ARE URGED TO VOTE TO "ACCEPT" THE PLAN.**

(The remainder of this page left blank intentionally.)

ATLANTA:5397829.2

The Cliffs Club & Hospitality Group, Inc.

By: _____

Name: Katie S. Goodman
Title:   Chief Restructuring Officer


CCHG Holdings, Inc.

By: _____

Name: Katie S. Goodman
Title:   Chief Restructuring Officer


The Cliffs at Mountain Park Golf & Country Club, LLC
By:     THE CLIFFS CLUB & HOSPITALITY GROUP, INC., AS SOLE MEMBER

By: _____
Name: Katie S. Goodman
Title:   Chief Restructuring Officer


The Cliffs at Keowee Vineyards Golf & Country Club, LLC
By:     THE CLIFFS CLUB & HOSPITALITY GROUP, INC., AS SOLE MEMBER

By: _____
Name: Katie S. Goodman
Title:   Chief Restructuring Officer


The Cliffs at Walnut Cove Golf & Country Club, LLC
By:     THE CLIFFS CLUB & HOSPITALITY GROUP, INC., AS SOLE MEMBER

By: _____
Name: Katie S. Goodman
Title:   Chief Restructuring Officer

The Cliffs at Keowee Falls Golf & Country Club, LLC
By:     THE CLIFFS CLUB & HOSPITALITY GROUP, INC., AS SOLE MEMBER

By: _____
Name: Katie S. Goodman
Title:   Chief Restructuring Officer

The Cliffs at Keowee Springs Golf & Country Club, LLC
By:     THE CLIFFS CLUB & HOSPITALITY GROUP, INC., AS SOLE MEMBER

By: _____
Name: Katie S. Goodman
Title:   Chief Restructuring Officer


The Cliffs at High Carolina Golf & Country Club, LLC
By:     THE CLIFFS CLUB & HOSPITALITY GROUP, INC., AS SOLE MEMBER

By: _____
Name: Katie S. Goodman
Title:   Chief Restructuring Officer


The Cliffs at Glassy Golf & Country Club, LLC
By:     THE CLIFFS CLUB & HOSPITALITY GROUP, INC., AS SOLE MEMBER

By: _____
Name: Katie S. Goodman
Title:   Chief Restructuring Officer


The Cliffs Valley Golf & Country Club, LLC
By:     THE CLIFFS CLUB & HOSPITALITY GROUP, INC., AS SOLE MEMBER

By: _____
Name: Katie S. Goodman
Title:   Chief Restructuring Officer


Cliffs Club & Hospitality Service Company, LLC
By:     THE CLIFFS CLUB & HOSPITALITY GROUP, INC., AS SOLE MEMBER

By: _____
Name: Katie S. Goodman
Title:   Chief Restructuring Officer


(The remainder of this page left blank intentionally.)

Dated: June 30, 2012        Respectfully submitted,

/s/ Däna Wilkinson
Däna Wilkinson
District Court I.D. No. 4663
**LAW OFFICE OF DÄNA WILKINSON**
365-C East Blackstock Road
Spartanburg, SC 29301
864.574.7944 (Telephone)
864.574.7531 (Facsimile)
danawilkinson@danawilkinsonlaw.com

-and-

/s/ J. Michael Levengood
Gary W. Marsh
Georgia Bar No. 471290
J. Michael Levengood
Georgia Bar No. 447934
Bryan E. Bates
Georgia Bar No. 140856

**MCKENNA LONG & ALDRIDGE LLP**
303 Peachtree Street, Suite 5300
Atlanta, Georgia 30308
404-527-4000 (phone)
404-527-4198 (fax)
gmarsh@mckennalong.com
mlevengood@mckennalong.com
bbates@mckennalong.com

*Attorneys for Debtors and Debtors in Possession*